## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | Chapter 11 |
| OLDE PRAIRIE BLOCK OWNER, LLC, | Case No. 10-22668 |
| Debtor. | Hon. Jack B. Schmetterer |

## MOTION OF CENTERPOINT PROPERTIES TRUST TO DISMISS CHAPTER 11 CASE FOR CAUSE OR, IN THE ALTERNATIVE, TO LIFT THE AUTOMATIC STAY TO PERMIT FORECLOSURE ACTION TO PROCEED AND RETAINING COURT-APPOINTED RECEIVER

CenterPoint Properties Trust ("CenterPoint"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 1112(b), hereby moves this Court (the "Motion") for an order dismissing the above-captioned chapter 11 case of Olde Prairie Block Owner, LLC ("OBPO" or the "Debtor") for "cause" or, in the alternative, lifting the automatic stay pursuant to 11 U.S.C. § 362(d)(1) or (d)(2) to permit CenterPoint to conclude a foreclosure action pending against the Debtor in the Circuit Court of Cook County, Illinois (the "Circuit Court"), Case No. 09 CH 08190 (the "Foreclosure Action") and retaining the receiver (the "Receiver") appointed by the Circuit Court in the Foreclosure Action pursuant to 11 U.S.C. § 543(d). In support of this Motion, CenterPoint respectfully states as follows:

### PRELIMINARY STATEMENT

This chapter 11 case was filed as a bare litigation tactic on the eve of a summary judgment hearing in the Foreclosure Action, despite final, non-appealable state court rulings appointing the Receiver, more than one year ago, and two prior state court rulings dismissing the Debtor's frivolous counterclaims against CenterPoint. Indeed, the Debtor has already been stripped of any right to collect rents from, possess, administer, or manage its principal asset, a defunct hotel and retail development project in Chicago (the "Property"). The same state court

has further confirmed CenterPoint's right to prosecute, defend and settle the Debtor's only other significant asset, comprised of a pending Condemnation Action (as defined below) affecting a significant portion of the Property, as more fully described below.  Pursuant to these final state court rulings, the Debtor's has only bare legal title to these two assets, with no ability to operate or control them pending completion of the Foreclosure Action commenced in February of 2009.

The Debtor's attempt to forestall the Foreclosure Action and the final dismissal of its frivolous counterclaims on the eve of a summary judgment hearing is a classic "hail mary" tactic intended to re-litigate issues already disposed of by final state courts orders, or which otherwise are so closely intertwined with the state court's prior rulings that it would violate the well-settled *Rooker-Feldman* doctrine that prohibits federal courts from acting as *de facto* appellate courts for state court rulings.  In essence, this chapter 11 case is a classic "single-asset case bad faith filing" that must be dismissed for "cause" under section 1112(b) of the Bankruptcy Code (as defined below).

In the alternative, the same facts described herein give rise to "cause" sufficient for this Court to grant relief from the automatic stay under section 362(d)(1) to permit CenterPoint to conclude the final chapter of the Foreclosure Action.  The Property is generating only nominal rents, collected by the court-appointed Receiver, that are admittedly insufficient by any measure to meet the Debtor's obligations to its creditors.  Further, not only is a significant portion of the Property the subject of pending condemnation proceedings, the Property has been cited for substantial public safety violations, which the court-appointed Receiver (and the Debtor) lacks sufficient funds to remedy, as detailed in a recent motion filed by the Receiver in the Foreclosure Action.  The commencement and duration of this chapter 11 case is not only detrimental to CenterPoint, but also to the public at large.  Finally, in the prevailing bleak economic

environment, especially in the commercial real estate sector, the Debtor has no realistic prospect of refinancing its ballooning $48 million debt to CenterPoint, or otherwise confirming a plan of reorganization in the near future, thereby justifying the granting of relief from stay under section 362(d)(2) of the Bankruptcy Code.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested in the Motion are sections 1112(b), 362(d) and 543(d) of chapter 11 of title 11 of United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

## BACKGROUND

3.      On May 18, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in this chapter 11 case.

A.      **The CenterPoint Note and Mortgage**

5.      On or about February 22, 2008, OPBO executed a promissory note (the "Note") in the principal amount of $37,127,667.03, evidencing a loan from CenterPoint to OPBO secured by the Property.  The Note matured and was due and payable in full on February 21, 2009 (the "Maturity Date").  *See Memorandum Opinion and Order Dated September 23, 2009 in CenterPoint Properties Trust v. Old Prairie BlockOwner, LLC,* Case No. 09 CH 8190, Circuit Court of Cook County, Illinois County Department, Chancery Division Mortgage

Foreclosure/Mechanics Lien Section (hereinafter referred to as the "CPT Decision I") at 1 (citing facts pled by Debtor). A true and correct copy of CPT Decision I is attached hereto as Exhibit A.

6.    Payment of the Note is secured by a mortgage dated February 22, 2008 (the "Mortgage"), that covers the Property, consisting of 225,000 square feet of commercial real estate located at 230 and 330 East Cermak Road, Chicago, Illinois, and OPBO's interest as lessee pursuant to a ground lease of certain other commercial real estate located on South Martin Luther King Drive, South Cottage Grove Avenue and South Prairie Avenue in Chicago, Illinois. CPT Decision I at 1. The Property is located near McCormick Place, on land zoned for hotel and retail development. In accordance with this Court's Standing Order No. 4 dated October 1, 2008, with respect to motions for stay relief, copies of the recorded Mortgage and Note are attached as Exhibits A and B, respectively, to the complaint filed in the Foreclosure Action (the "Foreclosure Complaint"), which is attached as Exhibit B hereto.

7.    The Debtor failed to pay the Note on the Maturity Date, as a result of which the Note has been in default since February of 2009. To date, no payments have been made to CenterPoint by OPBO as required by the Note and Mortgage. As of May 21, 2010, $48,438,758.49 is due, which amount includes the entire outstanding principal balance plus interest, late charges, fees, expenses and costs, but excludes attorneys' fees and court costs. Interest is accruing at the default annual rate of 16.89%, or *$22,504.13 per day* through the end of May 2010.

8.    *The amount of rent currently being collected by the court-appointed Receiver from the Property is only $11,500.00 per month, before deduction of total monthly expenses in the range of $7,600 to $9,100 per month. See* Receiver's Interim Report dated May 3, 2010 filed in the Foreclosure Action, a true and correct copy of which is attached hereto as Exhibit C.

(hereinafter, the "Receiver's Interim Report"). Prior to the Petition Date, the Receiver reported a current balance in his operating account of $33,618.79. *Id.* This amount is woefully inadequate to meet the Debtor's obligations to its creditors in excess of $48 million.

**B.     OPBO's Development History & Prior Maturing Loan**

9.     OPBO has been trying to develop the Property since 1995, planning to build a large hotel and retail complex on the site and has since then engaged in numerous activities aimed at developing the Property. CPT Decision I at 2 (citing facts pled by Debtor). To that end, it granted thirteen (13) acres of the Property to the Metropolitan Pier and Exposition Authority (the "MPEA") to build a parking garage in exchange for the MPEA's agreement to lease 450 parking spaces in the garage to OPBO. *Id.*

10.     In the middle of 2007, however, the City of Chicago was prompted by the MPEA to halt approval of OPBO's development activities while the MPEA prepared to file a condemnation suit to acquire a portion of the Property. In the meantime, as OPBO's previous loan on the Property approached maturity in February 2008, its lender refused to renew or extend the financing package.

**C.     Negotiation of the CenterPoint Loan**

11.     In January 2008, OPBO and CenterPoint executed a term sheet for a potential refinancing transaction, which term sheet incorporated an explicit disclaimer that the term sheet was not a binding commitment by CenterPoint to provide a loan. Specifically, the term sheet stated:

> This Term Sheet does not constitute a contract or commitment or agreement by Lender to provide the Loans or any other financing to Borrowers. Upon Borrower's acceptance of this proposal, Borrowers shall not engage in any discussions concerning the financing of the Asset other than the transaction contemplated by this letter until such time as Borrowers reasonably conclude that a mutually satisfactory Loan Agreement is not achievable.

CPT Decision I at 2 (citing facts pled by Debtor).

12.    Shortly after execution of the Term Sheet, OPBO ceased negotiating with other parties because it thought it had a deal with CenterPoint. *Id.* The closing of the contemplated transaction with CenterPoint was scheduled for February 25, 2008. *Id.*

13.    Prior to closing, CenterPoint informed OPBO that CenterPoint would not extend the loan unless certain terms were changed. Specifically, CenterPoint would not grant the loan unless OPBO agreed that: (i) CenterPoint would control the condemnation case; (ii) Pam Gleichman signed as co-guarantor; (iii) the rate of interest was increased from 12.5% to12.89% per year, and (iv) a $1.85 million reimbursement was removed from the deal. OPBO agreed to the changed terms and proceeded with the closing of the Loan. *Id* at 2-3.

14.    On or about June 20, 2008, the MPEA filed a condemnation complaint to acquire 55,000 square feet of the Property, Case No. 08 L 50636, a copy of which is attached hereto as Exhibit D (the "Condemnation Action"). Both OPBO and CenterPoint stepped in to defend the case, but CenterPoint invoked the "right to control" clause in the loan contract. *Id.* at 3. Specifically, section 1.5(a) of the Mortgage states "Notwithstanding anything to the contrary contained herein, Lender shall have the right, at Borrower's sole cost and expense, to exclusive control, prosecution and defense of any condemnation proceedings." (the "Condemnation Clause"). *See* Mortgage, Exhibit B to Foreclosure Complaint, at 14.

15.    Despite the Condemnation Clause, OPBO has attempted to frustrate CenterPoint's exclusive right to control the defense of the Condemnation Action. OPBO admits that it engaged in settlement discussions with the MPEA, without notice to CenterPoint, and alleges that the MPEA agreed to terms whereby the MPEA would pay OPBO $22 million to settle the Condemnation Action and OPBO would be designated lead developer of the Property. CPT

Decision I at 3. However, according to OPBO, the MPEA later rejected this settlement. *Id.* The Debtor further alleges that if it had received these funds, it would have been able to pay CenterPoint, without explaining the source of where it would obtain the balance of the funds due to pay the original $37 million Mortgage. *Id.*

### D. The Foreclosure Action & Receiver Appointment

16.     Subsequent to OPBO's default under the Note, CenterPoint filed the Foreclosure Action on February 24, 2009, to foreclose on the Mortgage on the Property. Shortly thereafter, on May 29, 2009, the Circuit Court appointed a receiver to manage the Property (the "Receiver"), finding that CenterPoint had demonstrated a reasonable probability of prevailing on the merits in the Foreclosure Action under applicable state law. Attached hereto as Exhibit E is the order appointing the Receiver (the "Receivership Order").

17.     OPBO immediately challenged the Receivership Order by filing an interlocutory appeal. It also requested that the Circuit Court stay the enforcement of the Receivership Order based on its assertion that OPBO would sustain an irreparable injury from purportedly diminished prospects of refinancing the Mortgage. That motion was denied.

18.     On February 10, 2010, the Appellate Court of Illinois, First District (the "Appellate Court"), affirmed the Receivership Order in *CenterPoint Properties Trust v. Olde Prairie Block Owner, LLC*, 923 N.E.2d 878 (Ill. App. Ct. 1st Dist. 2010) (the "Receiver Affirmation Ruling"). A true and correct copy of the Receiver Affirmation Ruling is attached hereto as Exhibit F.

19.     The Appellate Court relied in part on an interim report by the Receiver stating that under OPBO's management, real estate taxes had gone unpaid, rent collection was not maximized, insurance coverage was inadequate and necessary repairs to prevent water damage and vagrant access had not been made. *Id.* at 16. The Appellate Court also noted the fact that

prior to the appointment of a receiver, OPBO, without notice to CenterPoint as required under the Mortgage, had entrusted management of the Property to a certain Stanford Management, LLC, an entity based in Portland, Maine, with no apparent commercial management experience or registration to do business in Illinois. *Id.* at 19.

### E.    The Debtor's Frivolous Counterclaims

20.    On May 29, 2009, just hours prior to the hearing on CenterPoint's motion to appoint the Receiver, OPBO filed a counterclaim in the Foreclosure Action (the "Counterclaim"), requesting rescission of the Mortgage on the basis of alleged financial duress on the part of CenterPoint in connection with refinancing the Property, and including a second count alleging that CenterPoint had violated the Illinois Consumer Fraud and Deceptive Practices Act.

21.    The Circuit Court dismissed the Counterclaim on September 23, 2009. *See* CPT Decision I at 6, 8.   In *CPT Decision I*, the Circuit Court expressly found that OPBO had not stated a cause of action for rescission, which must include "elements of trickery, deceit and moral wrongdoing.   Rescission claims do not stem merely from bad business deals or harsh bargaining tactics." *Id.* at 5.  The Circuit Court stated that OPBO "seems to have taken its best shot at the rescission counterclaim, but prudence dictates that the court provide it an opportunity to amend." *Id.* at 6.

22.    OPBO  then  filed  a  first  amended  counterclaim  (the  "First Amended Counterclaim") on or about October 23, 2009.  The First Amended Counterclaim reasserted both counts in its original Counterclaim and added two counts alleging breach of contract and consumer fraud, respectively.

23.    The First Amended Counterclaim was also summarily dismissed on January 14, 2010, again with leave to amend. *See Memorandum Opinion and Order Dated January 14, 2010*

*in CenterPoint Properties Trust v. Old Prairie BlockOwner, LLC*, Case No. 09 CH 8190, Circuit Court of Cook County, Illinois County Department, Chancery Division Mortgage Foreclosure/Mechanics Lien Section (hereinafter referred to as the "CPT Decision II") at 2. ("Although again the court believes that [OPBO] has taken its best shot, the court will allow [OPBO] to take another opportunity to plead a valid counterclaim if it truly believes that it can escape the deficiencies expressed in this and the prior opinion."). A true and correct copy of CPT Decision II is attached hereto as Exhibit G.

24.    On February 22, 2010, OPBO proceeded to file a second amended counterclaim (the "Second Amended Counterclaim"), requesting rescission of the Mortgage for the third time based on substantially the same facts, even though the Debtor was and remains clearly unable to restore CenterPoint to the "status quo ante" by repaying the monies borrowed from CenterPoint. While dropping the counts alleging violation of the Illinois Consumer Fraud and Deceptive Practices Act, breach of contract and consumer fraud, the OPBO's Second Amended Counterclaim added a new count for damages stemming from CenterPoint's alleged tortious interference with OPBO's expectancy of settling the Condemnation Action with MPEA. This claim is patently unsustainable, however, as it is clearly contrary to the express terms of the Mortgage, and in particular the Condemnation Clause.

25.    CenterPoint filed a motion to dismiss (the "Dismissal Motion") the Second Amended Counterclaim, which was scheduled to be heard together with CenterPoint's motion for summary judgment (the "Summary Judgment Motion") in the Foreclosure Action on May 19, 2010. A true and correct copy of CenterPoint's Dismissal Motion and related pleadings and memoranda are attached hereto as Composite Exhibit H. A true and correct copy of CenterPoint's Summary Judgment Motion is attached as Composite Exhibit I. OPBO filed this

chapter 11 case barely twenty-four hours prior to the scheduled hearing on the Dismissal Motion and Summary Judgment Motion.

### F.    The City of Chicago Files the Building Code Action

26.    On or about April 1, 2010, the City of Chicago filed a complaint with respect to municipal building code violations at the portion of the Property located at 320-330 East Cermak Road, Chicago, Illinois, Case No. 10 M1 400839, a copy of which is attached hereto as Exhibit J (the "Building Code Action"). According to the complaint in the Building Code Action, among other things, a failure to maintain exterior walls of the building has caused concrete, wood and broken window glass to fall. The first count of the Building Code Complaint asserts that the defendant has failed to provide, in violation of municipal code sections applicable to buildings higher than 80 feet above grade, a critical examination report signed by an Illinois licensed architect or structural engineer.

27.    An estimate obtained by the Receiver for a review of the building's exterior facades as well as the required critical examination report is approximately $40,000, which cost the Debtor cannot afford to pay. OPBO simply does not have adequate resources to maintain the Property; nor has its sole equity holder stepped up to pay these costs. *See* Receiver's Interim Report at 1-3.

28.    Proceedings in the Building Code Action were continued at the request of the Receiver until July 21, 2010, because he lacks the necessary funds to address all of the asserted code violations and believes that the conclusion of the Foreclosure Action would permit CenterPoint as the new owner to fund the costs of compliance. In the meantime, the Receiver filed a "Motion for Authority To Respond to Building Code Violation Suit And To Effect Required Repairs and Examinations" (the "Receiver's Code Violation Motion") in the Circuit Court, which was also scheduled to be heard on May 19, 2010, one day after the Petition Date in

this chapter 11 case. A true and correct copy of the Receiver's Code Violation Motion is attached as Exhibit K hereto.

29.    The Receiver's Code Violation Motion, CenterPoint's Dismissal Motion with respect to OPBO's Second Amended Counterclaim and CenterPoint's Summary Judgment Motion, all scheduled to be heard by the Circuit Court on May 19, 2010, have been stayed on account of the filing of this chapter 11 case.

## RELIEF REQUESTED

30.    CenterPoint respectfully requests that this Court dismiss this chapter 11 case for cause pursuant to section 1112(b). This chapter 11 case is a mere continuation of a two-party dispute between CenterPoint and OPBO and was clearly filed in bad faith to forestall the Circuit Court's ruling on CenterPoint's Summary Judgment Motion in the Foreclosure Action, which has been pending since February 24, 2009.

31.    In the alternative, CenterPoint requests that the Court grant relief from the automatic stay for "cause" under section 362(d)(1) to permit the Foreclosure Action to proceed to its conclusion. The Circuit Court is the proper forum in which to adjudicate the respective rights and interests of the Debtor and CenterPoint in the Property, which are determined by Illinois state law, and indeed the Circuit Court has made significant progress towards this goal throughout the pendency of the Foreclosure Action by issuing no less than three final, non-appealable Memorandum Opinions affecting the rights of the two parties with respect to the Property, including the Receivership Order, the Receiver Affirmation Ruling, and the CPT Decision I and CPT Decision II rulings. Further, it is clear from the pending Condemnation Action and Building Code Action that CenterPoint's interest in the Property is not adequately

protected. Both Actions are adverse to the Property and continue to materially impair its inherent value.

32.     Alternatively, CenterPoint requests that the Court grant relief from the automatic stay under section 362(d)(2). On information and belief, the Debtor has nominal or no equity in the Property. This chapter 11 case is a classic single asset case in which, despite a thin argument that reorganization is not possible without that single asset, the facts are such that no reasonable prospect for reorganization exists. The meager monthly gross rents generated by the Property of $11,500 are insufficient to pay even one day of accruing interest, even before deducting the approximately $7,600 to $9,100 in monthly operating expenses reported by the Receiver. *See* Receiver's Interim Report at 4. Net rents in the range of $3,900 to $2,400 *per month* are even less sufficient.

33.     Pending this Court's final ruling on this Motion, CenterPoint requests that the Receivership Order remain in place, and the Receiver be authorized to continue to discharge all duties provided thereunder, including, without limitation, the expenditure of funds of the estate as necessary to maintain the Property and remedy such municipal building code violations as are affordable given the *de minimis* rents generated by the Property. The Receiver should also be authorized, as custodian of the Property, to continue to discharge its reporting obligations to the Circuit Court, and submit duplicate reports to this Court. Such authorization effectuates the purposes of the Bankruptcy Code and is well within the Court's power to grant under 11 U.S.C. § 105.

34.     CenterPoint further requests that an immediate hearing be set on this Motion given the urgency of the matters alleged in the Building Code Action, including the threat to public safety created by the multiple violations at the Property.

## LEGAL SUPPORT FOR RELIEF REQUESTED

**A.**   **Cause Exists to Warrant Dismissal of this Case as a Bad-Faith Litigation Tactic**

35.    In general, a party-in-interest may file a motion to dismiss a chapter 11 case "for cause." 11 U.S.C. § 1112(b).  If, after notice and a hearing, cause is established, a bankruptcy court must dismiss the case unless the court specifically finds that the requested dismissal is not in the best interest of creditors and the estate.  *Id.*  A bankruptcy court possesses broad discretion to dismiss a chapter 11 case for cause under § 1112(b).  *Matter of Woodbrook Associates*, 19 F.3d 312, 316 (7th Cir. 1994).

36.    Furthermore, a chapter 11 case can be dismissed at any time.  *Id.* at 317. "Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired," nor must they "incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated." *Id.*  In sum, "[t]he very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless." *Id.*

37.    Courts in the Seventh Circuit consider bad faith to be an acceptable basis for conversion or dismissal. *In re Jartran, Inc.*, 886 F.2d 859, 867 (7th Cir. 1989).  In determining whether a bankruptcy petition has been filed in bad faith, courts look at the "totality of circumstances." *See, e.g., In re Salvador*, 2009 Bankr. LEXIS 3637 (Bankr. N.D. Ill. Nov. 10, 2009) (debtor had no legitimate reorganizational purpose where chapter 11 petition filed to avoid paying state court judgment); *In re Local Union 722 Int'l Bd. of Teamsters*, 414 B.R. 443 (Bankr. N.D. Ill. 2009) (dismissal of chapter 11 case warranted because debtor could not in good faith have proposed a plan overcoming objection of creditor holding over two-thirds in amount of claims).

38.    The timing of the bankruptcy filing, number of creditors and whether the case is merely a two-party dispute are relevant to the good-faith inquiry. *See, e.g., In re Liptak*, 304 B.R. 820 (Bankr. N.D. Ill. 2004). In *Liptak*, the court dismissed a chapter 11 case on the basis of findings that it was predominantly a two-party dispute, and the debtor had only two other creditors whose claims were *de minimis* by comparison. *Id.* at 831-2. In addition, the court found that the timing of the filing was "indicative of an intent to delay the primary creditor" on the eve of its exercise of state-law collection rights, without posting an appeal bond, and the bankruptcy petition was "a remedy of last resort" when, two years after the creditor had prevailed on its underlying action, the debtor "could no longer find an effective legal method" to block the creditor's garnishment actions. *Id.* at 837. The court stated that "the more that the bankruptcy case appears to be a forum-shopping attempt for what is largely a two-party dispute, the less the debtor has a need for the type of bankruptcy relief contemplated by the Bankruptcy Code." *Id.* at 832 (citing *In re International Oriental Rug Center*, 165 B.R. 436, 443 (Bankr. N.D. Ill. 1994)).

39.    The Debtor filed this chapter 11 case barely twenty-four hours before the Circuit Court's decision with respect to CenterPoint's Summary Judgment Motion in the Foreclosure Action. The Foreclosure Action has been pending for over a year, and CenterPoint's Summary Judgment Motion has been pending for over seven months while OPBO has been permitted by the Circuit Court to conduct discovery in the interim. OPBO has repeatedly failed to maintain counterclaims against CenterPoint in the Foreclosure Action despite multiple opportunities to give, in the words of the Circuit Court, its "best shot." The filing of this chapter 11 case is merely the latest tactic in OPBO's implementation of a litigation strategy based on distraction and delay.

40.    There is no question but that this chapter 11 case is a two-party dispute between the Debtor and CenterPoint.  The Debtor scheduled nominal unsecured creditors in relation to the debt held owed to CenterPoint.  Indeed, in the schedules filed on the Petition Date, the Debtor identified only two insider creditors holding claims the aggregate amount of $1.9 million, an amount dwarfed by the debt to CenterPoint.  Thereafter, in an attempt to apply the proverbial "lipstick on a pig," the Debtor has purported to identify additional creditors that add up to less than $1.2 million in the aggregate, or less than 3% of the scheduled claims against the Debtor. The Debtor has no employees whose jobs might otherwise be preserved by affording the Debtor the opportunity to restructure in chapter 11, which is, in any event, not reasonably likely to occur. *See In re International Oriental Rug Center*, 165 B.R. at 442.

41.    The Debtor's principal asset, the Property, is not operating, is generating *de minimis* rents and has been in receivership for more than a year.  The pendency of this chapter 11 case has and will continue to diminish the estate substantially as the Debtor's liability to CenterPoint mounts, and the Debtor has no reasonable prospect for reorganization, which alone constitutes cause for dismissal under the Bankruptcy Code. *See* 11 U.S.C. § 1112(b)(4)(A).

42.    The totality of the circumstances requires dismissal of this chapter 11 case as a bad-faith filing as soon as possible.  Not only does the Debtor clearly lack any valid reorganizational purpose, this chapter 11 case prevents resolution of the pending Condemnation Action and Building Code Action.  The Building Code Action in particular underlines the urgency of dismissal, as the public will continue to face safety hazards that the Debtor has no wherewithal to address.

**B.**    **Alternatively, the Stay Should be Lifted to Permit the Foreclosure Action to Proceed**

43.    Under section 362(d), the Court may grant relief from the automatic stay, on request of a party in interest and after notice and a hearing, (i) for cause, including a lack of adequate protection, or (ii) if (a) the debtor does not have an equity in such property and (b) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(1) and (d)(2). With respect to a motion to modify the stay, the debtor carries the burden of proof to show that the stay should not be modified, except as to the issue of whether the debtor has equity. *In re Syed*, 238 B.R. 126, 132 (Bankr. N.D. Ill. 1999).

44.    Although "cause" under section 362(d)(1) is not defined under the Bankruptcy Code, "Congress did not intend the automatic stay to remain in force when the proceedings stayed have no relationship to the purpose of the automatic stay." *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 788 (7th Cir. 1991). The Seventh Circuit has articulated a three-part test to determine whether "cause" exists to lift a stay with respect to pending litigation: (i) whether any great prejudice will result from the continuation of the civil suit to either the bankrupt estate or the debtor, (ii) whether the hardship to the non-bankrupt party by the maintenance of the stay outweighs the hardship of the debtor, and (iii) whether the creditor has a probability of prevailing on the merits of its claim. *Id.* at 735; *In re Quay Corp.*, 2006 U.S. Dist. LEXIS 21615, 5-6 (N.D. Ill. Apr. 6, 2006).

45.    The legislative history of section 362 clearly indicates that Congress recognized that the stay should be lifted in appropriate circumstances to allow litigation to proceed in an alternative forum: "[I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may

be handled elsewhere." H.R. Rep. No. 595, 95th Cong., 1st Sess. 341 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5836, 6297; *see also In re Rogan*, 2009 Bankr. LEXIS 2090 (Bankr. N.D. Ind. July 23, 2009).

46.     In this case, cause exists to terminate the automatic stay to permit the Foreclosure Action to proceed to final resolution in order to determine the Debtor's and CenterPoint's respective interests in the Property. The Mortgage and Note are governed by Illinois law, and principles of federalism, comity and Congressional intent dictate that state law issues should be resolved by state courts, particularly where property interests are concerned. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). The Circuit Court is the proper forum in which to resolve the dispute between the Debtor and CenterPoint, which is grounded in Illinois state law and implicates no federal interest.

47.     The principle of judicial economy also dictates that the Foreclosure Action be permitted to proceed to final resolution. The Foreclosure Action has been pending for more than a year, and the Circuit Court is familiar with all of the attendant factual and legal issues, which have been fully briefed and had ripened for decision twenty-four hours after this chapter 11 case was filed.

48.     The Debtor will suffer neither prejudice nor hardship by returning to the Circuit Court, where OPBO long ago retained counsel that has been involved in, and is familiar with, the Foreclosure Action since its commencement. If OPBO is confident with respect to its Second Amended Counterclaim, the proper forum for determining the viability of its claims must be the

same court that already heard the substantially similar Counterclaim and First Amended Counterclaim.

49.     As to whether CenterPoint has a probability of prevailing on the merits of its claim in the Foreclosure Action, the Circuit Court made this explicit finding in the Receivership Order, which was affirmed by the Appellate Court.  *See* Receivership Order at 1 (Exhibit E hereto).

50.     Undoubtedly, the same set of facts described above demonstrating that the Debtor filed this chapter 11 case in bad faith also provides "cause" to lift the stay pursuant to section 362(d)(1).  *See In re Syed*, 238 B.R. 133, 140 (Bankr. N.D.Ill. 1999) ("cause" to annul stay found where debtor transferred title to property on eve of bankruptcy filing and had filed bankruptcy in bad faith).

51.     Importantly, CenterPoint's interest in the Property is not adequately protected, as required under section 362(d)(1), providing yet another cause to grant relief from the stay to permit the Foreclosure Action to proceed.  On information and belief, the Debtor has no equity in the Property, but to the extent any equity persists, it is rapidly eroding at a default interest rate of $22,504.13 per day.  As already noted, the Property is not operating, is generating only nominal rents, and has been in receivership for over a year.  The pending Condemnation Action and Building Code Action further impair the value of the Property while OPBO takes every measure to frustrate CenterPoint's legitimate effort to foreclose.

52.     Alternatively, this Court can and should grant relief from the automatic stay pursuant to section 362(d)(2) because the Debtor has no equity in the Property, and the Property is not necessary for an effective reorganization.  *In re Ascher*, 146 B.R. 764, 771 (Bankr. N.D. Ill. 1992).  In order to establish that the Property is necessary to an effective reorganization, the

Debtor must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *Id.* (citing *United Savings Assoc. v. Timbers*, 484 U.S. 365, 376 (1988)).

53.    The Debtor has no authority under the valid and final Receivership Order to administer the Property or collect its rents.  Given the magnitude of CenterPoint's claim and the accrual of interest thereon, there is no reasonable possibility that the Debtor can successfully reorganize, within a reasonable time or otherwise, with net rents of less than $3,900 per month and debt service obligations in excess of $660,000 per month.  Lacking any meaningful equity in the Property, the Debtor has virtually no prospects for selling or refinancing the Property on terms adequate to satisfy CenterPoint's claim.  In this case, undertaking a plan process would be an exercise in futility, and the stay should be lifted now to conserve resources and avoid further diminution in the value of the Property.  To the extent that the Debtor has any equity in the Property, such equity is rapidly eroding, as noted above, at a default interest rate of $22,504.13 per day.  Finally, even if the Property were marginally adequate to service the outstanding debt under the Note and Mortgage, OPBO would struggle in the current investment climate to sell or refinance the Property for an amount sufficient to retire its debt to CenterPoint.

C.    **The Receiver Should Remain in Place**

54.    Pursuant tos section 543(d) of the Bankruptcy Code, this Court may excuse the Receiver from turning over the Property to the Debtor if the interests of creditors would be better served by permitting the Receiver to continue in possession, custody or control of the Property. 11 U.S.C. § 543(d).  See *In re Foundry of Barrington Partnership*, 129 BR 550 (Judge Barliant, USBC, ND IL,1991); *In re CCN Realty Corp*, 19 BR 526, (USBC, SD NY, 1982); *In re Powers Aero Marine Services inc.*, 42 BR 540 (USBC SD Texas, 1984); *In the Matter of WPAS, Inc.*, 6 BR 40 (USBC, MD Fla., 1980).

55.     In this case, the interests of the estate's creditors, including the largest creditor, are best served by the continuation of the Receiver's duties consistent with the Receivership Order, as previously determined by the Circuit Court and the Appellate Court. Therefore, pending the hearing on this Motion, and in the event that the Court does not dismiss this chapter 11 case, the Court should authorize the Receiver to continue to discharge its duties under the Receivership Order pursuant to sections 105 and 543(d) of the Bankruptcy Code.

56.     Further, the Receivership Order falls within the purview of the well-settled *Rooker-Feldman* doctrine, which "prevents federal courts of original jurisdiction from having subject matter jurisdiction to act as *de facto* appellate courts for judgments rendered in any state-court system." *In re Liptak*, 304 B.R. at 838. The Receivership Order has already survived review by the Appellate Court, and this Court should confirm its effectiveness during the pendency of this chapter 11 case by authorizing the Receiver to continue to discharge its duties thereunder, including, without limitation, its duties to maintain the Property, remedy such municipal building code violations as are affordable given the rents generated by the Property, and fulfill its reporting obligations to the Circuit Court that entered the Receivership Order in the first instance. The Receiver has indicated that it is willing to submit duplicate reports to this Court to facilitate monitoring the financial condition of the Debtor's estate.

## NOTICE

57.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee, Attention: William T. Neary, 219 S. Dearborn Street, Room 873, Chicago, IL 60604, (ii) counsel to the Debtor, Gierum & Mantas, Attention: John E. Gierum, 9700 West Higgins Road, Suite 1015, Rosemont, IL 60018 (email: jgierum@7trustee.net), and (iii) all other parties that

have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

CenterPoint submits that under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, CenterPoint respectfully requests that the Court (i) dismiss this chapter

11 case for "cause" pursuant to 11 U.S.C. § 1112(b) or, in the alternative, lift the automatic stay

pursuant to 11 U.S.C. § 362(d)(1) or (d)(2) to permit the Foreclosure Action to proceed to its

conclusion; (ii) pursuant to section 543(d), order that the Receiver shall continue to perform his

duties pursuant to the Receivership Order pending final determination of this Motion and in the

event this chapter 11 case is not dismissed; and (iii) grant such other and further relief as may be

just and proper.

Dated: June 2, 2010

By: _____
    Carmen H. Lonstein
    Ethan Ostrow
    BAKER & MCKENZIE LLP
    One Prudential Plaza, Suite 3500
    130 East Randolph Drive
    Chicago, IL 60601
    Telephone: (312) 861-8000
    Facsimile: (312) 861-2899

    Attorneys for CenterPoint

**REQUIRED STATEMENT**
**TO ACCOMPANY MOTIONS FOR RELIEF FROM STAY**

All Cases: Debtor(s) _____ Olde Prairie Block Owner, LLC _____ Case No. ___ 10-22668 ___ Chapter _11_

All Cases: Moving Creditor _____ CenterPoint Properties Trust _____ Date Case Filed ___ 5/18/10 ___

Nature of Relief Sought: ☑Lift Stay        ☐ Annul Stay        ☐ Other (describe) _____

Chapter 13: Date of Confirmation Hearing _____ or Date Plan Confirmed _____

Chapter 7: ☐ No-Asset Report Filed on _____
            ☐ No-Asset Report not Filed, Date of Creditors Meeting _____

1.  Collateral
    a.      ☐ Home
    b.      ☐ Car   Year, Make, and Model _____
    c.      ☑ Other (describe) _____ Commercial Real Property _____

2.  Balance Owed as of Petition Date   $ _____ 48,371,246.10 _____
    Total of all other Liens against Collateral $ _____ 0 _____

3.  In chapter 13 cases, if a post-petition default is asserted in the motion, attach a payment history listing the
    amounts and dates of all payments received from the debtor(s) post-petition.

4.  Estimated Value of Collateral (must be supplied in *all* cases)  $ _____ 50-55 million estimated _____

5.  Default
    a.      ☑ Pre-Petition Default
            Number of months __14__        Amount $ _____ 37,127,667.03 _____

    b.      ☐ Post-Petition Default
            i.      ☐ On direct payments to the moving creditor
                    Number of months _____        Amount $ _____

            ii.     ☐ On payments to the Standing Chapter 13 Trustee
                    Number of months _____        Amount $ _____

6.  Other Allegations
    a.      ☑ Lack of Adequate Protection § 362(d)(1)
            i.      ☐ No insurance
            ii.     ☐ Taxes unpaid        Amount $ _____
            iii.    ☐ Rapidly depreciating asset
            iv.     ☑ Other (describe) _Property not operating, in receivership, generating de minimis rents_

    b.      ☑ No Equity and not Necessary for an Effective Reorganization § 362(d)(2)

    c.      ☑ Other "Cause" § 362(d)(1)
            i.      ☑ Bad Faith (describe) Case filed as litigation tactic on eve of hearing in foreclosure suit
            ii.     ☐ Multiple Filings
            iii.    ☐ Other (describe) _____

    d.      Debtor's Statement of Intention regarding the Collateral
            i. ☐ Reaffirm   ii ☐ Redeem   iii. ☐ Surrender   iv. ☑ No Statement of Intention Filed

Date: _____ 6/2/10 _____        _____
                                                Counsel for Movant

(Rev. 12 /21/09)

| **LIST OF EXHIBITS** | |
|---|---|
| **EXHIBIT #** | **ITEM** |
| A | *Memorandum Opinion and Order Dated September 23, 2009 in CenterPoint Properties Trust v. Old Prairie BlockOwner, LLC*, Case No. 09 CH 8190, Circuit Court of Cook County, Illinois County Department, Chancery Division Mortgage Foreclosure/Mechanics Lien Section ( "CPT Decision I") |
| B | Foreclosure Complaint, including Exhibit A (Mortgage) and Exhibit B (Note) |
| C | Receiver's Interim Report Dated May 3, 2010 |
| D | Complaint to acquire 55,000 square feet of the Property, Case No. 08 L 50636 (the "Condemnation Action"). |
| E | Receivership Order dated May 29, 2009 |
| F | February 10, 2010 ruling of the Appellate Court of Illinois, First District affirming the Receivership Order in *CenterPoint Properties Trust v. Olde Prairie Block Owner, LLC*, 923 N.E.2d 878 (Ill. App. Ct. 1st Dist. 2010) (the "Receiver Affirmation Ruling"). |
| G | *Memorandum Opinion and Order Dated January 14, 2010 in CenterPoint Properties Trust v. Old Prairie BlockOwner, LLC*, Case No. 09 CH 8190, Circuit Court of Cook County, Illinois County Department, Chancery Division Mortgage Foreclosure/Mechanics Lien Section ("CPT Decision II") |
| H | CenterPoint Motion To Dismiss Second Amended Counterclaim, scheduled to be heard in Foreclosure Action on May 19, 2010 (the "Dismissal Motion") |
| I | CenterPoint Motion For Summary Judgment, scheduled to be heard in Foreclosure Action on May 19, 2010 (the "Summary Judgment Motion") |
| J | Complaint with respect to municipal building code violations at the portion of the Property located at 320-330 East Cermak Road, Chicago, Illinois, Case No. 10 M1 400839 (the "Building Code Action"). |
| K | Motion for Authority To Respond to Building Code Violation Suit And To Effect Required Repairs and Examinations ("Receiver's Code Violation Motion"), scheduled to be heard May 19, 2010 in the Foreclosure Action. |