## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| OLDE PRAIRIE BLOCK OWNER, LLC, | ) | Bankruptcy No. 10 B 22668 |
|  | ) |  |
| Debtor. | ) |  |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
### CENTERPOINT'S MOTION TO LIFT STAY [Docket No. 21]

After the final hearing on the Motion to Lift Stay filed by CenterPoint Properties Trust

("CenterPoint"), for reasons stated from the bench, an order was entered conditionally denying

the Motion [Docket No. 241]. The following will stand as Findings of Fact and Conclusions of

Law that supplement the oral ruling of September 17, 2010.

### FACTS AND BACKGROUND

Olde Prairie Block Owner, LLC, ("Debtor") filed for bankruptcy relief under Chapter 11

on May 18, 2010. Debtor owns two parcels of real estate that, because of their proximity to

McCormick Place, Debtor hopes to develop into a hotel complex. The first parcel, known as the

"Olde Prairie Property," is located at 230 E. Cermak Road in Chicago, and the second, known as

the "Lakeside Property," is located across the street at 330 E. Cermak Road. The Olde Prairie

Property was at the time of the hearing the subject of a condemnation proceeding initiated by the

Metropolitan Pier and Exposition Authority ("MPEA").[1] Debtor also holds a long-term lease (the

"Parking Lease") with the MPEA that allows Debtor rent-free use of 450 parking spaces at the

---

[1] The MPEA has since sought and received a stay modification to allow it to dismiss the
condemnation proceeding.

-1-

McCormick Place parking garage until the year 2203.

On February 22, 2008, Debtor executed a promissory note evidencing a loan from CenterPoint in the amount of $37,127,667.03 and secured by Debtor's real estate. The note matured and was due and payable on February 21, 2009, but Debtor defaulted. CenterPoint filed a foreclosure action on February 24, 2009, and on May 28, 2009, the Circuit Court of Cook County appointed a receiver to manage Debtor's properties. When Debtor filed for bankruptcy, it owed CenterPoint $48,438,758.49 on the note.

On June 2, 2010, CenterPoint moved to dismiss Debtor's bankruptcy case, or in the alternative to modify the automatic stay so as to permit the foreclosure action to proceed. The stay motion was heard separately from the motion to dismiss, and a preliminary hearing was held on July 22 and 23, 2010. Following that hearing, for reasons stated from the bench, it was found and held that there was a reasonable likelihood that Debtor would prevail at conclusion of the final hearing.

The final hearing commenced on August 19, 2010. At that hearing, the parties presented evidence on several issues, but the value of Debtor's properties was the primary issue litigated. Each presented an expert real estate appraiser, and their opinions as to the values of Debtor's properties varied widely.

**A. Debtor's Expert**

Debtor's expert valued Debtor's properties at a total of $94,650,000. Noting the properties' proximity to McCormick Place and the need for hotel rooms to serve the convention business there, he determined that the highest and best use of the properties was for hotel development. He then compared Debtor's properties to other parcels of land that had been

-2-

purchased for hotel development, a process known as the sales comparison approach. For the

Parking Lease, he also used an income capitalization approach to confirm his results from the

sales comparison analysis. Using these methods, he determined that the value of the Olde Prairie

Property was $15,300,000; of the Lakeside Property, $45,600,000; and of the Parking Lease,

$33,750,000.

**B. CenterPoint's Expert**

CenterPoint's expert, however, valued Debtor's properties at a total of just $17,900,000.

The factor that accounts for most of the difference in values is a disagreement between the

experts over the highest and best use of the properties. Finding the case for hotel development

near McCormick Place unconvincing, CenterPoint's expert opined that the highest and best use is

to hold the property for future mixed-use (condominium and retail) development. He then used

the sales comparison approach to determine a value for Debtor's property using other properties

that had been purchased for mixed-use development. This process yielded property values that

are significantly lower than those found by Debtor's expert: $9,400,000 for the Olde Prairie

Property and $21,000,000 for the Lakeside Property.

But this was not the end of his analysis. He then performed a discounted cash flow

analysis, assuming that the property would be held for four years before it was developed and

discounting his concluded value from that date. This next step lowered his final values for the

properties to $5,500,000 for the Olde Prairie Property and $12,400,000 for the Lakeside Property.

CenterPoint's expert would have provided an opinion that the value of the Parking Lease

was zero, but that opinion was stricken because it was not timely disclosed under the Pretrial

Order.

## C. Other Evidence of Value

Apart from its expert reports, Debtor provided some additional evidence of the value of two properties. Before it commenced its condemnation proceeding, the MPEA offered to purchase the Olde Prairie Property for $17,700,000. That offer was apparently not accepted, as the MPEA did file the condemnation proceeding, which remained pending at the time of the hearing.

In addition, LAZ Parking Realty Investors, LLC, ("LAZ") sent a Letter of Intent to Pamela Gleichman, Debtor's developer, outlining the terms of a transaction in which LAZ would acquire the Parking Lease for $20,250,000. In the Letter, which was dated March 13, 2009, LAZ contemplated a closing date of March 15, 2011. Debtor has not yet accepted or rejected the Letter, but that offer is still open and evidence indicates that LAZ is still interested in the transaction.

## DISCUSSION

## A. CenterPoint is Not Entitled to Relief from the Stay Because Debtor Has Proposed a Confirmable Chapter 11 Plan

Under § 362 of the Bankruptcy Code, Title 11 U.S.C., relief from stay may be ordered if a debtor in a Chapter 11 does not have equity in the property that is the subject of the creditor's security and that property is not necessary to an effective reorganization. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988). An effective reorganization can include a liquidating plan. *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 371 n.14 (1987) (en banc); *see also Timbers*, 484 U.S. at 375–76 (citing the Fifth Circuit's opinion approvingly).

Debtor initially proposed a liquidating plan to which CenterPoint interposed a number of objections that could be dealt with by requiring plan amendments. There appeared to be a need for amendments to provide clarity, time lines for the plan, and need for court supervision.[2]

Since this has been found to be a single-asset case requiring early filing of a plan with prospects of confirmation, Debtor was ordered to amend the proposed plan expeditiously so as to provide the necessary clarity, time lines, and court supervision. As of September 17, 2010, when the Motion for Relief from Stay was denied, Debtor's proposed plan was facially sufficient to show that Debtor could confirm a liquidating plan, albeit one that needed to be amended.

**B. CenterPoint Is Not Entitled to Adequate Protection Because its Interest Is Not Declining in Value**

A creditor is entitled to adequate protection in Chapter 11 only if the creditor's interest in the debtor's property is declining in value. *Timbers*, 484 U.S. at 371. In this case, the properties in which CenterPoint has an interest are not declining in value during the bankruptcy. Therefore, Debtor need not provide CenterPoint adequate protection so long as it maintains the value that existed when the bankruptcy case was filed. To maintain that value, Debtor must pay all post-petition real estate taxes and take all steps needed to avoid a lien by the special receiver who was appointed to bring the property up to City Code.

**C. An Equity Cushion Has Been Established**

If adequate protection of CenterPoint's interest was necessary, a large equity cushion may

---

[2] Debtor has since filed an Amended plan. That plan seeks to raise capital to pay off CenterPoint, and Debtor has employed a financial advisor to seek investors. The plan also provides for partial liquidation in event investors cannot be found. That plan will be dealt with through pleadings since filed, including a new Motion by CenterPoint to modify stay that, *inter alia*, attacks the viability of Debtor's Amended plan.

suffice. *See In re Aaura, Inc.*, No. 06 B 01853, 2006 WL 2568048, at *2 (Bankr. N.D. Ill. Sept.

1, 2006) (citing *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992); *In re Markos

Gurnee P'ship*, 252 B.R. 712, 716–17 (Bankr. N.D. Ill. 1997)). In this case, it is clear that Debtor

does have an equity cushion. Contrary to some comments in the original oral remarks from the

bench, based on the evidence it is a large cushion but of uncertain protection for reasons stated

below.

Debtor's expert opined that the value of the Olde Prairie Property was $15,300,000, and

the MPEA's pre-condemnation offer to purchase that property for $17,700,000 gives credence to

that opinion. Regarding the Parking Lease, the Letter of Intent from LAZ persuasively shows that

the relevant market for possible uses of the property values the Lease at $20,250,000, which was

less than the value found by Debtor's expert. Therefore, it is found and held that the value of the

Olde Prairie Property is $15,300,000 and the value of the Parking Lease is $20,250,000.

Unfortunately, Debtor did not provide any firm market-supported offers for the Lakeside

Property. The value of that property, therefore, depends on the relative credibility of each party's

expert appraiser. In this respect, it must be found that Debtor's expert was more credible than

CenterPoint's expert. The latter's rejection of hotel development as the highest and best use of

Debtor's properties cannot be accepted: the proximity to McCormick Place, the scarcity of

nearby hotel rooms, and the oversupply of condominiums in the area all point to hotel

development as the highest and best use. Moreover, the expert's use of a discounted cash flow

analysis to reduce the valuations based upon sales is a further reason to reject his opinions.

Although he claimed that such analysis was approved by a learned treatise on appraisal, that

source does not appear to countenance that use of the method. *See generally* Appraisal Institute,

*The Appraisal of Real Estate* 297–376 (13th ed. 2008).

Since Debtor's principals have been seeking investment capital for a long time without success, there is some reason to wonder whether its expert's valuation is more valid as a future reality than as current value. That concern was reflected in some of the remarks from the bench. However, the expert's analysis was based on recent comparables, including some vacant properties wherein it is logically concluded that buyers in those transactions discounted future value when making an offer. Moreover, the creditor's expert refused to accept hotel usage as the highest and best use. Therefore, his appraisal must be rejected, leaving only the opinion of Debtor's expert for guidance. Following Debtor's expert, it is found and held that the value of the Lakeside Property is $45,600,000.

Combining these valuations, the total value of Debtor's property is found to be $81,150,000. This is far more than the approximately $48,000,000 that CenterPoint now claims to be owed by Debtor. Accordingly, Debtor holds a large equity cushion, albeit one based in large part on theoretical appraisals not yet supported fully by marketplace interests.

## CONCLUSION

Because the value of Debtor's properties is not declining, and because there is a plan in the offing that can likely be amended so as to be confirmable, CenterPoint's Motion for Relief from Stay was denied conditionally (with respect to real estate taxes and needed repairs) by order entered on September 30, 2010, *nunc pro tunc* to September 17, 2010 [Docket No. 241].

The alternative Motion of CenterPoint to dismiss the case rested partly on grounds asserted for stay modification (which have been rejected) and partly on assertions that this is a bad faith filing. The essence of bad faith is inability to confirm a Chapter 11 plan, and that has

-7-

not yet been demonstrated. While dismissal is not presently appropriate because stay relief has

been denied and a viable plan remains possible, the alternative Motion to Dismiss will be kept

alive on status as a vehicle to permit case dismissal if Debtor's reorganization fails.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 29 of October, 2010.

Case No. 10 B 22668
In re: Olde Prairie Block Owner, LLC

## CERTIFICATE OF SERVICE

I, Dorothy Clay, certify that on October 29, 2010, I caused to be served copies of the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CENTERPOINT'S MOTION TO LIFT STAY to the following by U.S. Mail, and by electronic mail to those who have consented to such service.

_Dorothy Clay_
Secretary/Deputy Clerk

## SERVICE LIST

### Electronic Service through CM/ECF System

George R Mesires
Patrick F Ross
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602
Counsel for Debtor

Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604

Shima S. Roy
Ethan Ostrow
Baker & McKenzie LLP (Chicago)
One Prudential Plaza
130 East Randolph Drive, Suite 3600
Chicago, IL 60601
Counsel for CenterPoint Properties Trust

Matthew T. Gensburg
Greenberg Taurig LLP
77 West Wacker Drive Suite 3100
Chicago, IL 60601
Counsel for CR Realty Advisors LLC

### Via First Class Mail

Leo N. Cinquino
Righeimer Martin & Cinquino PC
20 North Clark Street
Suite 1900
Chicago, IL 60602
Counsel for Debtor
phone: 312/726-5646
fax: 312/609-2277
e-mail: lnc@rmclaw.net