**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OLDE PRAIRIE BLOCK OWNER, LLC, | ) | Bankruptcy No. 10 B 22668 |
| | ) | |
| Debtor. | ) | |

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTOR'S
MOTION TO ENTER INTO SENIOR SECURED SUPERPRIORITY DEBTOR-IN-
POSSESSION CREDIT FACILITY PURSUANT TO 11 U.S.C. § 364(d) [Docket No. 371]**

Debtor in this Chapter 11 bankruptcy case has moved under 11 U.S.C. § 364(d) to borrow

up to $4 million in exchange for a priming lien on its property. CenterPoint Properties Trust

("CenterPoint"), Debtor's current secured lender, objects. For reasons discussed below, Debtor's

Motion will be granted in part and denied in part. After the original ruling on this issue [Docket

No. 744], Debtor moved to alter or amend the ruling [Docket No.760], and the parties have fully

briefed and argued that motion. The Amended Findings and related Amended Order resolve the

latter Motion and CenterPoint's Objection thereto.

**BACKGROUND**

Debtor's bankruptcy case has been found to involve single asset real estate, *see* 11 U.S.C.

§§ 101(51B); 362(d)(3), and so it is proceeding on a fast pace toward a confirmation hearing in

mid 2011. Debtor must demonstrate actual or imminent refinancing and development funds in

order to show a feasible plan for hotel development.

Debtor first filed its pending Motion to enter into credit facility [Docket No. 371] on

November 27, 2010. CenterPoint filed an Objection [Docket No. 391], to which Debtor filed a

Reply [Docket No. 408]. As discussed below, this Motion is critical to Debtor's effort to obtain

-1-

credit needed for its development.

When Debtor first presented this Motion on December 10, 2010, it argued that an immediate hearing on the Motion was necessary because, among other things, it sought to borrow money to pay real estate taxes that were due the next Monday, December 13, 2010. Because fourteen days had not elapsed since service of the Motion, a final hearing could not be held that day. *See* Fed. R. Bankr. P. 4001(c)(2); Local Bankr. R. 4001-2(B). Instead, a preliminary hearing was held at which Debtor first had to show the usual standards required to obtain senior secured financing—inability to obtain credit otherwise and adequate protection of the existing lender's interest. *See* 11 U.S.C. § 364 and discussion below. Debtor also had to show for emergency relief that the relief it sought was necessary to avoid immediate and irreparable harm to the estate. *See* Fed. R. Bankr. P. 4001(c)(2); Local Bankr. R. 4001-2(B).

At the preliminary hearing, Debtor presented evidence in the form of testimony from three witnesses: Pamela Gleichman, its developer; Marc Nuccitelli, its financial advisor; and Gilbert Li, a representative of the potential lender. CenterPoint elected to reserve its cross-examination of these witnesses until the final hearing on Debtor's Motion. CenterPoint's counsel argued that CenterPoint would be ready and willing to pay Debtor's property taxes if Debtor could not, but they did not call any witness or present any evidence by testimony or documents to back that argument with an actual commitment. Of course, the argument of counsel is not evidence. In fact, CenterPoint did not present any evidence at all at that time.

After Debtor rested at that preliminary hearing, it was opined from the bench that Debtor could not otherwise obtain funds to pay its property taxes and that payment of those taxes was necessary to prevent immediate and irreparable harm to the estate. The matter was set on

December 13, 2010, for entry of the order for emergency relief.[1] On that date, an order [Docket

No. 423] was entered authorizing Debtor to obtain post-petition financing secured by a first

priority lien on substantially all of Debtor's assets pursuant to 11 U.S.C. § 364(d) only to the

extent and in the amount necessary to pay real estate property taxes due that day. CenterPoint has

appealed from that order [Docket No. 428].

On January 11, 2011, Debtor was ordered [Docket No. 529] to provide at trial a summary

chart detailing its proposed payees, including the amount of each expenses that accrued before or

would accrue after the final hearing on its motion commenced on January 12, 2011.

Final hearing on evidence presented in support of Debtor's Motion was held beginning on

January 12, 2011. After resting, Debtor and CenterPoint submitted written argument in the form

of post-trial proposed findings of fact and conclusions of law.

After the hearing had concluded, Coman & Anderson, P.C., filed an additional objection,

arguing that its previously allowed administrative expense claim should be paid along with all

other administrative expenses out of the proposed post-petition loan.

Based on evidence presented, the following Findings of Fact and Conclusions of Law are

made and will be entered.

## FINDINGS OF FACT

Debtor owns two parcels of choice real estate located adjacent to McCormick Place in the

---

[1] Among the vagaries of weather faced by residents of the Midwest is the phenomenon
known as "lake-effect snow," which prevented the undersigned from making it to court from the
northwest part of Indiana on December 13. Another bankruptcy judge sat in the undersigned's
stead to enter an order in accord with the announced ruling. That judge was not familiar with the
evidence and made no further findings. CenterPoint immediately appealed the order before the
assigned judge arrived the next morning.

City of Chicago as well as a long-term lease of 450 parking spots in the McCormick Place

parking garage. Although the properties are mostly vacant and generate very little income, Debtor

plans to develop a hotel complex there that will serve the needs of people using and visiting

McCormick Place. After an evidentiary hearing earlier in this case on CenterPoint's motion for

relief from the automatic stay, it was determined that the value of Debtor's property was

$81,150,000 based on a finding that the highest and best use of the property will be for a fine

hotel. *In re Olde Prairie Block Owner, LLC*, No. 10 B 22668, 2010 WL 4512820, at *4 (Bankr.

N.D. Ill. Oct. 29, 2010). CenterPoint has opposed Debtor's attempt to reorganize at many stages

of this bitterly contested case.[2]

Karl Norberg is Debtor's Manager. His wife Pamela Gleichman is Debtor's Developer

and has signing authority to contract on Debtor's behalf.

CenterPoint is Debtor's only secured lender, having advanced a loan to Debtor in 2008

that was secured by a mortgage on Debtor's property. The loan matured on February 21, 2009,

but Debtor defaulted and CenterPoint filed a foreclosure action in state court on February 24,

2009. That proceeding was never resolved because it was interrupted by Debtor's bankruptcy

filing on May 18, 2010. In its Proof of Claim filed in the bankruptcy case, CenterPoint asserts a

secured claim of about $48,000,000. Given the property value found, Debtor has been found to

have an equity cushion over the CenterPoint debt of more than $30 million.

JMB Capital Partners LP ("JMB") is Debtor's proposed new lender. Debtor negotiated an

---

[2] Among the rulings in earlier contested matters are: Findings of Fact and Conclusions of
Law on CenterPoint's Motion to Lift Stay [Docket No. 313]; Opinion on CenterPoint's Motion
to Dismiss Counterclaim [Docket 369]; Opinion on CenterPoint's Motion to Amend [Docket No.
417]; Payment of Administrative Expenses [Docket No. 523]; and Memorandum Opinion
Dismissing Count II of Counterclaim with Prejudice [Docket No. 660].

arms-length agreement with JMB for a relatively small loan of up to $4 million. In exchange,
Debtor proposes to grant JMB (1) a new senior lien on its property that would prime
CenterPoint's lien and (2) a "superpriority" administrative expense.

Coman & Anderson, P.C., is a law firm that represented the receiver that was appointed
in the state-court foreclosure proceeding. After the receiver relinquished control of the property
to Debtor, Coman & Anderson was allowed $12,300 in fees and $224.60 in expenses, all payable
as an administrative expense claim at such time as funds are available to pay those and other
expenses. *See* on Request of Coman & Anderson, P.C., for Payment of Administrative Expenses
[Docket No. 523]. All services for which Coman & Anderson seeks payment out of the proposed
JMB loan were rendered prior to January 12, 2011.

## I. SUMMARY OF DEBTOR'S DEVELOPMENT PLANS AND PROPOSED USE OF FUNDS

Debtor's goal in obtaining the loan from JMB is to fund steps to make its project more
attractive to potential lenders and investors that might advance funds to Debtor at confirmation.
This includes taking steps to access benefits from a tax increment financing district
encompassing Debtor's property, obtaining various tax credits, generating reports needed to
further the development project, and generally managing the property toward hotel development.

## A. Tax Increment Financing

Tax increment financing ("TIF") is a government program under Illinois law designed to
encourage investment in particular locations. The amount of money available in a TIF district is
tied to the taxes generated in that district. When property is located in a TIF district, the owner
may apply to the local government for financing out of the TIF district funds for redevelopment

projects. Applicants must typically demonstrate that they have a viable development plan and access to other sources of funding that the TIF financing will complement. Where this source of relatively cheap and safe financing becomes available, potential lenders and investors are more likely to be interested in development projects for affected property.

Here, part of Debtor's property is located within an established TIF district. Debtor contends that it could realize an increased property value of $55 million from that TIF district, a district in which it is the sole potential beneficiary, if it can get a TIF plan approved. This estimate is based on a calculated present value of expected future tax revenue in that TIF district. While that calculation is somewhat speculative, it seems certain that success of this effort would materially enhance market value of Debtor's property and therefore increase its chances to finance the hotel project. Before Debtor can gain approval of its TIF plan, however, it had and still has much work to do.

First, Debtor had to ensure that its TIF district would remain viable and accessible. That TIF district had apparently expired prior to the final hearing on Debtor's financing motion, so Debtor hired various consultants to lobby the Illinois General Assembly to extend the life of the TIF district so that Debtor could access funds in the future. That effort in the Illinois legislature was successful, and the TIF district now remains potentially accessible to Debtor.

Second, in order to access TIF funds, Debtor will need to complete a long and cumbersome application process. That process involves submitting various plans and reports to the City of Chicago, demonstrating that there is a viable project, and negotiating with the City for approval of an acceptable development plan. This will be both time-consuming and complex, so Debtor will need to hire consultants to shepherd the project through the necessary process.

Debtor hired its consultant, S.B. Friedman & Co., which has already begun such work.

**B. Tax Credits**

Debtor is also taking steps to obtain and monetize various potential tax credits. Success in these efforts would likely enhance the value of Debtor's property and attract further investors and lenders.

First, there are "historic tax credits," which are federal income tax credits that might provide a 20% credit for certain expenditures for rehabilitation of historic structures. Debtor is eligible for these tax credits because one of the buildings on its property, the American Book Company Building, has been designated on the National Register. Debtor has hired a consultant, Midwest Chicago, LLC, that is available to work with Debtor to ensure that Debtor's development plans maximize the potential value of the tax credit. These credits, if obtained, would likely help attract investors who might benefit thereby.

Second, Debtor is pursuing "new market" federal tax credits, which are designed as an incentive to generate and provide private investment capital (in the form of debt or equity) to businesses that serve low-income communities or target populations. Debtor contends that it is eligible for these credits because the prospective hotel would be located adjacent to a targeted community and would provide jobs for that community. Like the other public funding sources Debtor is pursuing, the process for obtaining the new market tax credits is complex. Debtor has consulted with an attorney who specializes in the area, Alan Kennard of Wildman Harrold, and wishes to retain his services in pursuing these credits.

Debtor contends that these tax credits would add value of more than $20 million to its property and hotel project. Once again, that estimate is somewhat speculative, but it must be said

that success in obtaining tax credits would materially enhance the property value.

**C. Other Expenses**

Debtor also proposes to use some JMB loan proceeds to take other steps that will enhance

the value of its property. Among other things, it proposes to: (1) commission a new

environmental report to replace its current outdated report, a step that will be required by any

prospective lender; (2) retain legal counsel to assist it in its planned development by, for

example, helping with TIF and zoning issues or reviewing consultant and vendor contracts; and

(3) pay future real estate tax installments as they become due (the next installment of which will

be due on April 1, 2011).

## II. SPECIFIC ENTITIES DEBTOR PROPOSES TO PAY FROM THE JMB LOAN

Debtor seeks to borrow at least $3,245,417 from JMB. The following is a list of entities

that Debtor proposes to pay out of the JMB loan proceeds, along with a summary of the services

provided or to be provided and the amount proposed to be paid:

1.   *Cook County.* Debtor proposes to pay the next installments of real estate taxes of

approximately $141,612 due April 1, 2011. In its latest filings, CenterPoint's counsel

argued that it is willing to advance and pay those installments (as it argued before the

December 13th ruling without actually doing anything to implement that argument), but it

has not done so and the due date is tomorrow.

2.   *The Continental Companies, LLC ("TCC").* TCC is a hospitality and casino development

and operating company with over forty years of experience. TCC has worked with Debtor

as its development partner both before and after Debtor filed for bankruptcy. TCC

provides Debtor general development advice as well as TIF advice. Although TCC's

original contracts were signed by Gleichman without any indication that she was acting

on behalf of Debtor, Debtor has submitted revised contracts showing that the contracts

are between TCC and Debtor. Debtor seeks to pay TCC for services performed from July

1, 2010, after Debtor filed for bankruptcy. During the relevant time period, TCC has

assisted and will continue to assist Debtor with, among other things: assisting architects

on the design plan; coordinating hotel cost and development projections with the

Morgan's Hotel Group; providing necessary information to Debtor's TIF and tax credit

consultants; and working with financial institutions to finance the Debtor's development

project. Although TCC had agreed to a monthly fee for future work of $60,000 per

month, it agreed to accept $25,000 per month for work performed between July 1, 2010,

and January 1, 2011. Debtor seeks to pay TCC a total of $555,000, including $174,000

for services already performed and $381,000 for future services.

3.    *Mid-Chicago, LLC*. Mid-Chicago has an extensive background in real estate development

and working with city and state officials, and provides Debtor with TIF and development

advice. Debtor entered into an agreement with Mid-Chicago to: assist Debtor in

preserving the TIF district and available tax credits; assist the Debtor with its

development plans; coordinate engineers, architects, and other professionals working on

the project; and provide related services. Mid-Chicago played an important role in the

recent passage of TIF legislation earlier referred to. Debtor proposes to pay Mid-Chicago

$30,000, of which $21,000 is for services already performed and $9,000 is for future

services.

4.    *Development Design Group, Inc. ("DDG")*. DDG is a reputable planning, architecture,

and design company with a history of providing expertise in many successful commercial

endeavors. DDG will provide Debtor architectural services related to the TIF district and

City approval. DDG's services include architectural plans and elevations, design

guidelines, site and building selections, character perspective sketches, electronic 3D

massing models, photographic images, additional exhibits as reasonably required, and

application revisions and meetings that are necessary for further development work. This

work is needed for many aspects of the development project, including the TIF and tax

credit applications. Debtor proposes to pay DDG $350,300, including $10,000 for

services already performed and $340,300 for future services.

5.  *Gaia Tech.* Gaia Tech has provided an initial proposal to update their prior environmental

studies from 2007. This updated report is needed for the TIF application and other

development tasks. Debtor proposes to pay Gaia Tech $10,000 for future services.

6.  *Traffic and Structural Studies.* In order to secure necessary approval from the City of

Chicago, obtain TIF approval, and attract prospective lenders, Debtor will need to provide

traffic and structural studies. Debtor has not yet identified engineers who will perform the

studies, but hopes to do so in the near future. Debtor argued in its post-trial filings that

money from the JMB loan should be used to fund these studies, but did not specify

amounts needed. In addition, Debtor did not identify in its proposed order that it was

seeking funds to pay for either study, let alone specify an amount it sought to borrow for

those expenses.

7.  *HVS Global.* Debtor plans to employ HVS to perform a study regarding the feasibility of

building a hotel near McCormick Place. This study will be an updated version of a study

that HVS previously prepared for the Metropolitan Pier and Exposition Authority, the

operator of McCormick Place, and is necessary for Debtor to move forward with the TIF

application. Debtor proposes to pay HVS $17,000 for future services.

8.  *Wildman Harrold*. Debtor intends to employ Alan Kennard, a partner at the law firm

Wildman Harrold, to assist Debtor in obtaining new market tax credits, which would help

Debtor attract investors. Debtor proposes to pay Wildman Harrold $75,000 for future

services. Norberg guaranteed its fees.

9.  *Midwest Chicago, LLC*. Midwest will assist Debtor in applying for historic preservation

tax credits. Midwest will also work with and advise various persons working on the

development project in order to preserve and best leverage the historic preservation tax

credits. Debtor proposes to pay Midwest $165,000, including $15,000 for services already

performed and $150,000 for future services.

10. *S.B. Friedman & Co. ("Friedman")*. Friedman is a specialized real estate and

development advisory firm that works closely with clients to evaluate development

potential, project financial feasibility, identify public-private development solutions, and

prepare development strategies. Friedman's current contract is with Lakeside Place, LLC,

a member of the Debtor, but the company intends to obtain a new contract with Debtor

should the JMB loan be approved. The company will prepare Debtor's TIF financing

application, for which Debtor proposes to pay Friedman $200,000, including $10,000 for

services already performed and $190,000 for future services. Gleichman personally paid

S.B. Friedman a retainer.

11.   *Cullen & Associates ("Cullen")*. Cullen specializes in performing legislative and

executive branch representation and consulting services. Thomas Cullen, the owner of

Cullen, has worked with state legislators since 1987 in various capacities. Cullen has

provided and will offer Debtor services consisting of Illinois legislative analysis and

assistance. Cullen registered as a lobbyist for the Debtor and has assisted and will

continue to assist in the passage of TIF legislation. Debtor proposes to pay Cullen

$21,505, including $13,505 for services already performed and $8,000 for future services.

12.   *Res Publica*. Debtor has engaged Res Publica to assist in governmental relations and

related matters publicizing the many public benefits (including jobs and tax revenue) of

the development project. This work helps Debtor's efforts to secure and maximize TIF

benefits. Debtor proposes to pay Res Publica $50,000, half for services already performed

and half for future services. Gleichman personally paid Res Publica a retainer.

13.   *Daley George*. Debtor has retained the Daley George law firm to assist Debtor with

zoning, TIF, and other typical development work. This work is necessary to secure the

TIF funding and to keep Debtor's development project on track. Debtor proposes to pay

Daley George $94,000, including $44,000 for services performed and $50,000 for future

services.

14.   *Marcus, Clegg & Mistretta ("MCM")*. Debtor wants MCM to assist with general legal

work, including the review of consultant and vendor contracts. MCM's contract is with

Norberg, personally, as Manager of Debtor. Debtor proposes to pay MCM $55,000,

including $20,000 for services already performed and $30,000 for future services.

15.    *Walker Wilcox*. Walker Wilcox has performed a number of different tasks relating to the

foreclosure case and has provided background information relating to the claim objection

involving CenterPoint. Debtor proposes to pay Walker Wilcox $21,000, all for services

already performed.

16.    *Ungaretti & Harris, LLP*. Ungaretti is Debtor's general bankruptcy counsel. As a result of

the firm's legal work in this case, Debtor has been able to continue its efforts to develop

its real estate assets and reorganize its business. Debtor proposes to pay Ungaretti a total

of $800,000, including $424,273 for services already performed and the remaining

amount for future services. Gleichman and Norberg have guaranteed Ungaretti's fees.

17.    *Righeimer, Martin & Cinquino ("RMC")*. Leo Cinquino, a partner at RMC, was

approved as an additional bankruptcy counsel. Cinquino has assisted Debtor in several

aspects of its case, including an earlier condemnation proceeding relating to part of

Debtor's property, as well as through business advice to Debtor. Debtor seeks his

continued help to develop its real estate assets and reorganize its business in this

bankruptcy case. Debtor proposes to pay RMC $200,000, including $120,000 for services

already performed and $80,000 for future services.

18.    *CRT Capital Group LLC*. CRT is Debtor's financial advisor and investment banker. CRT

has canvassed the market and communicated with numerous investors who invest in

projects and developments of this type and size, including debt (to finance both

emergence from bankruptcy and the development project going forward) and equity

-13-

sources. Through these efforts, CRT identified JMB as a post-petition lender and as a possible source of exit financing and equity for the project. Debtor seeks to pay CRT $235,000, including $110,000 for services already performed and $125,000 for future services. Norberg has guaranteed CRT's fees.

19.   *Ostrow Reisen Berk & Abrams*. Ostrow Reisen is an accounting firm. The parties did not discuss the firm at all in their post-trial filings, other than to dispute whether it should be employed as a professional by the estate before the JMB loan is approved. It is not clear what services the firm will provide to Debtor or how the services it will provide will advance Debtor's ability to reorganize. Indeed, at trial it appeared that Ostrow Reisen would be preparing tax returns for two of the Debtor LLC's members, but not for Debtor itself. Moreover, Ostrow Reisen is the only creditor other than CenterPoint to file a Proof of Claim in this bankruptcy case, asserting a $45,000 unsecured prebankruptcy claim against Debtor that has not been waived thus far. Debtor seeks to pay Ostrow Reisen $25,000 out of the JMB loan for future services, subject to the firm's retention by Debtor as a professional.

20.   *General and Administrative Expenses*. Debtor also seeks to use funds from the proposed JMB loan to fund its operations. Specifically, Debtor seeks to pay up to $200,000 for office rent at an unspecified location, salary for an office assistant, office supplies and expenses, insurance, computer and telephone services, and utilities. Debtor does not explain where and how it obtained these services and facilities in the past, and it may be that Debtor has thus far been operated out of Gleichman's home.

-14-

Further factual matters described in the Conclusions of Law will stand as additional

Findings of Fact.

## CONCLUSIONS OF LAW

## I. LEGAL STANDARDS

A debtor-in-possession may obtain credit or incur debt only as provided in § 364 of the

Bankruptcy Code, Title 11 U.S.C. The standards that a debtor must meet under § 364 depend on

the type of credit it seeks to obtain. A debtor may obtain unsecured credit in the ordinary course

of business allowable as an administrative expense without a hearing or court approval, unless

the court orders otherwise. 11 U.S.C. § 364(a). A debtor may obtain unsecured credit outside the

ordinary course of business only with court approval after notice and a hearing. *Id.* § 364(b). If a

debtor is unable to obtain unsecured credit, a court may authorize the debtor, after notice and a

hearing, to obtain credit: (1) with priority over other administrative expenses (sometimes referred

to as "superpriority" administrative expenses); (2) secured by a lien on unencumbered estate

property; or (3) secured by a junior lien on encumbered estate property. *Id.* § 364(c). Finally, a

debtor can obtain credit secured by a senior or equal lien on encumbered estate property

(sometimes referred to as a "priming lien") with court approval and after notice and a hearing

only if: (1) the debtor is unable to obtain credit otherwise and (2) the interest of the creditor to be

primed is adequately protected. *Id.* § 364(d).

By their terms, these statutory standards do not require inquiry into a debtor's proposed

use of the funds. However, should authority to borrow be granted, the funds would be property of

the estate and subject to usage limitations set out in 11 U.S.C. § 363. Under that provision, a

-15-

debtor may use or sell estate property outside the ordinary course of business only after notice

and a hearing. *Id.* § 363(b)(1). In determining whether to approve such a use or sale, various

standards have been used, "including a business judgment test, a good faith test determining

whether the [use or] sale is fair and equitable, and a test to assess whether the transaction is in the

best interest of the estate." *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (internal

citations omitted). "The Seventh Circuit Court of Appeals has stated that there must be an

'articulated business justification' for the [use or] sale." *Id.* (citing *In re Schipper*, 933 F.2d 513,

515 (7th Cir. 1991)).

Here, Debtor seeks to obtain credit from JMB in exchange for a priming lien on property

encumbered by CenterPoint's lien, a lien on any of Debtor's property that is not already

encumbered, and a superpriority administrative expense claim. Debtor has shown that it cannot

obtain this credit under less onerous terms than those offered by JMB and, as discussed below,

that CenterPoint's interest in Debtor's property is adequately protected. *See* 11 U.S.C. § 364(d).

CenterPoint opposes this relief, arguing that its interest is not adequately protected, that the

various proposed expenditures will not advance Debtor's reorganization, and that specific

expenses objected to should not be approved.

It is not enough for Debtor to rely on a large equity cushion resting on expert opinions as

to value of its property even when, as in this case, the property is close to Lake Michigan at one

of Chicago's most vibrant locations next to McCormick Place. A large equity cushion is not a

debtor's piggy bank, and the uses contemplated for the new loan must have serious likelihood of

benefitting the property and advancing the purposes of reorganization. A priming lien without

-16-

such a showing would impose an unwarranted burden on the secured creditor if reorganization

fails.

## II. CENTERPOINT'S INTEREST IS ADEQUATELY PROTECTED

A debtor will sometimes provide adequate protection of an interest in estate property by:

(1) making cash payments to the affected entity to the extent its interest decreases in value; (2)

providing to the entity an additional or replacement lien to the extent its interest decreases in

value; or (3) granting some other relief that will allow the entity to realize the "indubitable

equivalent" of its interest. 11 U.S.C. § 361. The purpose of adequate protection "is to insure that

the creditor receives the value for which he bargained prebankruptcy." *In re O'Connor*, 808 F.2d

1393, 1396 (10th Cir. 1987).

However, a large equity cushion in the form of property value has also been found to

provide adequate protection in some circumstances. *See In re Aaura, Inc.*, No. 06 B 01853, 2006

WL 2568048, at *2 (Bankr. N.D. Ill. Sept. 1, 2006) (citing *In re James Wilson Assoc.*, 965 F.2d

160, 171 (7th Cir. 1992); *In re Markos Gurnee P'ship*, 252 B.R. 712, 716–17 (Bankr. N.D. Ill.

1997)). When a debtor seeks to prime an existing creditor, it must also show that the creditor's

interest is not being jeopardized, considering "all of the relevant facts, with a particular focus

upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the

prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the

Debtor's performance in accordance with the Plan." *In re Strug-Division LLC*, 380 B.R. 505,

513–14 (Bankr. N.D. Ill. 2008) (quoting *In re Aqua Assoc.*, 123 B.R. 192, 196–97 (Bankr. E.D.

Pa. 1991)). A debtor's use of credit obtained through a priming lien must be likely to benefit the

estate and improve the debtor's ability to reorganize. *See id.*; *In re 495 Cent. Park Ave. Corp.*,

136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996)

(finding potential increase in value from Chapter 11 debtor's property development plans too

speculative to adequately protect mortgagee's undersecured interest in debtor's property).

In this case, it was earlier found from expert testimony that Debtor's property has a value

of $81,150,000. Since Debtor's debt amounted to approximately $48.7 million as of July 7, 2010,

when CenterPoint filed its Proof of Claim, the property value found represents a large equity

cushion. While accepted methods were used with expert opinion to value the property, those

sources are only a substitute for testing the market to obtain actual sales or funding. Nonetheless,

it is clear here that CenterPoint's security interest in Debtor's property and cash would be

adequately protected, even when primed by the proposed lien. There is sufficient equity in

Debtor's properties (about 38% of value) to protect CenterPoint against the diminution in value

of its interest that will result from the relatively small JMB priming lien, and the activities to be

funded are likely to enhance property value, thus offering further possible protection.

CenterPoint argues that Debtor admitted at one point that its property was worth only $30

million. The basis for this argument is an inference CenterPoint derives from some unclear

statements in a presentation that Debtor had prepared and that was admitted into evidence as

Debtor's Exhibit 65. However, that document was an old presentation that did not contain the

most current information. In addition, the presentation contained an explicit statement that

Debtor valued its property at $93 million, not $30 million as CenterPoint argues. Finally, the

value found here after a full evidentiary hearing at which experts for both sides testified was

-18-

$81,150,000, *In re Olde Prairie Block Owner, LLC*, No. 10 B 22668, 2010 WL 4512820, at *4

(Bankr. N.D. Ill. Oct. 29, 2010), and that value must be accepted until new evidence shows the

contrary.

Relying on *In re Swedeland Development Group*, 16 F.3d 552 (3d Cir. 1994),

CenterPoint also argues that its interest cannot be adequately protected because there is no

tangible evidence that the financing will actually increase value of Debtor's property. In

*Swedeland*, the debtor property developer sought post-petition financing in the form of a priming

lien to obtain working capital to fund ongoing construction. 16 F.3d at 556–57. The debtor

argued that its secured creditor was adequately protected because the completed development

"would generate a positive cash flow, the residential units could be completed and sold, and the

completion of the project by the end of the century would result in [the secured creditor] being

paid in full." *Id.* at 557. On appeal, a panel of the Third Circuit found that this was not adequate

protection because the future profitability of the enterprise was entirely speculative in that case.

*Id.* at 563–67.

CenterPoint's reliance on *Swedeland* is not appropriate. It is found and held here that

CenterPoint's interest is sufficiently protected by the substantial equity cushion demonstrated by

the value found in Debtor's properties. While the proposed expenditures are likely to increase

property value that would provide additional protection, the amount of such possible increase in

value is speculative and dependant on market factors, and is not relied on here to determine

adequate protection of CenterPoint's interest. It can, however, be said that to the extent the

security is likely to be benefitted, the burden on CenterPoint of a priming lien is likely to be

mitigated.

Allowing a priming lien should be considered with caution to avoid transferring the entrepreneurial risk of failure by Debtor's investors and principals onto the secured creditor CenterPoint. Given the inherent uncertainty of determining valuation through methods commonly used by experts in appraising real estate, some restraint in allowing priming liens to fund particular expenses is warranted.

Debtor has shown that most of the expenses it seeks to fund with proceeds of its proposed borrowing will likely advance the value of the estate property and make it easier for Debtor to reorganize. First, Debtor has been taking steps towards acquiring funds from the TIF district, as well as various tax credits for which it is eligible. These government funding sources may be monetized and, if so, that would likely attract potential investors and lenders who would help fund Debtor's hotel development project. In addition, it is clear from evidence presented that these funding sources will be available to any future owner of Debtor's property, including CenterPoint should it acquire that property through foreclosure. Second, Debtor continues to push forward with its hotel development plans by seeking lenders and investors, generating various required reports, and generally operating as a property developer. By doing so, Debtor enhances the value of its property, and therefore, its bankruptcy estate. This has been a hotly contested bankruptcy case, and Debtor in this single asset bankruptcy is moving on a fast time line towards possible plan confirmation, as it must.

Debtor has also shown under § 363(b) and (c) that it has a serious articulated business justification for most of the proposed uses of the requested loan, regardless of whether they are

inside or outside the ordinary course of business, and that those uses are in the best interest of the estate. Moreover, tax credits and government assistance that Debtor seeks are tied to the proposed development and use of the property, not to other possible interests of Debtor, and will likely benefit whoever owns Debtor's properties in the future. Considering all relevant factors, it is concluded that CenterPoint's collateral would not be jeopardized by allowing a priming lien.

## III. DEBTOR'S PROPOSED USE OF FUNDS

For most of Debtor's proposed expenses, Debtor has shown that it is unable to obtain unsecured credit allowable under § 503(b)(1) as an administrative expense or allowable only under §§ 363(c)(2), (c)(3), or (d) on more favorable terms and conditions than those provided by JMB. For those expenses, Debtor is unable to obtain credit without granting JMB the terms it demands. However, Debtor has obtained unsecured credit for some of the proposed expenses. Indeed, some vendors have already provided services on retainers paid by Gleichman or some other person, on an unsecured basis or otherwise. Although the vendors for those expenses may have performed valuable services to Debtor's estate, permitting Debtor to borrow from JMB in exchange for a priming lien in order to pay past due expenses would be contrary to the plain language of the requirements under § 364(d).

In its Motion to Amend the original Order, Debtor seeks further authority to pay JMB's costs and expenses relating to the proposed loan. Debtor did not present evidence on this subject at trial, but now seeks blanket permission to pay those costs and expenses, "including, but not limited to, accrued attorneys' fees of $548,912.48, for, among other things costs and expenses relating to reviewing and responding to oral and written discovery requested by CenterPoint."

Such expenses are commonly required by lenders, but here Debtor and JMB cannot yet obtain

approval of them for two reasons. First, no evidence was offered as to the reasonableness and

necessity of the expenses sought to be approved. Second, attorneys for both JMB and Debtor

contended expressly at the final oral argument on Debtor's Motion to Amend that no evidence

need be offered and that CenterPoint has no right to review evidence as to the requested expenses

and that it should be given no opportunity to question them.

While Debtor and JMB offered to submit JMB's attorneys' fees and expenses to Court

review and approval without evidence, they have thus far stood firm on their position that

CenterPoint should not be allowed to challenge those expenses before loans to pay them would

prime its lien. Their stated reason for this position was a fear that CenterPoint would challenge

the expenses. However, fear of litigation is no excuse for the extraordinary claim of right to

deprive CenterPoint of its Fifth Amendment Due Process right to notice and a hearing before its

lien is primed by this part of the loan. To receive approval of the additional half million dollar

loan that is sought, JMB and Debtor will be required to yield their procedural objection to a

hearing to obtain approval of what they seek in this regard.

For these reasons, Debtor will be permitted to borrow from JMB only those amounts

necessary to fund approved future services—that is, services rendered after on January 1,

2011—provided under contracts with the Debtor. Jurisdiction will be reserved to consider

additional expenses on notice of motion and hearing with evidence is presented as to the

necessity, reasonableness, and usefulness thereof.

-22-

## IV. PAYEES WHO MAY BE PROFESSIONALS

CenterPoint argues that several of the payees that are attorneys or accountants cannot be paid from the requested JMB loan proceeds. However, that argument lacks merit.

First, CenterPoint argues that several payees that are law firms or accountants must be employed under 11 U.S.C. § 327 and must file fee applications before the JMB loan can be approved. Section 327 does not necessarily apply to all accountants and lawyers. *See In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 856–58 (Bankr. N.D. Ill. 2010). However, even assuming that § 327 will apply to professionals who are sought to be employed, Debtor can still be authorized to borrow funds from JMB without authority to pay those funds out to the professionals until they have been employed and have submitted proper fee applications. In other words, failure as of yet to be employed under § 327 or to submit a fee application is not a bar to Debtor borrowing money to pay properly employed professionals and other attorney and accountant payees in the future.

Second, CenterPoint argues that proceeds of the JMB loan will result from a disposition of its collateral, and therefore those proceeds would be its cash collateral which Debtor cannot use without its consent or court order. However, as discussed above, CenterPoint's interest in Debtor's property is adequately protected by the large equity cushion. This cushion exists regardless of whether it is in the form of cash or unencumbered real property, and it provides adequate protection for use of loan proceeds even when viewed as cash collateral.

Third, CenterPoint argues that payment to attorneys and accountants would be an impermissible charge against its collateral to pay general estate administrative expenses. Under

-23-

11 U.S.C. § 506(c), a debtor-in-possession "may recover from property securing an allowed

secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such

property to the extent of any benefit to the holder of such claim, including the payment of all ad

valorem property taxes with respect to such property." However, Debtor is not seeking to charge

CenterPoint's secured claim under § 506(c) for preservation expenses. Instead, Debtor seeks to

borrow additional funds from the unencumbered equity in its property in order to further its

reorganization efforts. A secured creditor "has no right to fence off the entire collateral in which

it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate

protection of its interest." *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) (debtor

may use oversecured mortgagee's cash collateral to pay attorney fees). Therefore, CenterPoint's

argument is without merit.

## V. THE PROPOSED JMB LOAN WAS NEGOTIATED AND IS BEING PROVIDED IN GOOD FAITH

The Bankruptcy Code offers some protections to lenders who advance post-bankruptcy

credit to debtors. Specifically,

> [t]he reversal or modification on appeal of an authorization under [§ 364]
> to obtain credit or incur debt, or of a grant under [§ 364] of a priority or a
> lien, does not affect the validity of any debt so incurred, or any priority or
> lien so granted, to any entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

Debtor and JMB negotiated the proposed loan in good faith and at arm's length. The

terms and conditions of the proposed loan are the best available under the circumstances, reflect

-24-

Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The proceeds of the proposed JMB loan will be extended in good faith and for valid business purposes and uses, so JMB is entitled to the full protection and benefits of § 364(e).

## CONCLUSION

By separate order, Debtor will be authorized to obtain credit in return for a priming lien on Debtor's property that is encumbered by CenterPoint's lien, liens on Debtor's unencumbered property, and a superpriority administrative expense claim, but only to the extent Debtor has not already obtained credit and to the extent the payee's services will provide a benefit to the estate. Specifically, Debtor will be authorized to borrow from JMB on terms requested only enough to net a total of $2,007,639, which may be used to pay only the following providers up to the following amounts for purposes described hereinabove:

1. Cook County, $141,612 to pay the next installments of real estate taxes due April 1, 2011.

2. The Continental Companies, LLC, $381,000.

3. Mid-Chicago, LLC, $9,000.

4. Development Design Group, Inc., $340,300.

5. Gaia Tech, $10,000.

6. HVS Global, $17,000.

7. Wildman Harrold, $75,000.

8. Midwest Chicago, LLC, $150,000.

-25-

9.  S.B. Friedman & Co., $190,000, provided that no payment may be made to it except under contract with Debtor approved by the Court on subsequent motion. Debtor has demonstrated that S.B. Friedman's services would benefit the estate and would not jeopardize CenterPoint's collateral. However, the evidence shows S.B. Friedman has a contract to provide services to some party other than Debtor. Therefore, Debtor may not use JMB funds to pay S.B. Friedman unless Debtor executes a contract with it.

10. Cullen & Associates, $8,000.

11. Res Publica, $25,000.

12. Daley George, $50,000.

13. Marcus, Clegg & Mistretta, $30,000, provided that no payment may be made to it except under contract with Debtor approved by the Court on subsequent motion. Debtor has demonstrated that Marcus, Clegg & Mistretta's services would benefit the estate and would not jeopardize CenterPoint's collateral. However, the evidence shows the law firm has a contract to provide services to some party other than Debtor. Therefore, Debtor may not use JMB funds to pay the law firm unless Debtor executes a contract with it.

14. Ungaretti & Harris, LLP, $375,727.

15. Righeimer, Martin & Cinquino, $80,000.

16. CRT Capital Group LLC, $125,000.

Debtor will not be authorized to borrow from JMB funds that would be used:

-26-

1.  To pay for traffic or structural studies. Debtor has shown that those studies would benefit the estate and would not jeopardize CenterPoint's collateral. However, Debtor has not yet presented evidence as to the cost of those services.

2.  To pay Walker Wilcox. Debtor seeks to pay Walker Wilcox for services previously performed, not for future services. Because the firm has provided services on an unsecured credit basis to Debtor, Debtor cannot now meet the standards for using funds out of the proposed JMB loan to pay the firm's fees.

3.  To pay Ostrow Reisen Berk & Abrams. Debtor did not satisfactorily show how this accounting firm's proposed services will benefit its estate. In fact, it appears that the services presently proposed would directly benefit individual members of the Debtor LLC rather than the bankruptcy Debtor or estate.

4.  To pay "general or administrative" expenses. Debtor did not present evidence at trial regarding need for an office, an office assistant, or the like. It cannot not be determined on this record what benefit this would have for the estate, whether these expenses are necessary, whether the costs are reasonable, or whether these expenses would unfairly jeopardize CenterPoint's collateral.

5.  To repay Gleichman or any other entity or individual the amounts of any payments or retainers they advanced to any of the above payees. Entrepreneurs who advance expenses may take personal risks in their pursuit of possible profit, and those unsecured voluntary advances cannot qualify under standards required under § 364(d) for a priming lien.

6.     To pay Coman & Anderson, P.C. The Objection of Coman & Anderson, P.C., will

be overruled. Its allowed administrative expense claim is for work in 2010 on

behalf of a replaced state-court receiver. As discussed above, Debtor may not

borrow from JMB to pay for prior expenses.

7.     To borrow an additional priming loan of over $500,000 to pay JMB its fees and

expenses related to this loan, an amount that was not established by evidence

during the hearing and that Debtor and JMB have stubbornly refused thus far to

present for review by the Court in a hearing participated in by CenterPoint.

However, recognizing the necessity of resolution of this additional loan request,

jurisdiction will be reserved to reopen the evidence upon notice and motion to

take evidence on this matter subject to CenterPoint objection and court review.

One final comment to explain the Amended Order being entered. Debtor and JMB ask

that terms of a forty-six page financing agreement be fully incorporated by reference. It contains

the usual series of protections that hog tie Debtor and forestall any other claims or rights by third

parties or Debtor. Similar contracts between debtors and lenders of new loans are usually

approved as negotiated so long as they do not impair third party rights. However, the JMB loan is

not a new first mortgage, but is rather a priming lien. Only certain terms therein are incorporated

in the Amended Order allowing a limited priming loan. Some other proposed provisions are not.

JMB is receiving a priming lien on prime Chicago lakefront property worth a great deal

more than its present loan, as well as a superpriority administrative expense claim. It has absolute

discretion whether or not to loan or to pay any of the approved expenses. Other provisions that

-28-

overly burden CenterPoint and give total control of the bankruptcy case to JMB are not approved.

An Amended Order in accord with the forgoing will separately be entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this _____ day of March, 2011.