## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OLDE PRAIRIE BLOCK OWNER, LLC, | ) | Bankruptcy No. 10 B 22668 |
| | ) | |
| Debtor. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON DEBTOR'S MOTION TO ALLOW PAYMENT
## OF EXPENSES FROM DIP LOAN [Docket No. 826]

Debtor in this Chapter 11 bankruptcy case was previously authorized under 11 U.S.C. § 364(d) to borrow from JMB Capital Partners ("JMB") in exchange for a priming lien on its property, but only for expenses it demonstrated were reasonable and necessary. Debtor now moves to borrow more to pay JMB's attorney fees and expenses associated with that loan and impose an additional priming lien for such additional borrowing. CenterPoint Properties Trust, Debtor's current secured lender, objects. For reasons discussed below, Debtor's motion will be allowed except for $76,685 of the amount sought.

Following trial on this issue, the following Findings of Fact and Conclusions of Law are made and will be entered.

## FINDINGS OF FACT

### I.    Background Facts

1.    Debtor owns two parcels of real estate: (a) a parcel known as the "Olde Prairie Property" located at 230 E. Cermak Road in Chicago, and (b) a parcel known as the "Lakeside Property" located across the street at 330 E. Cermak Road in Chicago.

2.    Debtor also holds a long-term lease (the "Parking Lease") with the Metropolitan

Pier and Exposition Authority ("MPEA") that allows Debtor rent-free use of 450 parking spaces

at the McCormick Place parking garage until the year 2203.

    3.      On May 18, 2010 (the "Petition Date"), Debtor filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code.

    4.      Debtor remains in possession of its assets and continues to operate as a debtor in

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

    5.      No trustee, examiner, or committee has been appointed in this case.

    6.      CenterPoint Properties Trust is Debtor's pre-petition lender.

    7.      CenterPoint has opposed Debtor's reorganization from the outset. On June 2,

2010, CenterPoint filed its Motion To Dismiss Chapter 11 Case for Cause or, in the Alternative,

to Lift the Automatic Stay to Permit Foreclosure Action To Proceed and Retaining Court

Appointed Receiver ("Lift Stay Motion") [Docket No. 21].

    8.      After preliminary and final hearings in which extensive evidence was offered,

including property valuations presented by experts called by each party, the Lift Stay Motion was

denied for reasons to be explained in a forthcoming written ruling.

    9.      On October 29, 2010, Findings of Fact and Conclusions of Law [Docket No. 313]

on CenterPoint's Motion to Lift Stay were entered in which it was determined that, among other

things, the total value of Debtor's Property was $81,150,000, far more than the approximately

$48,000,000 that CenterPoint claims to be owed by Debtor.

    10.     On November 12, 2010, CenterPoint filed its Motion to Amend the Findings of

Fact and Conclusions of Law Pursuant to Bankruptcy Rule 7052(b).

    11.     On December 12, 2010, an Opinion on CenterPoint's Motion to Amend [Docket

No. 417] was entered in which the valuation of the Properties was reaffirmed at $81,150,000.

## II. The JMB Loan

12. Because the substantial equity in Debtor's assets is not liquid or immediately available to fund Debtor's reorganization efforts or to further enhance Debtor's estate, Debtor determined in its business judgment that it needed to borrow money to secure new financing.

13. With assistance from CRT Capital ("CRT"), Debtor's business and financial advisor and investment banker, Debtor investigated the availability of potential lenders.

14. One potential new lender was JMB Capital Partners ("JMB"). Due to its unique capabilities, and after conducting some due diligence, JMB agreed to offer a debtor-in-possession financing facility to Debtor of up to $4 million (the "DIP Loan").

15. JMB was represented by counsel, Bracewell & Giuliani LLP ("B&G") in New York, with local counsel assistance from Duane Morris, (collectively, "Lender Counsel") relating to the DIP Loan.

16. B&G began to work in mid-October 2010 in this regard.

17. On November 27, 2010, after successful negotiations with JMB resulted in a commitment letter and term sheet, Debtor filed a Motion to Enter into Senior Secured Superpriority Debtor-in-Possession Credit Facility Pursuant to 11 U.S.C. 364 [Docket No. 375] (the "DIP Motion"), seeking approval for the DIP Loan in the amount of $4 million.

18. Over the next three months, several hearings were held on the DIP Motion, including multiple hearings on CenterPoint motions for discovery relating to and objections to the DIP Loan, status hearings, and six days of evidentiary hearings (on December 10, 2010 and January 12–14, January 21, and February 4, 2011).

19.    On March 11, 2011, Findings of Fact and Conclusions of Law relating to the DIP Motion [Docket No. 744] (the "DIP Findings") and an Order granting the DIP Motion in part [Docket No. 746] (the "DIP Order") were entered.

20.    On March 14, 2011, Debtor moved to amend certain aspects of the DIP Order and the DIP Findings [Docket No. 760].

21.    On March 31, Debtor's Motion to Amend was granted in part, and Amended Findings [Docket No. 818] (the "Amended Findings") and an Amended Order [Docket No. 820] (the "Amended Order") were entered.

22.    In the Amended Findings and the Amended Order, JMB was allowed a priming lien on Debtor's property that is encumbered by the CenterPoint lien, a first priority lien on Debtor's unencumbered property, and a superpriority administrative expense claim (the "Section 364 Rights") as security for all principal, interest, and fees—other than JMB financing expenses for Lender Counsel (the "JMB Financing Expenses")—due JMB under the DIP Loan for amounts borrowed by Debtor to fund the approved list of payments set forth in the Amended Order, for a total of $2,007,639 in approved borrowings.

23.    It was further found that JMB is a good faith lender pursuant to Section 364(e), and provisions of the DIP Credit Agreement were approved in both the Amended Findings and the Amended Order.

24.    The approvals, statements, findings, and conclusions set forth in the Amended Findings [Docket No. 818] and the Amended Order [Docket No. 820] are hereby adopted and incorporated by reference into these Findings of Fact and Conclusions of Law.

**III.    Additional Findings Relating To JMB Financing Expenses**

-4-

25.    On April 5, 2011, consistent with the Amended Findings, the Amended Order, and the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of December 13, 2010 (as supplemented, amended, or modified from time to time, the "DIP Credit Agreement"), Debtor moved for authorization to borrow the funds necessary to pay the JMB Financing Expenses and for an Order confirming that JMB has rights to a priming lien, lien on unencumbered property, and a superpriority administrative expense under 11 U.S.C. § 364 for this additional borrowing [Docket No. 826].

26.    As demonstrated during the hearings on the DIP Motion, Debtor canvassed the capital markets for financing and ultimately determined that the DIP Loan offered the best option for Debtor to move forward with its Chapter 11 case.

27.    Debtor and JMB would not have been able to negotiate and finalize the DIP Credit Agreement and other aspects of the DIP Loan without the assistance of their respective counsel.

28.    Without the DIP Loan, Debtor will not be able to fund its Chapter 11 case and the many activities, such as the Tax Increment Financing ("TIF") and tax credit applications, that have previously been recognized as helpful to further Debtor's development project, to further attract the interest of potential lenders in this development project, and to enhance the value of Debtor's property.

29.    Approval of the DIP Loan was vigorously contested by CenterPoint, resulting in several hearings before this court and driving up costs related to the borrowings sought.

30.    Over the six month period pending approval of the DIP Loan, as evidenced by B&G's invoices for its expenses and fees for the nearly six month period from October 20, 2010,

to March 31, 2011, JMB incurred expenses for the negotiation and drafting of the DIP Loan, due diligence, and additional expenses for reviewing and responding to CenterPoint's discovery demands and pleadings and for attending court hearings.

31.    JMB also employed the Chicago office of Duane Morris as local counsel relating to the DIP Loan, as is appropriate and typical, and that firm, as evidenced in its invoices, assisted JMB with the more than 20 court proceedings relating to the DIP Loan in this matter and advised JMB with respect to local practice.

32.    The DIP Credit Agreement requires that Debtor pay the JMB Financing Expenses as a condition to any further draws under the DIP Loan. There is no dispute that this requirement is typical in loan transactions.

33.    JMB agreed to loan up to $4 million, although only enough to net a total of $2,007,639 has thus far been approved.

34.    In support of its present motion to expand the borrowing to include loan expenses, Debtor presented the testimony of Jennifer Feldsher, a B&G partner specializing in bankruptcy work, both through her declaration and through live testimony, all subject to cross examination.

35.    Feldsher has been licensed to practice law in the State of New York since 2001 and is admitted to practice before the Supreme Court of the United States, the United States Court of Appeals for the Second Circuit, and the state and federal courts of New York and New Jersey. She has appeared in numerous bankruptcy courts throughout the United States.

36.    The tables below provide a summary of the professional services rendered by B&G divided by task. As is customary for firms representing DIP lenders, B&G attorneys did not segregate their time entries into discrete tasks, and thus the amounts set forth in the tables below

were partially approximated by B&G from the time records set forth in the B&G Invoices, though documented in great detail.

37.     In her declaration and in her hearing testimony, Feldsher explained the role and experience of the B&G attorneys with different specialties relating to the DIP Loan, including individuals with specialties in bankruptcy and restructuring (due to the underlying bankruptcy and to address Bankruptcy Code requirements on topics such as DIP loans and priming liens), real estate (to perform due diligence and related services relating to Debtor's property ownership and leasehold interests in property owned by the MPEA, including the prior objections filed by the MPEA), lending (for the negotiation and drafting of the initial commitment letter and term sheet and later the DIP Credit Agreement, Schedules, and related documents and the DIP Order), and litigation (to review and respond to the discovery demands and other pleadings by CenterPoint).

38.     It is appropriate and typical to involve attorneys with the applicable backgrounds and experience to address the various matters that arose relating to the DIP Loan.

39.     As further discussed below, the many filings by CenterPoint, both prior to the DIP Loan and relating to the DIP Loan itself, also required review and impacted the due diligence and other work performed by B&G.

40.     The expedited timing of many activities including litigation relating to the DIP Loan also played a role in increasing the amount of JMB Financing Expenses.

**A.     The JMB Financing Expenses Relating to Loan Documentation**

41.     JMB has presented sufficient evidence of its fees relating to the DIP Loan documentation.

42.     In order to address the many particular aspects of Debtor's property and this bankruptcy case, including the condemnation proceeding involving the Olde Prairie Parcel, issues relating to the potential benefit from a TIF district covering the Lakeside Parcel, the appraisals provided by CenterPoint and Debtor relating to Debtor's Property, and Debtor's lease agreement with the MPEA, the DIP Credit Agreement required extensive work and was not a standard form document.[1]

43.     Moreover, as a result of the contested and protracted nature of the proceedings related to approval of the DIP Financing, the DIP Loan documentation required revision several times.

44.     For this same reason, and due to the length of time between the filing of the DIP Motion and entry of the Amended Order and at the request of Debtor, B&G also negotiated with Debtor and prepared documentation to permit two interim draws under the DIP Facility to enable Debtor to pay its taxes pending final approval of the DIP Motion. B&G also negotiated and drafted various DIP Orders (including several on an emergency basis) at the request of Debtor or

---

[1] CenterPoint presented testimony by Jeffrey Altshul in an effort to argue that the loan documentation portion of the JMB Financing Expenses should be limited to $150,000 at most. Little weight can be given to Altshul's testimony considering his limited bankruptcy experience and the unique aspects of this heavily contested DIP Loan. Altshul admitted that, for the past five years, he has not been lead counsel for any debtors or DIP lenders, that he has not had any priming or contested DIP loan experience, and that he has not lectured or published relating to DIP lending. In response to questioning, Altshul also acknowledged that he has not reviewed the pleadings relating to the DIP Loan or CenterPoint's objections. Altshul's testimony also is not helpful for the additional reason that he did not request, nor did he receive, the drafts of the DIP Credit Agreement that were produced by Debtor and JMB in response to CenterPoint's discovery requests.

as required by the Court. Summary of this work is set forth below.[2]

| Negotiation and drafting of DIP Documentation, including but not limited to:<br><br>• DIP initial term sheet<br>• DIP commitment letter<br>• The DIP Credit Agreement and related documentation<br>• Various DIP Orders<br>• Officers certificates and schedules | 416.15 hours | $281,226.50 | Attorneys in B&G's Business and Regulatory, Real Estate, and Restructuring groups had primary responsibility for these tasks, led by<br><br>• Jennifer Feldsher<br>• Jonathan Wry (a business and regulatory partner with 14 years experience in financings, syndicated loans, securitizations, and restructurings)<br>• Ron Erlichman (a finance partner with 13 years experience focused on real estate assets)<br>• Helena Raifman (a business and regulatory associate with 10 years experience in financings, loans, securitizations, and real estate matters), and<br>• Soham Naik (a business and regulatory associate with 8 years experience in both finance and restructuring matters). |

**B.     JMB Financing Expenses Relating to Due Diligence**

45.     It was certainly appropriate for JMB to perform due diligence relating to the DIP

Loan. Due diligence is appropriate, necessary, and commonly preformed prior to agreeing to fund

---

[2] The hourly and billable amounts sought have been reduced from 418.45 hours and $282,767.50 because Debtor withdrew some fees and expenses originally sought.

a multi-million dollar loan.

46.    B&G provided sufficient evidence of the activities included in their due diligence.

47.    Since the pre-petition loan was signed by CenterPoint and Debtor in February 2008, numerous events have occurred both generally (including the global financial crisis) and specifically as to Debtor that demonstrate the necessity and propriety of due diligence that was taken. Related to Debtor specifically, JMB was required to analyze: CenterPoint's foreclosure action against Debtor; the MPEA's condemnation action against Debtor relating to the Olde Prairie Parcel; the potential availability of TIF funds for the Lakeside Parcel; Debtor's bankruptcy proceeding; the Lift Stay Hearing in this matter, which included separate and significantly different real estate valuations from CenterPoint and Debtor; and numerous other filings in this proceeding prior to the filing of the DIP Motion [Docket No. 385].

48.    The due diligence work included:

| Due Diligence, including: <br>• Review of documentation provided by Debtor in connection with the loan; <br>• Lien searches; <br>• Appraisals; <br>• TIF analysis but solely for purposes of supporting the DIP facility, the timing provided by Debtor for its Chapter 11 case, and the events of default in the loan; <br>• Parking Lease review and analysis; and | 153.01 hours | $85,814.00 | Attorneys in B&G's Business and Regulatory group had primary responsibility for these tasks, including Ron Erlichman and Helena Raifman. |
|---|---|---|---|

| General background on Debtor's Chapter 11 case. | | | |
|---|---|---|---|

**C.   JMB Financing Expenses Relating to General Bankruptcy Matters**

49.    JMB has provided sufficient evidence of its fees relating to general bankruptcy matters. There have been numerous hearings and filings relating to the DIP Loan since the DIP Motion was filed in November 2010. Thus, the JMB Financing Expenses include work necessary to monitor the DIP Loan proceedings and filings, to appear at the DIP Loan hearings, and to prepare and negotiate proposed Orders relating to the DIP Loan.

50.    Many of the DIP Loan hearings were covered solely by local counsel. However, B&G attorneys also attended several hearings. A summary of this work follows:[3]

| Bankruptcy Matters, including, but not limited to,<br><br>• Researching, reviewing and commenting on numerous pleadings submitted by Debtor and Centerpoint in connection with the DIP Financing; and<br><br>• Attendance at various hearings and status conferences before the Court. | 222.4 hours | $115,007.50 | Attorneys in B&G's Business and Regulatory and Restructuring groups had primary responsibility for these tasks, led by Jennifer Feldsher and Soham Naik. |
|---|---|---|---|

**D.   JMB Financing Expenses Relating to Litigation**

51.    JMB also has identified JMB Financing Expenses for litigation matters including

---

[3] The hourly and billable amounts have been reduced from 223.8 hours and $115,945.50 originally sought because Debtor withdrew some fees and expenses.

-11-

responding to CenterPoint's demands for oral and written discovery from JMB (much of which

occurred on an expedited basis) and defending and preparing a JMB witness (Gilbert Li) for his

second day of testimony during the hearings on the DIP Loan.

52.     Due to the expedited nature of CenterPoint's request to depose a JMB

representative, B&G attorneys were required to prepare Li for his deposition, to defend the

deposition, and to represent Li as needed during his Court testimony.

53.     In regard to Li's deposition, Jennifer Feldsher was involved because she had

knowledge of the underlying bankruptcy proceeding and loan terms, Daniel Connolly was

involved due to his litigation background generally and his specific prior knowledge of JMB, and

Kelly Koscuiszka was involved because she had been brought in to assist in early January to

collect, review, and produce documents in response to the CenterPoint document requests.

Rosanne Ciambrone also participated for thirty minutes because she had attended the status

hearing relating to depositions and was familiar with the Court's comments relating to the

depositions

54.     Considering the heavily contested nature of the DIP Motion, JMB also monitored

the litigation proceedings. Soham Naik from B&G was responsible for monitoring the initial one-

and-a-half days of the DIP Loan hearing in January 2011 and summarizing the testimony.

Following Li's testimony on the second day, Koscuiszka took on this role to allow Naik to return

to New York.

55.     This work included:

| Litigation matters related to: | 103.35 hours | $71,448.25 | Attorneys in B&G's Litigation group had primary responsibility for these tasks, led by: |
|---|---|---|---|
| • Reviewing and responding to multiple motions by Centerpoint seeking oral and written discovery;<br>• Document review and production;<br>• Mr. Li's deposition; and<br>• Preparing for and attending hearings involving JMB testimony | | | • Daniel Connolly (a litigation partner with twenty-three years experience in trial and appellate matters) and<br>• Kelly Koscuiszka (a litigation associate with six years experience in trial matters) |

**IV.    Debtor's Substantial Equity Cushion Demonstrates That CenterPoint Has Adequate Protection.**

56.    The Court previously found that the total value of the Real Properties and the Parking Lease was $81,150,000, far more than the approximately $48,000,000 that CenterPoint claims to be owed by Debtor.

57.    The DIP Loan does not impair the available equity cushion of over $25 to $30 million.

58.    Debtor, in its business judgment, has determined that the cost of borrowing sufficient funds in order to pay the JMB Financing Expenses is necessary and reasonable in order to move forward with its development project and reorganization plans.

Further factual matters described in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### I. LEGAL STANDARDS

A debtor-in-possession may obtain credit or incur debt only as provided in § 364 of the

Bankruptcy Code, Title 11 U.S.C. The standards that a debtor must meet under § 364 depend on

the type of credit it seeks to obtain. A debtor may obtain unsecured credit in the ordinary course

of business allowable as an administrative expense without a hearing or court approval, unless

the court orders otherwise. 11 U.S.C. § 364(a). A debtor may obtain unsecured credit outside the

ordinary course of business only with court approval after notice and a hearing. *Id.* § 364(b). If a

debtor is unable to obtain unsecured credit, a court may authorize the debtor, after notice and a

hearing, to obtain credit: (1) with priority over other administrative expenses (sometimes referred

to as "superpriority" administrative expenses); (2) secured by a lien on unencumbered estate

property; or (3) secured by a junior lien on encumbered estate property. *Id.* § 364(c). Finally, a

debtor can obtain credit secured by a senior or equal lien on encumbered estate property

(sometimes referred to as a "priming lien") with court approval and after notice and a hearing

only if: (1) the debtor is unable to obtain credit otherwise and (2) the interest of the creditor to be

primed is adequately protected. *Id.* § 364(d).

By their terms, these statutory standards do not require inquiry into a debtor's proposed

use of the funds. However, should authority to borrow be granted, the funds would be property of

the estate and subject to usage limitations set out in 11 U.S.C. § 363. Under that provision, a

debtor may use or sell estate property outside the ordinary course of business only after notice

and a hearing. *Id.* § 363(b)(1). In determining whether to approve such a use or sale, various

-14-

standards have been used, "including a business judgment test, a good faith test determining

whether the [use or] sale is fair and equitable, and a test to assess whether the transaction is in the

best interest of the estate." *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (internal

citations omitted). "The Seventh Circuit Court of Appeals has stated that there must be an

'articulated business justification' for the [use or] sale." *Id.* (citing *In re Schipper*, 933 F.2d 513,

515 (7th Cir. 1991)). Moreover, professional fees approved in bankruptcy must generally be

reasonable and necessary. *See* 11 U.S.C. §§ 330 (permitting reasonable compensation for actual,

necessary services rendered by professionals and the like working on behalf of the estate); 506(b)

(permitting oversecured creditors to seek reasonable fees, costs, or charges).

Here, Debtor seeks to obtain credit from JMB to pay the JMB Financing Expenses in

exchange for a priming lien on property encumbered by CenterPoint's lien, a lien on any of

Debtor's property that is not already encumbered, and a superpriority administrative expense

claim. Therefore, Debtor must show that it cannot obtain this credit under less onerous terms and

that CenterPoint's interest in Debtor's property is adequately protected. *See* 11 U.S.C. § 364(d).

## II. CENTERPOINT'S INTEREST IS ADEQUATELY PROTECTED

A debtor will sometimes provide adequate protection of an interest in estate property by:

(1) making cash payments to the affected entity to the extent its interest decreases in value; (2)

providing to the entity an additional or replacement lien to the extent its interest decreases in

value; or (3) granting some other relief that will allow the entity to realize the "indubitable

equivalent" of its interest. 11 U.S.C. § 361. The purpose of adequate protection "is to insure that

the creditor receives the value for which he bargained prebankruptcy." *In re O'Connor*, 808 F.2d

-15-

1393, 1396 (10th Cir. 1987).

However, a large equity cushion in the form of property value has also been found to provide adequate protection in some circumstances. *See In re Aaura, Inc.*, No. 06 B 01853, 2006 WL 2568048, at *2 (Bankr. N.D. Ill. Sept. 1, 2006) (citing *In re James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir. 1992); *In re Markos Gurnee P'ship*, 252 B.R. 712, 716–17 (Bankr. N.D. Ill. 1997)). As pointed out in an earlier opinion in this bankruptcy case, an equity cushion is not a debtor's piggy bank. When a debtor seeks to prime an existing creditor, it must also show that the creditor's interest is not being jeopardized, considering "all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan." *In re Strug-Division LLC*, 380 B.R. 505, 513–14 (Bankr. N.D. Ill. 2008) (quoting *In re Aqua Assoc.*, 123 B.R. 192, 196–97 (Bankr. E.D. Pa. 1991)). A debtor's use of the credit obtained through a priming lien should be more likely than not to benefit the estate and improve the debtor's ability to reorganize, *see id.*; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992), but speculative benefit should not be relied on for adequate protection, *see In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) (finding potential increase in value from Chapter 11 debtor's property development plans too speculative to adequately protect mortgagee's undersecured interest in debtor's property).

In this bankruptcy case, it was found that Debtor's property has a value of $81,150,000. Since Debtor's debt amounted to approximately $48.7 million as of July 7, 2010, when CenterPoint filed its Proof of Claim, the value found represents a large equity cushion. While

-16-

accepted methods were used with expert help to value the real estate, those sources are only a substitute for testing the market to obtain actual sales or funding.

Nevertheless, it is clear here that CenterPoint's security interest in Debtor's property and cash is adequately protected, even when reduced by the priming lien. There is sufficient equity in Debtor's properties to protect CenterPoint against the diminution in value of its interest that will result from the relatively small JMB priming lien that has been approved even when increased by the approved JMB Financing Expenses.

## III. REASONABLENESS OF JMB FINANCING EXPENSES

JMB has thus far advanced under the DIP Credit Agreement only enough funds to pay real estate taxes that became due, and it will advance no further funds unless JMB Financing Expenses are paid. Debtor is not able to obtain funds from any other source to pay those expenses. Debtor and JMB have bargained at arms length, and Debtor has agreed to pay the various fees and expenses, so all of the JMB Financing Expenses are allowable. The only question that remains is whether JMB's attorney fees are reasonable and necessary so that they may be secured by a priming lien on CenterPoint's collateral.

Because all the expenses sought are agreed to between Debtor and JMB and have been established to be customary in financing transactions, none are disallowed as to amounts sought to be paid from Debtor. However, because they are also sought to affect rights of CenterPoint by a priming lien, they may not be approved unless necessary and reasonable.

CenterPoint has raised objections to most of the line items in the invoices supplied by JMB's law firms at the evidentiary hearing. Most of these objections are without merit, as

discussed below. However, several CenterPoint objections do have merit.

## A. Objections Sustained

As a preliminary matter, it should be noted that JMB's attorneys recorded one entry per person per day. Any task that one attorney worked on is lumped into a single time entry, and it is impossible to determine how much time was spent on any particular task. Such lumping is generally disapproved. *See In re Hedstrom Corp*, 333 B.R. 815, 823–24 (Bankr. N.D. Ill. 2005). Because there is no way to separate tasks, if an objection in this case to a portion of a particular time entry is sustained, it must be sustained as to the entire time entry.

### 1. Multiple Attorneys

CenterPoint's first complaint is that multiple attorneys attended various hearings and depositions. Fees for nonparticipating counsel at hearings and depositions are not generally considered necessary and reasonable, *see In re Wildman*, 72 B.R. 700, 710 (Bankr. N.D. Ill. 1987), so those expenses cannot prime CenterPoint's lien in this case. Here, local counsel attended several hearings when JMB's lead counsel was present, and often lead counsel sent more than one attorney to the deposition or hearing. A priming lien is disallowed on this ground for the following fees:

| Date | Attorney | Firm | Time Expended | Fees |
|------|----------|------|---------------|------|
| 12/10/2010 | S. Naik | Bracewell & Giuliani | 4.90 | $3,283 |
| 12/10/2010 | H. Raifman | Bracewell & Giuliani | 10.10 | $6,767 |
| 1/10/2011 | J. Feldshar | Bracewell & Giuliani | 4.60 | $3,151 |
| 1/10/2011 | K. Koscuiszka | Bracewell & Giuliani | 7.00 | $4,095 |
| 1/12/2011 | R. Ciambrone | Duane Morris | 5.00 | $3,100 |

-18-

| 1/13/2011 | R. Ciambrone | Duane Morris | | 6.00 | $3,720 |
|-----------|--------------|--------------|--|------|--------|
| 1/13/2011 | K. Koscuiszka | Bracewell & Giuliani | | 8.00 | $4,680 |
| 1/13/2011 | S. Naik | Bracewell & Giuliani | | 8.50 | $5,695 |
| 1/14/2011 | R. Ciambrone | Duane Morris | | 6.50 | $4,030 |
| 1/20/2011 | K. Koscuiszka | Bracewell & Giuliani | | 2.50 | $1,462 |
| 1/21/2011 | R. Ciambrone | Duane Morris | | 6.30 | $3,906 |
| 1/21/2011 | K. Koscuiszka | Bracewell & Giuliani | | 5.00 | $2,925 |
| 1/22/2011 | K. Koscuiszka | Bracewell & Giuliani | | 2.00 | $1,170 |
| 3/28/2011 | H. Raifman | Bracewell & Giuliani | | 2.40 | $1,608 |
| | | | **Total:** | | **$49,592** |

In addition, a priming lien is disallowed on this ground for the following expenses:

| Date | Firm | Expenses |
|------|------|----------|
| 2/25/2011 | Bracewell & Giuliani | $64 |
| 3/25/2011 | Bracewell & Giuliani | $66 |
| | **Total:** | **$130** |

## 2. Billing for Other Matters

CenterPoint also objects to several time entries that relate to other matters, including a potential second loan from JMB to Debtor that would enable Debtor to exit bankruptcy and a "Gleichman/Norberg loan." Only fees and expenses relating to the DIP loan can be secured by a priming lien. Debtor apparently agrees and has withdrawn one time entry that mentions an exit agreement in its entirety. A priming lien is disallowed on this ground for the following fees:

| Date | Attorney | Firm | Time Expended | Fees |
|------|----------|------|---------------|------|
| 11/17/2010 | J. Wry | Bracewell & Giuliani | 1.00 | $760 |

| 1/05/2011 | H. Raifman | Bracewell & Giuliani | 2.20 | $1,474 |
| 3/23/2011 | H. Raifman | Bracewell & Giuliani | 1.80 | $1,206 (withdrawn) |
| | | | **Total:** | **$3,440** |

### 3. Senior Attorneys Doing Below-Pay-Grade Work

CenterPoint's next objection in that senior attorneys billed at high rates for simple tasks, such as assembling a hearing binder and calendaring hearings. *See Wildman*, 72 B.R. at 710 (appropriate level of skill required). CenterPoint specifically identifies two time entries in this objection. In response, Debtor offered to withdraw a total of 1.9 hours from these two time entries. However, as discussed above, it is impossible to determine how much time was actually spent on these tasks, so the entire time entries must be excluded from the priming lien. Therefore, a priming lien is disallowed on this ground for the following fees:

| Date | Attorney | Firm | Time Expended | Fees |
|------|----------|------|---------------|------|
| 12/09/2010 | S. Naik | Bracewell & Giuliani | 6.20 | $4,154 |
| 12/22/2010 | S. Naik | Bracewell & Giuliani | 1.40 | $938 |
| | | | **Total:** | **$5,092** |

### 4. Vague and Inadequate Time Entries

CenterPoint also complains that many time entries are too vague and inadequate to justify a priming lien. As discussed below, Debtor has explained most of the entries. However, one time entry for "meetings in Chicago" was not sufficiently explained. Another time entry purported to document one attorney's work for 18.2 hours on a single day, listing her activities as "Drafted DIP Credit Agreement; reviewed DIP order, spoke w/S. Naik and J. Wry; correspondence; tcw

-20-

G.Li." It may be that the attorney did work enough to bill more than eighteen hours on that day. However, because she lumped time, it is impossible to determine whether the time she spent was necessary and reasonable. For this reason, these fees cannot be secured by the priming lien:

| Date | Attorney | Firm | Time Expended | Fees |
|------|----------|------|---------------|------|
| 12/01/2011 | H. Raifman | Bracewell & Giuliani | 18.20 | $12,194 |
| 1/14/2011 | D. Connolly | Bracewell & Giuliani | 7.00 | $6,195 |
| | | | Total: | $18,389 |

## B. Objections Overruled

The remaining CenterPoint objections are to be overruled.

CenterPoint objects to certain Lender Counsel fees as "redundant." For example, CenterPoint objects that certain meetings, depositions, and hearings should have had more limited attendance. It is proper and often necessary for more than one attorney working on a case to confer. Based on the evidence discussed above, and except as specifically sustained above, CenterPoint's objections on this ground are overruled.

CenterPoint also objects to certain B&G time entries as "repetitive." For example, CenterPoint generally objects to the time entries of B&G attorney Jonathan Wry on this basis. However, Debtor presented evidence that Wry performs lending work and that his time entries reflected the lending work for the DIP Loan, for example: communications with JMB or Debtor and its counsel relating to the proposed loan, drafting and negotiation of the DIP Credit Agreement, and review and revision of associate work. Thus, except as specifically sustained above, CenterPoint's objections to any fees on this ground are overruled.

CenterPoint next objects to certain B&G time entries as "vague." Except as noted above, based on the evidence presented about the type of work performed relating to the DIP Loan and the specialties of B&G counsel that assisted with the DIP Loan, the identified fees can be sufficiently understood. Thus, except as specifically sustained above, CenterPoint's objections to any fees on this ground are overruled.

CenterPoint's next objection is to certain B&G time entries on the basis of "lumping." This objection also is overruled, except as specifically sustained above. Unlike a debtor's counsel in a bankruptcy proceeding, counsel for DIP Lenders are not generally required to break out their entries under Section 327 of the Bankruptcy Code, and typically do not do so. Moreover, the time entries supplied were detailed enough to determine that the tasks completed and the work required were reasonable and necessary.

Finally, CenterPoint objects that certain B&G disbursements were unnecessary. CenterPoint's primary argument appears to be that certain expense entries are dated the final day of each month. However, Feldsher explained that the expenses identified on the B&G invoices reflect the date that the invoice was logged from a particular vendor, and not the date that the underlying expenses was incurred.[4] Thus, CenterPoint's characterization of the challenged expenses is rejected. CenterPoint's secondary argument for this objection appears to relate to all travel expenses from New York to Chicago relating to the B&G's attendance at certain hearings. Except as otherwise noted above, it was appropriate and reasonable for JMB's counsel to attend certain DIP Loan hearings, thus warranting their travel expenses from New York. Therefore,

---

[4] Debtor did withdraw $42 of expenses for taxis that were billed on December 31, 2010.

except as specifically sustained above, CenterPoint's objection on this ground is denied.

## CONCLUSION

Based on the evidence presented and for reasons discussed above, JMB Financing

Expenses are entirely valid and enforceable as between Debtor and JMB. However, for reasons

detailed above, JMB shall have Section 364 priming rights for all that is sought except $76,685

of the requested JMB Financing Expenses, thus allowing only $542,928 of those Expenses to

prime the CenterPoint lien. A separate order granting the Motion to that extent and otherwise

denying the Motion will be entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 30 day of May, 2011.

-23-