## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| OLDE PRAIRIE BLOCK OWNER, LLC, | ) | Bankruptcy No. 10 B 22668 |
|  | ) |  |
| Debtor. | ) |  |

### FINDINGS OF FACT AND CONCLUSIONS OF
### LAW ON DEBTOR'S OBJECTION AND COUNTERCLAIM
### COUNT III TO CENTERPOINT CLAIM NO. 1

Olde Prairie Block Owner, LLC, the debtor in this Chapter 11 bankruptcy case, has

asserted Counterclaims and Objection to the Claim of its mortgagee CenterPoint Properties Trust

("CenterPoint"). Of the five Counterclaim Counts, four were previously disposed of and only

Count III remains. Debtor asserts in Count III that CenterPoint breached its duty of good faith

and fair dealing by failing to take steps to settle a state-court condemnation proceeding. Debtor

also objected to several dollar components of the CenterPoint Claim. For reasons discussed

below, Debtor's Counterclaim Count III will fail, and CenterPoint's Claim will be allowed

except for asserted post-bankruptcy attorneys fees and undefined expenses for which no evidence

was offered.

### CASE HISTORY

This year-old Chapter 11 bankruptcy case has generated extensive litigation between

Debtor and CenterPoint. Final hearing on the CenterPoint Claim and Count III of Debtor's

Counterclaim now at issue poses particularly critical issues. Debtor's attempt to pare down

CenterPoint's secured Claim against Debtor's property was likely intended to enhance its ability

to refinance CenterPoint's loan and thereby to confirm a plan of reorganization.

-1-

The other four Counts of the Counterclaim were earlier dismissed with prejudice, but were not certified for immediate appeal until the remaining Count III is resolved.[1] The parties consented in all Counts to entry of final judgments by the bankruptcy judge, even if any were based on related jurisdiction.

An Amended Final Pretrial Order [Docket No. 654] was entered setting a consolidated trial on the CenterPoint Claim and Count III. After the parties rested, closing arguments were submitted in the form of written Proposed Findings of Fact and Conclusions of Law and briefs filed by each. The following Findings of Fact and Conclusions of Law are now made and will be entered.

## INTRODUCTION

This Introduction comprises Findings that are supplemented by the additional detailed Findings of Fact set forth in the detailed Appendix hereto.

## I. THE PARTIES AND THE REAL ESTATE

Karl Norberg and Pamela Gleichman, who are married to each other, are real estate developers. Through various corporate entities, they acquired two parcels of real estate adjacent to McCormick Place, a large convention center in Chicago, Illinois. The first parcel, located at 230 East Cermak Road, is known as the Olde Prairie parcel. The second, located at 330 East Cermak Road, is known as the Lakeside parcel.

---

[1] The dispositions of Counts I, IV, and V are discussed at *In re Olde Prairie Block Owner, LLC*, 441 B.R. 298 (Bankr. N.D. Ill. 2010) (Docket No. 369), and the disposition of Count II is discussed at *In re Olde Prairie Block Owner, LLC*, 442 B.R. 675 (Bankr. N.D. Ill. 2011) (Docket No. 660). These Counts were each dismissed, and eventually the dismissals were made with prejudice [Docket No. 419 as to Counts I, IV, and V, and Docket No. 665 as to Count II].

The proximity of those parcels to McCormick Place and the dearth of nearby hotel development convinced Norberg and Gleichman that the best use of the properties was hotel development. Over the years since acquiring the parcels, Norberg and Gleichman have taken many steps towards that goal, among other things developing marketing materials, seeking approval of a plan of development, and pursuing tax credits that would facilitate financing for hotel construction. They also acquired a 195-year rent-free leasehold interest for 450 parking spots in the McCormick Place parking garage and the rights to a heating and cooling easement that provides cooling, hearing, steam, and water from the Trigen Energy Corp power plant to the Lakeside parcel. Eventually, the Debtor LLC was created and all these assets were transferred to it. Norberg is Debtor's Manager, and Gleichman serves as its developer.

Debtor borrowed to finance its development plans. In 2007 and early 2008, Debtor's property was encumbered by a mortgage with MMA Realty Capital. The maturity date for that loan was February 19, 2008. Debtor was unable to refinance the loan with MMA when it came due, so it sought out other lenders. In late 2007, Debtor began refinancing negotiations with CenterPoint.

## II. THE CENTERPOINT LOAN

During negotiations, CenterPoint generated several internal documents evaluating the potential loan to Debtor, considering three possible outcomes of the loan. First was the "best case" (that is, the most profitable outcome), which was the possibility that Debtor would default on the loan when it matured in one year, allowing CenterPoint to acquire the real estate collateral and resell it after five years. Second was the "base case" (that is, the most likely outcome) that Debtor would pay off the loan at maturity. Last was the "worst case" possibility that Debtor

-3-

would default on the loan when it matured in one year, allowing CenterPoint to acquire and resell the real estate but for much less than in the "best case."

After hard-fought negotiations, Debtor and CenterPoint struck a deal. On February 22, 2008, Debtor executed a promissory note (the "Note") evidencing a loan from CenterPoint in the amount of $37,127,667.03. The Note bears an interest rate of 12.89% per annum and, upon default in the payment of principal, a default interest rate of 16.89% per annum. The Note also included an interest reserve in the amount if $4,467,217.24, which was drawn on to fund monthly interest payments on the Note until it matured on February 21, 2009.

On February 25, 2008, Debtor executed a document entitled "Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (the "Mortgage") in favor of CenterPoint. CenterPoint funded the loan that day, which was used to pay off the MMA loan, and the new Mortgage was recorded.

One key issue in negotiations was control over a likely anticipated condemnation proceeding. The final version of the Mortgage provided:

> Borrower shall provide Lender with written notice of and reasonable details concerning the institution (or notice regarding the potential institution) of any proceedings for the condemnation of the Property or any portion thereof, within ten (10) days after Borrower first learns of any such potential or actual proceedings (including and administrative, quasi-judicial, quasi-legislative, legislative or judicial proceedings), and shall forward to Lender copies of all notices and other communications regarding such proceedings. Lender may participate in any condemnation proceedings and Borrower shall do all things necessary to obtain prompt settlement of any condemnation proceedings. . . .
>
> . . .
>
> Notwithstanding anything to the contrary contained herein, Lender shall have the right, at Borrower's sole cost and expenses, to exclusive

-4-

control, prosecution and defense of any condemnation proceedings;
provided, however, all condemnation (including the conveyance in lieu
thereof) compensation, awards, proceeds, damages, claims and payments
to which Borrower may become entitled as a result of such condemnation
proceedings shall be subject to the reasonable approval of Borrower and
Lender.

(Debtor's Ex. 36, at 13–14.)

## III. THE CONDEMNATION PROCEEDING

The provisions quoted above were quite important in context of the Count III trial. In

September 2007, before the CenterPoint loan was finalized, Debtor had received word that the

Metropolitan Pier and Exposition Authority (the "MPEA") was exploring the possibility of

acquiring the Olde Prairie parcel through eminent domain. The first step in the eminent domain

process was for the MPEA to obtain an appraisal of the real estate it hoped to acquire. Debtor

saw this as a great opportunity.

Although the Olde Prairie parcel was acquired in 2005 for approximately $6 million,

Debtor's principals placed a substantially higher value on it in 2008. They engaged the law firm

Righeimer Martin & Cinquino to represent it in negotiations with the MPEA. Highly skilled as

an attorney in condemnation proceedings, Attorney Leo Cinquino of that firm knew that prior

purchases were often significant factors for juries in condemnation proceedings. He therefore

worked diligently to persuade the MPEA's appraiser that the property value had increased. He

shared with the MPEA a series of documents, including private potential purchase offers,

development plans, environmental reports, comparable sales, and zoning information. He also

allowed the appraiser to interview Pamela Gleichman, an unusual step in potential

condemnations. The strategy worked. The MPEA's appraiser valued the Olde Prairie parcel at

$17.7 million, almost three times what had been paid to acquire it.

On March 11, 2008, (only a month after the new CenterPoint loan was made) the MPEA took an active step toward obtaining the Olde Prairie parcel, sending Debtor a letter offering to purchase that parcel for $17.7 million. This letter was the MPEA's bona fide attempt to acquire the parcel without resorting to its eminent domain powers, as required of it under Illinois condemnation law. Given the much lower amount paid for the parcel, that offer was very reasonable, as Debtor now admits. Nevertheless, Debtor did not accept the MPEA's offer, deciding instead to push for more. Debtor took no action on the offer, not even notifying CenterPoint as it was required to do under terms of the Mortgage, thereby letting the offer lapse by its terms on March 25, 2008. However, as opined by Debtor's condemnation lawyer, Leo Cinquino, it is commonly assumed that such an offer, even if lapsed by its terms, is often the floor for future negotiations.

The MPEA filed a condemnation proceeding against the Olde Prairie parcel on June 20, 2008, naming Debtor, Karl Norberg, and CenterPoint as defendants. While Debtor had not accepted the $17.7 million offer, the MPEA's counsel remained willing to settle the matter for that amount were the defendants to agree. Mr. Cinquino's skilled work with the MPEA appraiser pre-condemnation therefore continued to offer a very favorable potential result. In fact, that settlement possibility remained available throughout the two-and-a-half years that the condemnation proceeding was pending, until the MPEA decided in October 2010 to abandon its attempt to acquire the parcel, five months after Debtor filed its bankruptcy case.

After the condemnation case was filed, Debtor and CenterPoint exchanged a series of letters. On June 25, 2008, CenterPoint notified Debtor that it intended to exercise its exclusive-

-6-

control rights under the Mortgage and demanded that Debtor turn over all relevant documents.

Debtor responded in its letter dated July 2, 2008, asserting reasons why it was "inappropriate" for

CenterPoint to attempt to control the condemnation proceedings. That letter represented that

there was an offer by a third party for the Olde Prairie parcel of $30 million, although in fact no

such written firm offer had been received. The letter also asserted a potential conflict by the

counsel that CenterPoint had selected to appear in the condemnation proceeding. That lawyer

was Stephen Burke, who had briefly met with Debtor's principals about the parcel before the

condemnation proceeding was filed. CenterPoint replied on July 7, 2008, again asserting its

rights to control the condemnation proceeding and demanding the turnover of related documents.

Debtor responded by letter dated July 29, 2008, explaining that Debtor was threatening to defeat

the condemnation through filing a "traverse" (a motion to dismiss the proceeding) and thereby

hoped to induce an increased settlement offer. In that letter, Debtor also argued that CenterPoint

should not control the condemnation case because the case would continue well beyond February

2009, when CenterPoint's loan was due to mature. CenterPoint replied in a letter dated August

11, 2008, recounting its view of the loan history and the condemnation proceeding. It again

insisted that it controlled the condemnation proceeding through its chosen counsel.

The squabbling was not confined to letter writing. Debtor and Norberg continued to use

Leo Cinquino as their condemnation counsel, CenterPoint continued to use Stephen Burke, and

both attorneys filed appearances in the condemnation proceeding. On September 22, 2008,

Norberg moved in that proceeding to disqualify Burke on grounds not directly relevant to this

discussion. That motion was eventually resolved in August 2009 in CenterPoint's favor. While

that Motion was pending, however, CenterPoint's counsel Burke could not have engaged in any

substantive way with the case, including pursuit of settlement, without risking a grave legal

conflict with Debtor. However, during periods both before and after that issue was pending,

Burke did not engage in settlement negotiations.

Adding further complication, Norberg did indeed file a traverse and motion to dismiss the

condemnation proceeding. While such a filing tested the authority of the MPEA to engage in the

condemnation proceeding, Norberg and Debtor intended to gain negotiating leverage by that

effort. Of course, that tactic might be a useful strategy only so long as the condemnor remained

motivated to acquire the property. CenterPoint disagreed with Norberg's litigation strategy and

insisted, as part of its assertion of control over the proceeding, that Norberg withdraw his filing

of the traverse and dismissal motion. He never withdrew that filing. However, the traverse and

motion to dismiss were never resolved before the MPEA ultimately decided not to pursue its

effort to acquire the parcel and withdrew its condemnation proceeding.

On May 1, 2009, CenterPoint filed a motion before the state court in the condemnation

case seeking an order declaring that CenterPoint controlled the condemnation proceeding

pursuant to the Mortgage. Debtor and Norberg opposed that motion, which was never resolved.

During this period, despite the squabbling with CenterPoint, Debtor itself and Norberg as

a party continued to negotiate with the MPEA without CenterPoint's involvement. Under

agreement of the parties quoted earlier, Debtor had a perfect right to engage in such negotiations,

though any settlement with the MPEA would have to be approved by CenterPoint.

In late 2008 and early 2009, Debtor tried to interest the MPEA in a "quick-take"

settlement, in which the MPEA would receive title to the Olde Prairie parcel immediately and the

parties would continue to trial on value, potentially with a floor and ceiling on the amount the

-8-

MPEA would eventually have to pay. A number of other terms were also discussed, including the interest of Pamela Gleichman in becoming the "master developer" for the MPEA's development project. During these negotiations, Debtor made two written offers to value the parcel at more than the $17.7 million being offered by the MPEA: the first on December 19, 2008, for $22 million and the second on March 4, 2009, for $19.2 million. The MPEA did not agree to any of those proposals and Debtor did not agree to accept the $17.7 million continued to be offered by the MPEA, so they never reached a deal.

As Debtor's negotiations with the MPEA continued, the CenterPoint loan maturity date of February 21, 2009, approached. Debtor hoped to use the proceeds of the condemnation proceeding to repay CenterPoint in part, allowing it to refinance the loan balance with some other lender. Debtor's unwillingness to accept the original $17.7 million offer and the MPEA's unwillingness to agree to the larger amount sought by Debtor or to the proposed role for Pam Gleichman brought those parties to a negotiating impasse. What became more problematic was the deep recession that our nation and particularly the real estate market had fallen into during this period. When the CenterPoint loan came due on February 21, 2009, Debtor lacked the cash to repay the CenterPoint loan, and given the pendency of the condemnation proceeding and general deterioration of the real estate finance market at the time, Debtor could not find another lender to refinance the CenterPoint loan.

Facing this financial reality, Debtor sought on a few occasions to meet with CenterPoint. Although it had not kept CenterPoint informed of the ongoing negotiations, Debtor sent letters on December 5, 2008, February 19, 2009, and March 4, 2009, asking to meet with CenterPoint representatives to discuss "confidential information" but without divulging anything further. In

response, CenterPoint demanded that Debtor provide agendas and other relevant documents and

information before any meeting. Because Debtor did not provide that information, CenterPoint

refused to meet.

The CenterPoint loan came due and payable on February 21, 2009, and CenterPoint filed

a Complaint to foreclose on Debtor's property on February 24, 2009. That proceeding generated

extensive litigation in state court, with Debtor asserting various defenses and counterclaims

against CenterPoint. The latest iteration of Debtor's counterclaims in that court were due to be

ruled on when, on May 18, 2010, Debtor filed for bankruptcy.

## IV. CENTERPOINT'S PROOF OF CLAIM

CenterPoint filed in this bankruptcy case its Proof of Claim, which has been designated

Claim Number 1. In that Claim, CenterPoint asserted a total claim as of the petition date of

$48,762,842.19 plus interest, fees, and costs, fully secured by real estate and other property, with

an annual interest rate of 16.89%. In an Addendum attached to and amplifying the Proof of

Claim, CenterPoint detailed components of that Claim, including outstanding principal of

$37,093,012.18, a late charge of $1,854,650.61, interest of $9,072,229.84, tax protest fees of

$36,550.24, 2008 real estate taxes of $207,716.06, the first installment of 2009 real estate taxes

of $107,087.17, attorney fees and costs of $250,938.14 accrued prior to the filing of the Proof of

Claim, and receiver's costs and attorney fees of $140,657.95. CenterPoint also asserted therein its

rights to undefined attorneys fees, costs, and other expenses that were due under the Mortgage

but had not yet accrued. By the Pretrial Order, that Claim was consolidated for trial with the

Count III Counterclaim.

-10-

## CONCLUSIONS OF LAW

### I. JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. It is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. §§ 1408 and 1409. Allowance and disallowance of claims is generally a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Debtor's Counterclaim against CenterPoint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C), but even if it were only a related proceeding, the parties have consented to final judgment being entered by the bankruptcy judge.[2]

### II. OBJECTIONS TO PORTIONS OF CENTERPOINT'S CLAIM

A creditor[3] who asserts a claim[4] against a debtor may file a Proof of its Claim. 11 U.S.C. § 501(a). The Proof of Claim must conform to the Official Form, be executed by the creditor or its authorized agent, attach any writing that the claim is based on, and provide evidence of

---

[2] Some opinions have held, despite the plain language of the statute, that some counterclaims are not core proceedings under 28 U.S.C. § 157(b)(2)(C), thereby depriving bankruptcy judges of jurisdiction to enter final judgments adjudicating those counterclaims. *See In re Marshall*, 600 F.3d 1037 (9th Cir. 2010). That issue need not be addressed here, as the parties consented to entry of final judgments relating to the Counterclaims. (*See* Docket Nos. 346 & 350.) Such consent, being expressly provided for by statute, lays to rest any question of whether a final judgment may be entered here. 28 U.S.C. § 157(c)(2).

[3] A "creditor" is, among other things, an "entity that has a claim against the debtor that arose at the time of or before" the bankruptcy case was filed. 11 U.S.C. § 101(10).

[4] A "claim" is broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

-11-

perfection of any security interest asserted. Fed. R. Bankr. P. 3001(a)–(d).

      If a creditor files a proof of claim, its claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). If an objection is made, a hearing is held to determine the amount of the claim as of the date the bankruptcy case was filed. *Id.* § 502(b). After such hearing, the claim is to be allowed except to extent the claim is unenforceable if the debtor has some defense against the claim, the claim is for unmatured interest, or for other reasons not relevant here. *Id.*; *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449–50 (2007). A creditor's claim may also include contractually due attorney fees incurred post bankruptcy, *Travelers*, 549 U.S. at 449–53, and, if the claim is oversecured, post-bankruptcy interest, 11 U.S.C. § 506(b).

      A proof of claim executed and filed in accordance with Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). "Claim objectors carry the initial burden to produce some evidence to overcome this rebuttable presumption." *In re McCoy*, 355 B.R. 69, 72 (Bankr. N.D. Ill. 2006). If the objector has produced some basis for calling a claim into question, the burden ordinarily shifts back to the claimant to establish the validity of the claim. *Id.* Who bears this ultimate burden in a particular case is a matter of nonbankruptcy law. *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20–22 (2000) ("[T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it."). Under Illinois law, a party seeking to foreclose a mortgage bears the burden of proof. *See* 735 Ill. Comp. Stat. 5/15-1506(a) (requiring evidence to support the allegations of the complaint to be taken in open court);

*id.* § 15-1504(a)–(b) (detailing allegations required and implied as a matter of law in a
foreclosure complaint, including indebtedness, interest, and defaults).

In its Proof of Claim, CenterPoint asserts a total claim of "$48,762,842.19 plus interest,
fees and costs." In an Addendum to the Proof of Claim form, CenterPoint detailed the following
components of its claim:

    a.    The outstanding principal balance of $37,093,012.18;

    b.    A late charge of $1,854,650.61;

    c.    Post-default, pre-bankruptcy interest of $9,072,229.84;

    d.    Tax protest fees of $36,550.24;

    e.    Real estate taxes of $314,803.23;

    f.    Pre-petition attorneys' fees and costs of $250,938; and

    g.    Receiver's costs, including attorneys' fees, of $140,657.95.

CenterPoint also calculated the per diem interest that accrued after the bankruptcy filing at the
annual rate of 16.89% until July 31, 2010, totaling $1,695,233. The total of all the foregoing
dollar claims is $50,458,075.05. CenterPoint did not detail or quantify any additional fees or
costs in its Proof of Claim or by evidence at trial.

CenterPoint timely filed its Proof of Claim on July 30, 2010, using the appropriate
Official Form. James Clewlow, CenterPoint's Chief Investment Officer, executed the form, and
CenterPoint attached the Note and Mortgage as Exhibits A and B, respectively, to the Proof of
Claim. The Addendum attached to it spelled out details of the Claim. Therefore, the Proof of
Claim was properly filed and constituted prima facie evidence of the elements of CenterPoint's

-13-

claim that were detailed in the Proof of Claim.

Debtor argues that several parts of the Claim should not be allowed on grounds that CenterPoint did not provide evidence at trial. However, the properly filed Proof of Claim was all that was necessary to fulfill CenterPoint's initial burden as to detailed parts of the Claim. To support its argument, Debtor relies on the Pretrial Order entered shortly before trial on March 9, 2011 [Docket No. 737], which stated in Paragraph 5: "CenterPoint shall have the initial burden of going forward with the evidence with respect to the validity and amount of its claim. The Debtor shall have the burden of going forward with evidence as to the Claim Objection." This Paragraph directed only which party was to go first on each issue. It did not allocate burdens of proof or relieve Debtor of the burden of producing some evidence to challenge CenterPoint's Proof of Claim.

If Debtor sought seriously to challenge various elements of CenterPoint's claim, it should have produced evidence at trial calling them into question. It did not do so. In fact, the only issue that Debtor focused on at trial was its Counterclaim Count III. It provided no evidence to suggest that any of the elements included in the Proof of Claim were not valid, so the burden never shifted back to CenterPoint to establish those elements by proof at trial. Therefore, CenterPoint's Proof of Claim will be allowed in the amount of $50,458,075.05 plus interest accruing at the annual rate of 16.89% from July 31, 2010.

However, CenterPoint did not include in its Proof of Claim any information from which post-bankruptcy attorneys fees or undefined expenses could be calculated. It presented no evidence at trial on those subjects, nor did it seek to reserve for future ruling a calculation of such

-14-

matters. Therefore, CenterPoint did not meet its burden to show the amounts of post-bankruptcy

fees and any additional expenses claimed to be due. Since the parties rested their respective cases

after trail, the proofs are closed and that part of the Claim will not be allowed.

## III. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

To prevail in a breach of contract action, a plaintiff must establish existence of a contract,

performance of its conditions by the plaintiff, breach by the defendant, and damages that result

from the breach. *Roberts v. Adkins*, 921 N.E.2d 802, 810 (Ill. App. Ct. 2010). In Count III,

Debtor seeks damages for CenterPoint's supposed breach of the duty of good faith and fair

dealing.

Under Illinois authority, a duty of good faith and fair dealing has been held to be an

implied term of every contract. *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill.

1958). "[T]his obligation requires a party vested with contractual discretion to exercise it

reasonably, and further he may not do so arbitrarily, capriciously, or in a manner inconsistent

with reasonable expectations of parties." *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 793 (Ill. App.

Ct. 2008).

Debtor's argument is essentially that the Mortgage vested CenterPoint with discretion in

exercising its contractual right to control any condemnation proceeding; that CenterPoint did take

control of the condemnation proceeding; but that CenterPoint did not exercise this right

reasonably because it made no efforts to settle the condemnation proceeding for the MPEA's pre-

condemnation offer of $17.7 million. From filing of the condemnation proceeding on June 20,

2008, until Debtor filed its Motion to Disqualify Burke on September 22, 2008, and then from

-15-

the denial of that motion on August 10, 2009 until the MPEA decided to withdraw its

condemnation proceeding in October of 2010, CenterPoint's counsel had authority to negotiate

with the MPEA, but did not do so. Given its "best case" view of the value of acquiring the

property securing the loan, that might have supported an argument that CenterPoint had a serious

motive to avoid settlement of the condemnation proceeding. However, Debtor itself always had

the right to negotiate with the MPEA and it vigorously exercised that right. Had it ever been

willing to accept the MPEA offer of $17.7 million, it could and should have informed

CenterPoint of such willingness and requested its approval to settle for that amount. Had Debtor

done so and had CenterPoint obstructed that settlement, a very different case would have been

presented here. However, Debtor did not ever indicate in any way a willingness to accept the

offered $17.7 million or request that CenterPoint agree to that offer. Nonetheless, Debtor sues

here asserting the loss of that offer was CenterPoint's fault.

     A breach of the duty of good faith and fair dealing is a breach of contract. *See*

*Kirkpatrick*, 894 N.E.2d at 793. A plaintiff may generally recover from a person breaching a

contract

> such damages as may be fairly and reasonably be considered as naturally
> arising from the breach thereof, in light of the facts known or which
> should have been known, or such as may reasonably be supposed to have
> been within the contemplation of the parties as a probable result of a
> breach thereof.

*Jones v. Melrose Park Nat'l Bank*, 592 N.E.2d 562, 569 (Ill. App. Ct. 1992). "Speculative

damages or damages not the proximate result of a breach of contract will not be allowed." *Id.*

     Here, any loss Debtor suffered was not caused by CenterPoint's action or inaction in the

-16-

condemnation. The MPEA's counsel testified at trial that he was willing to negotiate with either Debtor or CenterPoint, regardless of who had "control" of the proceeding under the Mortgage. In fact, Debtor actively and aggressively negotiated with the MPEA throughout the pendency of the condemnation proceeding, culminating in two written counteroffers by Debtor to settle the action at values higher than the MPEA's original offer, and suggestions of a special role for Pam Gleichman. While CenterPoint would have had to approve any settlement reached by Debtor and the MPEA, Debtor was never prepared to accept the MPEA offer. Debtor was seeking more than the $17.7 million that Debtor itself had not been willing to accept. Debtor never told CenterPoint that it was willing to accept the $17.7 million offer and never asked CenterPoint to agree to the offer. Negotiations reached an impasse because the MPEA and Debtor could not agree on a price, not because CenterPoint did not approve the price. Debtor cannot now blame CenterPoint for its own decision not to accept the $17.7 million offer.

Even if CenterPoint had wanted to accept the $17.7 million offer, there is no indication that Debtor would have approved, as was necessary under the Mortgage for any resolution of a condemnation proceeding. Although Debtor's principals testified at trial that they now view the $17.7 million offer as reasonable and that they would have accepted it had CenterPoint asked them to, Debtor's actions belie those words. *Debtor* refused to accept the pre-condemnation offer. *Debtor* sought an additional $2 to 3 million from the MPEA in settlement negotiations. *Debtor* tried to leverage its position to obtain a master developer position with the MPEA for Pamela Gleichman. The MPEA's counsel testified that the $17.7 million offer remained on the table until approximately October 2010, but not once did Debtor inform the MPEA or

-17-

CenterPoint that it would accept that amount. Indeed, Debtor's representatives did not even

inform CenterPoint about negotiation details.

It is clear that Debtor's own actions frustrated any settlement with the MPEA for $17.7

million. Debtor sought more benefit from the condemnation proceeding, and itself took the

risk—a risk always present in any contest—that the condemnor would change its mind. Indeed,

under Illinois law a condemnor can change its mind even after reaching a settlement, as long as it

has not yet taken possession of the property. *See* 735 Ill Comp. Stat. 30/20-5-40; *Vill. of*

*Bellwood v. Am. Nat'l Bank & Trust Co. of Chi.*, Nos. 1-09-3115, 09-3116, 09-3117, 09-3118,

09-3119, 09-3120, 09-3121, 2001 WL 2278768, at *3–5 (Ill. App. Ct. June 7, 2011). So in

making a choice to seek more than is offered by the condemnor, a property owner faces an

inherent risk that all may be lost. That risk proved to be very great in a recession economy, and

the MPEA withdrew the condemnation as it had every right to do. Any supposedly unreasonable

failure by CenterPoint to participate in the negotiations did not cause the loss of the MPEA offer.

The loss was due to a risk assumed by Debtor in an effort to get more benefit, and it now seeks to

put the burden of that loss on the other party for failure to interfere with Debtor's attempt to

obtain more. Because any damage to Debtor was not proximately caused by CenterPoint, Debtor

cannot prevail on its breach of contract Counterclaim.

## CONCLUSION

Appended are additional detailed Findings of Fact fleshing out details of the proof

received. By reason of the foregoing and the additional appended Findings of Fact and

Conclusions of Law, judgment will be entered separately allowing CenterPoint's Claim, other

than post-bankruptcy attorney fees and expenses not detailed in the Proof of Claim and otherwise overruling Debtor's Objection. Also, Debtor will recover nothing by its Counterclaim in Count III and judgment thereon will be awarded in favor of CenterPoint. Court costs will also be allowed to CenterPoint.

Because all Counts of the Counterclaim are now fully disposed of, a certificate as to each Count of the Counterclaim will be entered that there is no reason to delay enforcement or appeal from all orders disposing of the Claim and all five Counterclaims.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 22 day of June, 2011.

-19-

## APPENDIX: ADDITIONAL FINDINGS OF FACT

### I. The Parties and Properties

1. Olde Prairie Block Owner, LLC, the debtor in this case, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on May 18, 2010.

2. Debtor is an Illinois limited liability corporation doing business in Cook County, Illinois. (Am. Objection [Docket No. 312] ¶ 9.)

3. Karl Norberg has been the Manager and sole employee of Debtor for its entire existence. (Trial Tr. 3/15/2011 (Norberg) 4:10–15.)

4. Pamela Gleichman acts as developer for Debtor, pursuant to a contract and authority granted her by her husband Norberg. (Trial Tr. 3/14/2011 (Gleichman) 27:17–28:14.)

5. Debtor owns: (1) two parcels of partially developed land in Chicago, Illinois, located at 230 East Cermak Road (the "Olde Prairie parcel") and 330 East Cermak Road (the "Lakeside parcel"), (2) a leasehold interest for 450 parking spots in the McCormick Place parking complex, which is immediately to the south of the Lakeside parcel, pursuant to a 195-year lease from the Metropolitan Pier and Exposition Authority (the "MPEA"); and (3) the rights to a heating and cooling easement, which results in the Trigen Energy Corp power plant being able to provide cooling, heating, steam and water to the Lakeside parcel without the need for those mechanicals on the premises (collectively, "the Property"). (Debtor's Ex. 36; Trial Tr. 3/14/2011 (Gleichman) 31:21–32:2.)

6. Debtor purchased the Olde Prairie parcel in June 2005 for $6 million. (Debtor's Ex. 20 at CPT 16259; Trial Tr. 3/16/11 (Helm) 30:25–31:4, 31:17–25.)

7.     Debtor plans to redevelop the Property for hotels, retail, and other commercial activity, as

well as parking and services related to those uses. (Trial Tr. 3/14/2011 (Gleichman)

28:15–32:2.)

8.     CenterPoint Properties Trust ("CenterPoint") is an industrial real estate company owned

by the California Public Employee Retirement System, a pension fund for public

employees of California. (Trial Tr. 3/18/2011 (Clewlow) 63:15–64:9.)

9.     CenterPoint "buy[s] and sell[s] probably forty to fifty buildings a year . . . [and]

develop[s] . . . ten to fifteen buildings a year, all industrial, all warehouses primarily here

in Chicago." (*Id.* at 63:19–22.)

10.     CenterPoint has been a lender only twice. It pursued two short-term construction loans in

2008 because of forces in the economy that led CenterPoint to seek out alternative forms

of investment. (*Id.* at 64:10–66:6, 85:18–21.)

11.     While CenterPoint has only engaged in two loan transactions, the loan at issue here is

within the average size of CenterPoint's normal investments of $30 to 40 million. (*Id.* at

148:17–19.)

12.     James N. Clewlow is and has been CenterPoint's Chief Investment Officer for the past

six years. (*Id.* at 62:18–63:3.)

13.     Clewlow was the primary officer at CenterPoint responsible for extending the

CenterPoint loan to Debtor and pursuing CenterPoint's remedies upon Debtor's default.

(*Id.* at 95:20–21.)

14.     Michael Mullen is and has been CenterPoint's Chief Executive Officer for the past six

-21-

years. (*Id.* at 127:10–14.)

## II. CenterPoint's Claim Amount and Proof of Claim

15.  On February 22, 2008, Debtor executed a Promissory Note (the "Note") evidencing a loan

from CenterPoint Properties Trust ("CenterPoint") in the amount of $37,127,667.03.

(Stip. Court Ex. B ¶ 1; Debtor's Ex. 71.)

16.  The Note bears interest at a rate of 12.89% per annum. Upon default in the payment of

principal, the Note bears interest at a rate of 16.89% per annum. (Stip. Court Ex. B ¶¶

3–4; Debtor's Ex. 71.)

17.  The Note includes an interest reserve in the amount of $4,467,217.24, which was drawn

on to fund monthly interest payments on the Note until it matured on February 21, 2009.

(Trial Tr. 3/15/11 (Norberg) 43:22–44:4, 46:1–17; Debtor's Exs. 71–72.)

18.  Exhibit A to CenterPoint's Proof of Claim is a true and correct copy of the executed

Promissory Note. (Stip. Court Ex. B ¶ 2.)

19.  On February 25, 2008, Debtor executed a Fee and Leasehold Mortgage, Assignment of

Leases and Rents, Security Agreement and Fixture Filing (the "Mortgage") in favor of

CenterPoint. (*Id.* ¶ 5; Debtor's Ex. 36.)

20.  On February 28, 2008, the Mortgage was recorded with the Cook County Recorder of

Deeds. (Stip. Court Ex. B ¶ 5.)

21.  Exhibit B to the Proof of Claim is a true and correct copy of the executed Mortgage as

recorded. (*Id.* ¶ 7.)

22.  The recording of the Mortgage establishes that CenterPoint held a prior perfected security

interest in Debtor's Property as of February 28, 2008, securing the obligations under the

Note. (*Id.* ¶¶ 6, 10; Debtor's Ex. 36.)

23.   On February 25, 2008, CenterPoint funded the loan, transferring $32,396,895.59 to

Debtor and $4,467,217.24 into the interest reserve account. (Trial Tr. 3/15/2011

(Norberg) 43:1–23, 45:22–46:22; CenterPoint's Ex. 68.)

24.   On February 21, 2009, (the "Maturity Date") the Note matured and was due and payable

in full. (Stip. Court Ex. B ¶ 8.)

25.   Debtor failed to pay the Note on the Maturity Date, as a result of which the Note has been

in default since February 2009. (*Id.* ¶¶ 8–9.)

26.   In its Answer [Docket No. 40] to CenterPoint's earlier Motion for Relief from Stay,

Debtor admitted that as of May 21, 2010, the amount due CenterPoint under the Note was

$48,438,785.49, "[e]xcept that [Debtor] believes the amount owed may be less due to

conduct of the lender and its agents." (Trial Tr. 3/14/11 (Court) 16:8–19; CenterPoint's

Ex. 91.)

27.   On July 30, 2010, CenterPoint timely filed its Proof of Claim in the face amount of

"$48,762,842.19 plus interest, fees and costs." (Proof of Claim § 1; Stip. Court Ex. B ¶

11.)

28.   In Section 2 of the Proof of Claim, it states that the Basis for Claim is "Note and

Mortgage (See Addendum attached hereto)." In Section 4, entitled "Secured Claim,"

CenterPoint selected (1) "Real Estate" and "Other" as the nature of property secured by a

lien; (2) Value of Property as Unknown (TBD); (3) Annual Interest Rate as 16.89%; (4)

$48,762,842.19 as both the "[a]mount of arrearage and other charges as of time case filed included in secured claim" and the Amount of Secured Claim; and (5) $0.00 as the Amount Unsecured. (Proof of Claim 1.)

29.    The Proof of Claim was executed by CenterPoint's Chief Investment Officer, James N. Clewlow, on July 30, 2010. (*Id.*)

30.    The Addendum to the Proof of Claim contains twenty-one separately numbered factual assertions in the style of a pleading, including:

    a.    Paragraph 12, which lists in separate subparagraphs each and every component of CenterPoint's alleged claim and the amount alleged, including (a) outstanding principal; (b) a late charge; (c) interest; (d) tax protest fees; (e) 2008 real estate taxes; (f) first installment of 2009 real estate taxes; (g) attorney's fees and costs; and (h) receiver's costs, including attorney's fees;

    b.    Paragraph 13, which sums the amounts delineated in Paragraph 12 and states "[t]here is thus due to CenterPoint from OPBO, pursuant to the Note and Mortgage, a total of $48,762,842.19 as of the Petition Date;"

    c.    Paragraph 15, which states, "[p]er diem interest at the augmented interest rate of 16.89% per annum continues to accrue on the unpaid balance of the Note and the Obligations;" and

    d.    Paragraph 18, which states, "CenterPoint hereby reserves its rights to amend, supplement or withdraw this POC at any time and in any respect, including, without limitation, as necessary or appropriate to file additional claims . . . ."

-24-

*(Id.* app.)

31.   Attached as Exhibit C to the Proof of Claim is a loan schedule (the "Loan Schedule")

reflecting the dates and amounts of charges for disbursements and interest under the

CenterPoint loan, with a summation of the running balance. *(Id.)*

32.   According to the Loan Schedule, the "Principal Balance" on May 18, 2010, was

$48,371,246.10. The Loan Schedule also contains balances for June 30, 2010, and July

31, 2010. *(Id.)*

33.   A mathematical calculation demonstrates that (i) (A) the amount stated on the Loan

Schedule ($48,371,246.10) plus (B) the attorney's fees and costs listed in paragraph 12(g)

of the Addendum ($250,938.14) plus (C) the receiver's costs listed in paragraph 12(h) of

the Addendum ($140,657.95) equals (ii) the amount stated on the face of the Proof of

Claim ($48,762,842.19). The Loan Schedule does not reflect the aggregation of fees and

costs provided for in paragraph 10 of the Note entitled "Costs of Collection."

**III. Meetings Between Debtor and Stephen Burke and Mark O'Toole**

34.   In August and September 2007, attorneys Stephen Burke and Mark O'Toole of the law

firm Foran O'Toole & Burke, LLC ("FOB") met with the Karl Norberg ("Norberg") and

Pamela Gleichman ("Gleichman") to discuss the MPEA's project to acquire certain

property near McCormick Place, including Debtor's Olde Prairie parcel, through its

eminent domain powers. (Trial Tr. 3/14/2011 (Gleichman) 39:25–49:18; Trial Tr.

3/15/2011 (Norberg) 7:23–9:20; Debtor's Ex. 2.)

35.   Debtor did not hire O'Toole and Burke to represent it in connection with the MPEA's

expected condemnation proceeding. (Trial Tr. 3/14/2011 (Gleichman) 55:23–56:9.)

36.     O'Toole and Burke had previously represented CenterPoint. (Debtor's Ex. 2.)

**IV. The CenterPoint Loan Transaction**

37.     Prior to December 2007, the Debtor's Property was encumbered by a mortgage with

MMA Realty Capital (the "MMA Loan"). (Trial Tr. 3/15/2011 (Norberg) 6:5–13.)

38.     The maturity date for the MMA Loan was extended to February 19, 2008. (Trial Tr.

3/15/2011 (Norberg) at 16:18–17:3.)

39.     Beginning in late 2007, the Debtor and CenterPoint began to negotiate a loan transaction.

(Trial Tr. 3/15/2011 (Norberg) at 13:10–14:2.)

40.     CenterPoint and its representatives were aware of the possibility that the Olde Prairie

parcel would be the subject of a condemnation proceeding during these negotiations.

(Trial Tr. 3/15/2011 (Norberg) at 16:8–17; Trial Tr. 3/15/2011 (Burke) 146:25–147:13.)

41.     Approximately one week before the loan closed, CenterPoint first requested control over

the any eminent domain proceedings relating to the Olde Prairie parcel. (Trial Tr.

3/15/2011 (Norberg) at 34:3–8; Trial Tr. 3/16/2011 (Downey) at 166:26–167:22;

Debtor's Ex. 30.)

**V. Negotiation of the Loan Documents**

42.     On January 28, 2008, CenterPoint's counsel, Barry A. Comin, sent to Debtor's counsel,

Raymond Groble, the first draft of the loan agreements. (Debtor's Ex. 16.)

43.     The January 28, 2008 draft Mortgage provided in Section 1.5(a) in relevant part that:

> Borrower shall have the right to control any condemnation proceedings
> and all condemnation (including the conveyance in lieu thereof)

-26-

compensation, awards, proceeds, damages, claims, rights of action and
payments and all causes of action and proceeds thereof all types to which
Borrower may become entitled as a result of such condemnation
proceedings.

(Debtor's Ex. 16, at CPT 03158.)

44.    On February 8, 2008, CenterPoint's counsel sent to Debtor's counsel the second draft of

the loan agreements for their approval. (Debtor's Ex. 21.) The second draft of the loan

documents also provided in Section 1.5(a) that the Borrower shall have the right to

control any condemnation proceedings. (*Id.* at CPT 03836.)

45.    The original closing date for the CenterPoint loan transaction was set for February 19,

2008. (Trial Tr. 3/15/2011 (Norberg) 31:3–6.)

46.    On February 19, 2008, CenterPoint sent a revised draft of the Mortgage document to

counsel for Debtor and for the first time in a written draft of the Mortgage changed the

proposed terms of the Mortgage in Section 1.5(a) to provide that CenterPoint as "Lender

shall have the right to control, prosecute and defend any condemnation proceedings."

(Debtor's Ex. 30, at CPT 09153.)

47.    Debtor objected to this revision, but CenterPoint refused to negotiate this term and

advised Debtor this was a "deal killer" if Debtor did not agree to this new term. (Trial Tr.

3/15/2011 (Norberg) 39:15–24.)

48.    CenterPoint sought this new term in order to mitigate what it saw as Debtor's risky credit

profile, and entertained a variety of ways to do so, including a letter of credit and a

personal guaranty. (Trial Tr. 3/18/2011 (Clewlow) 76:22–78:10.)

49.    Debtor eventually agreed to accept the provision that allowed CenterPoint the right to

-27-

control any condemnation action. (Trial Tr. 3/14/2011 (Gleichman) 74:15–24; Trial Tr.

3/15/2011 (Norberg) 39:25–40:18.)

50.     The loan closing date was rescheduled to February 25, 2008, and at closing the final draft

of Section 1.5(a) of the Mortgage was again revised to provide:

> Borrower shall provide Lender with written notice of and
> reasonable details concerning the institution (or notice regarding the
> potential institution) of any proceedings for the condemnation of the
> Property or any portion thereof, within ten (10) days after Borrower first
> learns of any such potential or actual proceedings (including and
> administrative, quasi-judicial, quasi-legislative, legislative or judicial
> proceedings), and shall forward to Lender copies of all notices and other
> communications regarding such proceedings. Lender may participate in
> any condemnation proceedings and Borrower shall do all things necessary
> to obtain prompt settlement of any condemnation proceedings. . . .
>
>       . . .
>
> Notwithstanding anything to the contrary contained herein, Lender
> shall have the right, at Borrower's sole cost and expenses, to exclusive
> control, prosecution and defense of any condemnation proceedings;
> provided, however, all condemnation (including the conveyance in lieu
> thereof) compensation, awards, proceeds, damages, claims and payments
> to which Borrower may become entitled as a result of such condemnation
> proceedings shall be subject to the reasonable approval of Borrower and
> Lender.

(Debtor's Ex. 36, at 13–14.)

51.     The loan closed on February 25, 2008. (Debtor's Ex. 72; CenterPoint's Ex. 68.)

52.     Shortly after the closing, Debtor learned that Stephen Burke received a fee in connection

with the loan made by CenterPoint to Debtor. The existence of that fee was not disclosed

to Debtor prior to closing and did not appear on the closing statement. (Trial Tr.

3/15/2011 (Norberg) 44:9–12; Debtor's Ex. 72; CenterPoint's Ex. 68.)

-28-

## VI. CenterPoint's Internal Analysis of the Loan

53.    The business of CenterPoint is to buy and sell industrial real estate primarily in Chicago.
(Trial Tr. 3/18/2011 (Clewlow) 63:15–22.) The loan to Debtor was one of only two loans
ever made by CenterPoint, and by far the larger of the two loans. (*Id.* at 65:10–17.)

54.    CenterPoint determined that Debtor's credit profile was risky. (*Id.* at 69:12–17,
86:20–24.)

55.    CenterPoint was aware that Debtor acquired the Olde Prairie parcel for approximately $6
million in 2005. (Debtor's Ex. 20.)

56.    According to an internal CenterPoint report from February 2008, CenterPoint was aware
of the potential condemnation of the Olde Prairie parcel and analyzed the loan taking into
account the financial consequences of the potential condemnation of the Olde Prairie
parcel. The internal report also repeated an estimation by Steven Burke, who is not an
expert in real estate valuation, that the Olde Prairie parcel had a then-current value of
$10,727,000, and a potential value of $13,000,000 to $15,000,000. (Debtor's Ex. 24;
Debtor's Ex. 28.)

57.    In addition, CenterPoint estimated that Debtor's entire Property could be worth as much
as $67.2 million if certain conditions were considered. (Debtor's Ex. 28, at CPT 14740,
14744, 14750.)

58.    A February 1, 2008, internal e-mail from Jim Clewlow, CenterPoint's Chief Investment
Officer and Executive Vice President, provided the following underwriting scenarios:

> Best Case: Borrower defaults on the loan and the properties are acquired at
> the end of Yr 1. The buildings are then mothballed for five years and razed

at the end of Yr 5. The sale to a third party would also occur at the end of
Yr 5.

Base Case: Borrower pays loan off and there are no expenditures by CNT,
other than due diligence, legal and normal closing costs (mostly
reimbursable)[.]

Worst Case: Borrower defaults on the loan and the properties are acquired
at the end of Yr 1. The buildings are razed at the beginning of Yr 2 and
property is sold off at the end of Yr 5 at a lower value than Best Case.

(Debtor's Ex. 19.)

59.    Under the Best Case scenario, CenterPoint would be able to foreclose quickly and acquire

the Property. (Trial Tr. 3/18/2011 (Clewlow) 109:22–25.)

60.    Clewlow also stated "one of the reasons we are providing the loan is to create the

opportunity to acquire [the Property]." (Debtor's Ex. 19.)

61.    The reasonable expectation of both parties to the loan agreement was to have the loan

repaid according to its terms and for Debtor to retain ownership of the Property. (Trial Tr.

3/15/2011 (Burke) 115:1–15; Trial Tr. 3/18/2011 (Clewlow) 73:22–23.)

62.    CenterPoint's "Base Case" scenario was its intended case. (Trial Tr. 3/18/2011

(Clewlow) 69:24–70:4.)

**VII. The MPEA's Condemnation Proceeding**

63.    On or about September 18, 2007, Debtor received notice from the MPEA that the Olde

Prairie parcel had been identified for acquisition by the MPEA through its eminent

domain powers. (Debtor's Ex. 4.)

64.    On March 11, 2008, MPEA made a pre-condemnation offer to Debtor to purchase the

Olde Prairie parcel in the amount of $17,700,000. (Debtor's Ex. 66.) By the terms of the

MPEA's letter, the offer would be deemed rejected if not accepted within fourteen days. (*Id.*)

65.   Pam Gleichman testified that she believes that the $17.7 million offer was fair and reasonable. (Trial Tr. 3/15/2011 (Gleichman) 141:6–20.)

66.   Debtor did not respond to the offer within fourteen days and did not forward the MPEA's letter to CenterPoint. (Trial Tr. 3/14/2011 (Gleichman) 86:5–25; Trial Tr. 3/17/2011 (Cinquino) 120:7–24); Trial Tr. 3/15/2011 (Norberg) 48:24–49:11.)

67.   Debtor did not accept that offer because it believed that it could improve upon the MPEA's initial offer. (Trial Tr. 3/15/2011 (Norberg) 63:18–25; Trial Tr. 3/15/2011 (Gleichman) 80:21-81:6; Trial Tr. 3/17/2011 (Cinquino) 121:12–122:12.)

68.   The MPEA's initial $17.7 million offer to settle the condemnation proceeding remained available until approximately thirty days before the MPEA filed its motion to abandon the proceeding in November 2010. (Trial Tr. 3/17/2011 (Neal) 16:24–18:8, 72:12–20.)

69.   Debtor never sought CenterPoint's approval of the $17.7 million offer. (Trial Tr. 3/17/2011 (Cinquino) 172:13–173:6; Trial Tr. 3/18/2011 (Cinquino) 31:18–32:4.)

70.   On June 20, 2008, the MPEA filed the condemnation proceeding. (Stip. Court Ex. A ¶ 38.) Debtor, Karl Norberg, and CenterPoint were named as defendants. (CenterPoint's Ex. 79.)

71.   On June 25, 2008, James Clewlow, CenterPoint's Vice President and Chief Investment Officer, notified Debtor of its "intention to exercise its rights under the Mortgage . . . to exclusively control, prosecute and defend the condemnation case." (Debtor's Ex. 39.)

-31-

72.    In response, on July 2, 2008, the Debtor stated that "it was not appropriate for

CenterPoint to attempt to control these eminent domain proceedings," that "the Mortgage

does allow for CenterPoint to defend this condemnation case," and that "Borrower has

refused" the $17.7 million offer. (Debtor's Ex. 40.)

73.    Debtor's letter dated July 2, 2008, also advised CenterPoint of a contract to sell the Olde

Prairie parcel for $30 million. (*Id.*) In a letter dated August 11, 2008, CenterPoint stated

that it did not believe Debtor's statement about the $30 million offer to be accurate.

(Debtor's Ex. 43.)

74.    The $30 million contract was not a bona fide contract and Debtor's statement about it was

inaccurate. (Trial Tr. 3/17/2011 (Cinquino) 140:14–141:11.)

75.    On July 7, 2008, CenterPoint's counsel notified Debtor that CenterPoint "will not waive

any rights, including the rights granted by the Borrower as set forth in Section 1.5(a) of

the Mortgage," and stated that CenterPoint "has asserted its right to control, prosecute and

defend the current eminent domain proceedings." (Debtor's Ex. 41.) CenterPoint

encouraged the Debtor to retain its own counsel in the condemnation proceeding. (*Id.*)

76.    On August 11, 2008, CenterPoint's Chief Executive Officer again insisted that

CenterPoint control the condemnation proceeding and notified Debtor that CenterPoint

would "not waive any rights including the rights granted by the borrowers as set forth in

Section 1.5(a)." (Debtor's Ex. 43.)

77.    In addition, CenterPoint informed Debtor that its "goal is to ensure that the economic

interest of the Old Prairie members and CenterPoint are protected whether through the

-32-

retention of the property and the filing of a traverse, or by seeking full fair and just

compensation for the taking of the Olde Prairie Parcel." (Debtor's Ex. 43.)

78.    On or about May 1, 2009, CenterPoint filed a Motion to Enforce Mortgage Agreement in

the condemnation proceeding. (CenterPoint's Ex. 83.) In its motion, CenterPoint asserted

that "the only right in this condemnation proceeding retained by Owner under the

Mortgage Agreement is the right to reasonably approve any settlement." (CenterPoint's

Ex. 83, at 5.)

79.    Debtor formally opposed CenterPoint's Motion to Enforce. (CenterPoint's Ex. 94; Trial

Tr. 3/15/2011 (Norberg) 56:23–57:7; Trial Tr. 3/16/2011 (Downey) 134:1–8.)

80.    In August 2008, Foran O'Toole & Burke filed an appearance in the condemnation

proceeding on behalf of CenterPoint. (Debtor's Ex. 44.)

81.    On August 20, 2008, Karl Norberg filed a Traverse and Motion to Dismiss. (Debtor's Ex.

46.) That motion was never ruled on by the state court. (Trial Tr. 3/15/2011 (Norberg)

57:8–20.)

82.    CenterPoint requested that Norberg withdraw the Traverse, but Norberg refused.

(Debtor's Ex. 48; Trial Tr. 3/15/2011 (Norberg) 57:12–17.)

83.    On September 22, 2008, Norberg also filed a motion to disqualify Foran O'Toole &

Burke as attorneys for CenterPoint on the basis that they had a purported conflict

resulting from their prior discussions with Gleichman and Norberg regarding the then-

potential condemnation proceeding. (CenterPoint's Ex. 81.)

84.    The state court denied the motion to disqualify Foran O'Toole & Burke on August 10,

2009. (CenterPoint's Ex. 82.)

85. Neither CenterPoint nor its counsel conducted any negotiations with MPEA nor did they

ever attempt to discuss the condemnation proceeding with the MPEA's counsel, even

after the motion to disqualify was resolved. (Trial Tr. 3/15/2011 (Burke) 161:14–163:11,

165:9–16, 168:23–169:8; Trial Tr. 3/17/2011 (Neal) 35:8–11, 42:19–44:15.)

86. The only actions CenterPoint took with regard to control of the condemnation

proceedings were to send the letters to Debtor asserting its right to do so and to file the

Motion to Enforce seeking the state court's ruling that CenterPoint did have the right to

exclusive control. (Trial Tr. 3/15/2011 (Burke) 226:15–24.)

**VIII. Debtor's Attempts to Negotiate with the MPEA**

87. Gleichman and Cinquino had started negotiating with the MPEA even before the

condemnation proceeding was initiated. (Trial Tr. 3/17/2011 (Neal) 15:4–12.)

88. As Cinquino stated, "I wanted to try and start the case out at as high a level as possible

and take the risk of letting the appraiser talk to Ms. [Gleichman] because that $6 million

purchase was something we had to try and get away from as much as we could." (Trial

Tr. 3/17/2011 (Cinquino) 116:3–24.)

89. Gleichman personally met with the appraiser for the MPEA and provided her with

documents and information relating to Debtor in an attempt to get the initial

condemnation demand (ultimately the $17.7 million offer) as high as possible. (*Id.* at

115:17–23, 117:5–16 ("We gave them all the plans that had been drawn on the property. .

. . We let her [Gleichman] be interviewed about the environmental conditions, sales that

-34-

we knew of, developments in the area, plans, and also all the zoning information."),
118:24–119:9.)

90. None of the documents provided to the MPEA's appraiser, including a $20 million offer
on the Property, were provided to CenterPoint. (*Id.* at 8:10–25; 39:19–40:6.)

91. After the condemnation proceeding was filed, Debtor met with MPEA several times to
negotiate a settlement. (*Id.* at 149:1–12.)

92. Debtor also had discussions with MPEA's counsel about a possible settlement that would
include a development agreement for all of Debtor's Property, including the parcels that
were not the subject of the condemnation proceeding and a Master Developer position for
Gleichman. (CenterPoint's Exs. 24–26.)

93. In addition, Debtor and the MPEA discussed a high/low "quick-take" agreement for the
Olde Prairie parcel with a high of $19 to 22 million and a low of $17 million, which its
counsel, Langdon Neal, was prepared to recommend to his client. (Trial Tr. 3/17/2011
(Neal) 30:25–31:9.)

94. CenterPoint was not included in these settlement negotiations. (*Id.* at 26:20–27:1.)

95. Counsel for the MPEA stated that no agreement in principle was ever reached for the
acquisition of the Olde Prairie parcel and that "Debtor never accepted [his] settlement
demand . . . ." (*Id.* at 24:20–24; 34:10–21.)

96. The MPEA's counsel believed that negotiating with CenterPoint's counsel before the
Motion to Disqualify was resolved "would have been a meaningless exercise" (*id.* at
37:8–10) and that he "would not speak to a client that is represent[ed] by counsel, even

-35-

one that is subject to a motion to disqualify" (*id.* at 47:11–13).

97.   Debtor never accepted the quick-take proposal. (*Id.* at 61:20–25.)

98.   On December 19, 2008, Debtor sent a letter to the MPEA offering to settle the

      condemnation proceeding and transfer the Olde Prairie parcel to the MPEA for $22

      million. (CenterPoint's Ex. 22; Trial Tr. 3/15/2011 (Norberg) 60:1–13.)

99.   This letter still suggested that the Olde Prairie parcel, once acquired by the MPEA, be

      combined with Debtor's other real property and developed jointly under Gleichman as

      master developer. (CenterPoint's Ex. 22.)

100.  CenterPoint was never consulted or informed of the offer. (Trial Tr. 3/14/2011

      (Gleichman) 173:13–175:16.)

101.  In early 2009, Debtor's discussions with the MPEA turned from a global project with

      Gleichman as master developer (and a condemnation or other agreement that would pay

      off the CenterPoint loan) to discussions focusing on price for the Olde Prairie parcel.

      (Trial Tr. 3/17/2011 (Neal) 60:16–19, 61:7–15, 63:11–18; Trial Tr. 3/17/2011 (Cinquino)

      162:14-20.)

102.  On March 4, 2009, Debtor sent a letter offering to settle the condemnation proceeding for

      $19.2 million. (CenterPoint's Ex. 25; Trial Tr. 3/17/2011 (Norberg) 68:8–14; Trial Tr.

      3/18/2011 (Cinquino) 30:12–31:17.) This offer was never communicated to CenterPoint.

      (Trial Tr. 3/18/2011 (Cinquino) 31:12–17.)

103.  After the $19.2 million offer, conversations between the Debtor and MPEA ended for a

      time "because we didn't reach a dollar agreement as part of a package of paying off the

-36-

whole CenterPoint loan, I remember now." (Trial Tr. 3/17/2011 (Cinquino) 157:9–20.)

104. Negotiations with the MPEA ended and the condemnation was abandoned by the MPEA
in November 2010 because "there was substantial economic downturn, as everyone is
aware of. And the delay in the acquisition in my ability to acquire the property caused the
MPEA to rethink its plans, its development plans, and decide that, essentially, the project
that was contemplated back in 2007 was no longer in the best interest of the Authority."
(Trial Tr. 3/17/2011 (Neal) 64:20–65:6; 67:9–17.)

105. The Debtor negotiated freely with the MPEA from March 2008 through September 2010,
but never agreed on a price. (Trial Tr. 3/15/2011 (Norberg) 65:5–67:15; CenterPoint's
Exs. 22 & 25.)

106. CenterPoint's attempt to exercise its right to exclusive control over the condemnation
proceeding did not preclude Debtor from engaging in settlement negotiations. (Trial Tr.
3/15/2011 (Burke) 125:22–25; Trial Tr. 3/17/2011 (Cinquino) 174:11–13.)

107. Debtor did not notify CenterPoint of, nor include CenterPoint in, any meetings between
Debtor and the MPEA or inform CenterPoint of the status of Debtor's negotiations with
the MPEA. (Trial Tr. 3/15/2011 (Norberg) 48:24–49:11; Trial Tr. 3/18/2011 (Clewlow)
80:20–81:5; Trial Tr. 3/18/2011 (Cinquino) 19:22–20:13; Trial Tr. 3/14/2011
(Gleichman) 172:3–19.)

108. The Debtor did not communicate to CenterPoint any proposals for settlement that the
Debtor submitted to or discussed with the MPEA, nor did it request that CenterPoint
accept any offer it had proposed. (Trial Tr. 3/15/2011 (Norberg) 61:5–17, 68:18–69:3;

-37-

Trial Tr. 3/18/2011 (Clewlow) 80:20–81:5, 146:23–147:3.)

## IX. Debtor and CenterPoint Fail to Meet with Each Other

109.    On December 5, 2008, Debtor informed CenterPoint that "significant progress has been

made with the MPEA" and requested a meeting to provide CenterPoint with an update.

(Debtor's Ex. 51.)

110.    CenterPoint refused to meet with Debtor at that time because certain conditions it insisted

on were not met. (Trial Tr. 3/16/2011 (Downey) 159:9–15; Debtor's Ex. 53.) CenterPoint

wanted to be involved in meetings with the MPEA. (Trial Tr. 3/16/2011 (Downey)

164:5–15.) It also wanted a letter stating what Debtor intended to discuss at the meeting

in order to limit potential liability. (*Id.*; Trial Tr. 3/18/2011 (Clewlow) 78:13–80:12.)

111.    On February 19, 2009, Debtor again requested a meeting with CenterPoint and noted that

Debtor had "highly confidential information regarding [a] refinancing that must be

disclosed through a personal meeting. . . . We are available at your convenience to meet

in person and disclose this source of funds." (Debtor's Ex. 57.)

112.    CenterPoint again refused to meet with Debtor because its conditions still had not been

met, and to the date of trial CenterPoint had not met with Debtor or its representatives.

(Trial Tr. 3/15/2011 (Gleichman) 130:17–131:17.)

113.    On March 4, 2009, Debtor sent CenterPoint a Draft Confidentiality Agreement signed by

Pan Gleichman and Karl Norberg and again requested a meeting with CenterPoint.

(Debtor's Ex. 59.)

114.    Once again, CenterPoint refused to meet with Debtor because its conditions had not been

met. (Debtor's Ex. 60; Trial Tr. 3/16/2011 (Clewlow) 136:16–137:7.)

## X. CenterPoint's Foreclosure Complaint

115.   On February 21, 2009, the Note came due by its terms. (Debtor's Ex. 71.)

116.   On February 24, 2009, the next business day, CenterPoint filed its complaint to foreclose on Debtor's Property. (Trial Tr. 3/18/2011 (Clewlow) 145:3–146:3.)

117.   There is no evidence that CenterPoint sent a Notice of Default prior to filing the foreclosure complaint.

## XI. Debtor's Attempts to Refinance CenterPoint's Loan

118.   Debtor spoke with several investors and Lenders about the possibility of refinancing the remainder of CenterPoint's loan in the event an agreement could be reached with the MPEA. (Trial Tr. 3/15/2011 (Gleichman) 135:18–137:19.)

119.   Due in part to the pending condemnation proceeding, Debtor was unable to procure new financing or sell the Property, and it was unable to repay CenterPoint's loan when it came due on February 21, 2009. (Trial Tr. 3/15/2011 (Gleichman) 140:8–141:5.)

120.   As of October 9, 2010, the Olde Prairie parcel was valued at $15.3 million. (Findings of Fact & Conclusions of Law on CenterPoint's Motion to Lift Stay [Docket No. 313], at 6.)