UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OLDE PRAIRIE BLOCK OWNER, LLC, | ) | No. 10 B 22668 |
| | ) | |
| Debtor. | ) | |

**MEMORANDUM OPINION ON CENTERPOINT'S MOTION TO DISMISS DEBTOR'S UPDATED THIRD AMENDED CHAPTER 11 PLAN (Docket No. 1093)**

## I.     INTRODUCTION

*A. Factual Background*

Olde Prairie Block Owner, LLC ("Prairie" or "Debtor") is Debtor in this Chapter 11 case. Its secured creditor CenterPoint Properties Trust ("CenterPoint") has pending a Motion to Dismiss the case, contending that Prairie's pending "Updated Third Amended Plan of Reorganization" proposes an unlawful reorganization.

This relates to an on-going battle between Prairie and CenterPoint over Debtor's real estate securing a loan from CenterPoint. Prairie owns two adjacent parcels of real estate located near McCormick Place in Chicago, Illinois that it hopes to develop into a hotel complex. The first parcel, known as the "Olde Prairie Property," is located at 230 E. Cermak Road in Chicago. The second parcel, known as the "Lakeside Property," is located at 330 E. Cermak Road in Chicago. Prairie also holds a long-term lease (the "Parking Lease") with the Metropolitan Pier and Exposition Authority ("MPEA") that provides Prairie with rent-free use of 450 parking spaces at the McCormick Place parking garage until 2203.

Debtor filed under Chapter 11 of the Bankruptcy Code on May 18, 2010. Shortly after, on June 2, 2010, CenterPoint moved to dismiss Debtor's bankruptcy case, or in the alternative modify the automatic stay so as to permit a foreclosure action to proceed. The request to modify the stay was heard first and separately from the motion to dismiss and was denied after CenterPoint was found to be oversecured. (Docket No. 100) After months of further disputes including failed litigation in which Debtor sought to reduce CenterPoint's claim through several counterclaims, the Motion to Dismiss is again up for consideration following the Debtor's latest Plan submission and argument on certain legal issues asserted by CenterPoint against the Plan. (Debtor's Updated Third Amended Plan, Docket No. 1093)

1

It was earlier held that this is a single asset real estate case under 11 U.S.C. § 101(51B) requiring prompt filing of a plan with prospects of confirmation. CenterPoint focuses its present effort to dismiss the case by arguing that Debtor cannot confirm its currently proposed Plan because of legal impediments on its face. CenterPoint argues that the Plan contains at least four *per se* violations of confirmation requirements under 11 U.S.C. § 1129.

To focus the legal issues, on October 19, 2011, the parties were ordered to file briefs addressing the following four specific issues identified by CenterPoint as legal defects in the latest Plan:

1. Whether the Plan deprived CenterPoint of its statutory right to credit-bid its claim in violation of 11 U.S.C. § 1129(b)(2)(A)(ii).
2. Whether the Plan strips CenterPoint of the lien securing its claim in violation of 11 U.S.C. § 1129(b)(2)(A)(i).
3. Whether the Plan provides CenterPoint with the "indubitable equivalent" of its secured claim under 11 U.S.C. § 1129(b)(2)(A)(iii).
4. Whether the Plan provides for the impermissible release of guarantors of the Debtor's loan with CenterPoint.

At oral argument on November 21 and 22 of this year, Debtor's counsel acquiesced on the issue regarding release of Debtor's guarantors by agreeing to an amendment that eliminated that issue, leaving only the remaining three issues to be decided. (Tr. at 13–16) Furthermore, based on Circuit precedent discussed below, no analysis is yet possible on whether Debtor's Plan provides CenterPoint with the indubitable equivalent of its claim.

*B. CenterPoint's Claim*

CenterPoint's claim was disputed by Debtor in five counterclaims. Four of those were dismissed on pleading grounds. On June 22, 2011, following trial, Findings of Fact and Conclusions of Law were entered herein in favor of CenterPoint on Debtor's Counterclaim Count III. (Dkt. No. 937) Its claim was allowed in the amount of $50,458,075.05 plus interest from July 31, 2010 at an annual rate of 16.89%. The next day, the Supreme Court handed down its decision in *Stern v. Marshall*, No. 10-179, 2011 WL 2472792 (June 23, 2011) that called into question a bankruptcy judge's authority to enter final judgment on non-bankruptcy law counterclaims. Supplemental briefing on this issue was ordered, following which Additional Conclusions of Law on Debtor's Counterclaim to CenterPoint's Claim were entered. (Dkt. No.

1007) On August 30, 2011, final judgments were entered on Debtor's Counterclaim Counts I, II, IV, and V. (Dkt. No. 1019) and separately on Debtor's Counterclaim Count III. (Dkt. No. 1021) CenterPoint filed a Motion to Amend in part the order regarding Count III so as to permit CenterPoint's allowed claim to be fully calculated in a later proceeding to include attorney's fees and interest as provided in Mortgage documents based upon the original valuation showing that CenterPoint was oversecured, unless any new valuation hearing which might be held in a Plan confirmation hearing would show otherwise. (Dkt. No. 1038). That Motion was allowed. (Dkt. No. 1119)

### C. *The Plan*

The current proposed Plan bases its treatment of CenterPoint's liens on an estimated claim amount of $60,170,750.00. (Plan at 12) Under the Plan, CenterPoint would receive the following treatment of its claim:

> (a) a cash payment on the Effective Date from the proceeds of the Cash Equity Investment in the amount of $35,000,000; and (b) [for the balance due] the executed Plan Note. The Plan Note, and related documentation, would containing [sic] the following terms and conditions: (i) interest would accrue on a quarterly basis at the prime rate . . . plus one percent (1.0%) per annum . . . (ii) a term of seven years, (c) no amortization or other required principal payments prior to the scheduled maturity date, (d) prepayable in whole or in part without premium or penalty, (e) secured by a first priority mortgage on the Olde Prairie Property and a first priority assignment of the Parking Lease . . . and (f) containing other usual and customary commercially reasonable terms and provisions.

( Disclosure Statement at ii.) In sum, Debtor proposes to pay CenterPoint $35 million in cash immediately and pay the remaining amount of CenterPoint's allowed claim, which Debtor values at $25 million in its Plan, pursuant to a Plan Note. The Plan Note is to be secured by a parcel of real estate owned by the Debtor (the Olde Prairie Property) and the Parking Lease. It is not, notably, to be secured by the Lakeside parcel. CenterPoint would thereby lose its present lien on the Lakeside Parcel.

Debtor proposes to fund its Plan with a mixture of cash and non-cash equity contributions leading to the creation of a joint venture by two plan investors. The cash contribution will be in the amount of approximately $45 million (including the $35 million offered to CenterPoint) and is offered by a plan investor with a background in real estate development. The non-cash equity

contribution consists of parcels of land offered by one of the Plan investors, Landmark America LLC. Both contributions are to be made in exchange for 50% ownership interests in what is referred to here as the "Reorganized Debtor." The Debtor LLC. CenterPoint, as described further below, argues that the proposed Joint Venture would, in fact, be an entirely new entity because ownership of it would be changed.

    C. *Relevant Statutory Provisions*

        **1. Cram Down Under 11 U.S.C. § 1129(b)(2)(A)**

Subsection 1129(a) of the Bankruptcy Code provides requirements that a Chapter 11 plan must meet to be confirmed. Included in those requirements under § 1129(a)(8) is that each class of claims or interests either accept the plan or not be impaired by it. If this requirement is not met, the debtor may "cram down" the plan over objection of an impaired class by satisfying the requirements of § 1129(b). As Prairie seeks to modify the interest of the creditor CenterPoint by depriving it of one parcel of land securing its interest, it is impaired under the Code and has shown through objections that it will not accept the currently proposed Plan.

The one criterion under § 1129(b) is that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Subsection (b)(2)(A) sets out the requirements for what is "fair and equitable":

> § 1129(b)(2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements . . . (A) With respect to a class of secured claims, the plan provides –
> (i)(I) that the holders of a claim of such class retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims;
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
> (ii) for the sale, subject to 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

4

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i)–(iii).

### 2. Standard for Dismissal Under 11 U.S.C. § 1112(b)

Dismissal of a bankruptcy case is governed by 11 U.S.C. § 1112(b), which provides that ". . . on request of a party in interest, and after a notice and a hearing, the court shall . . . dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1). "Cause" includes "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this chapter or by order of the court." 11 U.S.C. § 1112(b)(4)(J). CenterPoint argues Debtor's Plan is not confirmable because it contains on its face violations of plan confirmation requirements in 11 U.S.C. § 1129(b)(2)(A). It also argues that this case, a single asset real estate case, has gone on for over eighteen months, longer than should be permitted. That period of time was deemed reasonable until now to allow for many legal issues and evidentiary disputes to be resolved, and because Debtor's property was found to be valuable and favorably located for hotel development. (Dkt No. 191)

However, Debtor has now had ample time to comply with its obligation to file a confirmable plan as a single asset entity. Debtor's counsel indicated in open court that its plan as modified partially by limited accommodations to CenterPoint objections is not likely to change. If Debtor indeed rests its fate on a failed Plan, the Chapter 11 case of this Debtor may have to be dismissed.

## II.    JURISDICTION

Jurisdiction lies under 28 U.S.C. §§ 157 and 1334 and District Court Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## III.    DISCUSSION

*A. Debtor's Plan Cannot be Confirmed Under 11 U.S.C. § 1129(b)(2)(A)(i).*

A Bankruptcy Plan in Chapter 11 must provide that a secured creditor retain its lien on all collateral securing its claim. Under the Plan in this case, CenterPoint would lose its lien on the Lakeside Parcel. Debtor suggests two arguments why 1129(b)(2)(A)(i) is either satisfied or inapplicable.

First, Debtor argues that 1129(b)(2)(A)(i)(I) requires only that CenterPoint retain its liens "to the extent of the allowed amount of such claims." The allowed amount of CenterPoint's

5

secured claim has been adjudged to be $ 50,458,075.75 plus possible further accruals for attorneys' fees and interest up to the maximum of the valuation found early in the case, a collateral value of $ 81,150,000. (Dkt. No. 313) Debtor assumes that after CenterPoint would be paid $35 million on property formerly valued at that amount, the balance of its claim would be protected by liens on other property. That is by no means certain. The value of security in Chapter 11 may be determined at different points in time depending on the reason for the valuation. 11 U.S.C. § 506(a)(1). CenterPoint has asked that the property be revalued for purposes of a confirmation hearing but that has not yet been done.

In any event, it is doubtful that the statute permits a debtor to partially strip a secured lender of its collateral in exchange for a cash payment under § 1129(b)(2)(A)(i) merely because that parcel was valued at one time in the amount offered. First it must be recognized that prior valuation of the real estate relied in part on the synergy of potential use of the parcels, i.e. usefulness of the aggregate of properties closely placed near McCormick Place for hotel development value. Depriving CenterPoint of its lien on the Lakeside property would deprive it not only of the land but also of whatever value can be attributed to that relationship between the parcels. A relationship of land that collectively showed great value for the Debtor is likewise of great security to the creditor.

Prairie argues that there is precedent for stripping a secured lender of its collateral under § 1129(b)(2)(A). It cites a Seventh Circuit case for the proposition that a secured lender's liens may be modified in bankruptcy. *In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992). There, a Panel of the Seventh Circuit affirmed confirmation of a Chapter 11 debtor's plan that provided for the secured creditor's claim to be paid over a term of seven years with a balloon payment at the end of that period. *Id.* at 173. In ruling that the plan could be crammed down on the secured creditor, the Panel permitted modification of the secured lender's liens under the indubitable equivalence provision of § 1129(b)(2)(A)(iii), not under § 1129(b)(2)(A)(i). *Id.*

Prairie argues that the transaction contemplated in this case is not novel and that courts regularly accept transactions similar to it. Its counsel cited other cases in which courts did permit the partial strip-off of a creditor's lien in exchange for payment but each of those cases analyzed whether such treatment gave the creditor the indubitable equivalent of its claim. *In re Bryant*, 439 B.R. 724, 747 (Bankr. E.D. Ark. 2010) (finding proposal to pay a secured creditor in exchange for release of junior lien was the indubitable equivalent of the creditor's claim); *Matter*

6

*of Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 449 (Bankr. N.D. Ga. 1994) (confirming plan that called for debtor to surrender a portion the collateral back to the creditor in partial satisfaction of the creditor's claim); *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 527–28 (S.D. Tex. 1990) (affirming confirmation of a plan of reorganization that provided creditor the indubitable equivalence of its claim by offering a mixture of cash payment and stocks).

Our Circuit recently made clear in the *River Road* case (discussed below) that a debtor may not proceed under the indubitable equivalence prong of § 1129(b)(2)(A)(iii) unless it proposes to treat a secured creditor in a way not contemplated by prongs (i) or (ii) of that provision. Because Debtor claims that it qualifies under § 1129(b)(2)(A)(i) and Debtor's Plan proposes that it retain possession and ownership of all real estate presently securing CenterPoint's lien, Debtor's Plan must provide that CenterPoint retain its liens in order to permit the Plan to be confirmed over CenterPoint's objection. *See In re Ahlers*, 794 F.2d 388, 400 (8th Cir. 1986) (requiring, in a case wherein the debtor proposed to remain on and use a farm securing loans, that debtor's reorganization plan propose that secured creditors retain a lien in the collateral securing the amount of their allowed secured claims). Since the statute says that liens must be retained "to the extent of the allowed amount" of a secured creditor's claims, Debtor argues that by giving cash for the subject parcel no lien need be retained for it.

A District Court case in the Eastern District of Pennsylvania addressed a similar situation and held that a debtor could not strip a secured lender of its liens by offering cash in exchange. In *Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33 (D.E.D. Pa. 1996), the District Court Judge noted the absence of a definition of the word "retain" used in § 1129(b)(2)(A)(i) by the Supreme Court or the Third Circuit precedent. In the absence of such guidance, the District Court Judge chose to interpret strictly the language in § 1129(b)(2)(A)(i), an approach that will be followed here. The provision requires that CenterPoint "retain the liens securing" its claims, a provision read to refer to all of those liens, even though they protect only to the extent of amounts of claims established.

At oral argument, CenterPoint conceded that Debtor's Plan might be confirmable under § 1129(b)(2)(A)(iii) were the Plan to propose a substitution of CenterPoint's collateral found to be the "indubitable equivalent." (Tr. at 98) As it stands, however, Debtor's Plan does not provide for that possibility, although a new parcel of land is proposed to be added to the property of the

7

reorganized Debtor. Should Debtor propose lien substitution instead of lien stripping, which might be a different case.

### B. *Debtor's Plan Cannot be Confirmed Under 11 U.S.C. § 1129(b)(2)(A)(ii).*

#### 1. Section 1129(b)(2)(A)(ii) Is the Exclusive Means By Which a Debtor May Cram Down a Chapter 11 Plan that Effectuates a Sale of Collateral.

In *In re River Road Partners, LLC*, a Panel of the Seventh Circuit considered an appeal from a bankruptcy court judge's order denying bid procedures sought by Chapter 11 debtors in connection with their plan of reorganization. 651 F.3d 642, 643 (7th Cir. 2011) *cert. granted sub nom, RadLAX Gateway Hotel, LLC, et al. v. Amalgamated Bank*, No. 11-166, 2011 LEXIS 9014 (Dec. 12, 2011). The bankruptcy judge in *River* found that the plan could not be confirmed over the objections of the debtor's secured creditor because it was not "fair and equitable" as required by 11 U.S.C. § 1129(b)(2)(A). *Id.* The plans sought to auction off substantially all of the Debtors' assets with proceeds to be distributed among creditors without permitting secured creditors to credit bid. Credit bidding permits a secured creditor to offset its claim against the purchase price of an asset when bidding to purchase the asset. Motions filed in connection with these plans requested court approval of proposed procedures for the sales. *Id.* at 645. One creditor, representing a group of lenders, objected on the basis that cram down requirements of § 1129(b)(2)(A) could not be satisfied because the plan sought to sell encumbered assets free and clear of liens without allowing the lenders to credit bid at the auctions. *Id.* The Debtors agreed that the plans did not comply with § 1129(b)(2)(A)(ii)'s credit-bidding requirements but argued that the plans met the standard for confirmation under § 1129(b)(2)(A)(iii). *Id.*

The Panel Opinion affirmed the bankruptcy judge after analyzing the relevant statute using traditional rules of statutory construction and by looking to protections afforded secured creditors in other parts of the Bankruptcy Code. Credit bidding protects secured creditors from the risk that a winning bid at auction will not capture the asset's full value, resulting in the creditor losing its lien for less than face value. The Opinion concluded that, "plans . . . only qualify as 'fair and equitable' under *Subsection (iii)* if they propose[] disposing of assets in ways that are not described in *Subsections (i)* and *(ii)*." *Id.* at 652 (emphasis in original). The Opinion reasoned that allowing debtors to cure violations of § 1129(b)(2)(A)(i) and (ii) by using the indubitable equivalence prong of (iii) "would render the other subsections of the statute superfluous." *Id.* As a result of *River Road*, Debtor cannot cram down on CenterPoint under 1129(b)(2)(A)(iii), by seeking to provide CenterPoint with the indubitable equivalent of its claim unless subsections (i)

8

and (ii) do not apply to a proposed plan. As discussed above, subsection (i) applies under Debtor's Plan. As discussed below, subsection (ii) also applies.

The parties disagree on how the Plan's treatment of CenterPoint's liens should be characterized. Debtor asserts that the Plan envisions nothing more than a "clear-cut recapitalization and reorganization through cash and non-cash equity contributions." (Resp. at 3.) In oral argument, Debtor's counsel explained that the Debtor is currently owned by two holding companies, Olde Prairie Owner, LLC and Lakeside Place, LLC. (Tr. at 20) If the Plan is confirmed, the Reorganized Debtor would be the same legal entity as Debtor but would be controlled by a joint venture with ownership divided between plan investors. *Id.* Debtor maintains that this would merely result in a change of ownership of the Debtor's LLC and not in a change to the entity itself. In support of this reasoning, Debtor's counsel noted that the Debtor possesses certain permits and plans necessary to proceed with the development of the land. *Id.* at 21. Presumably, those permits must remain in the Debtor's name to be effective. In addition, Debtor maintains that title to real estate owned by it will not be transferred. (Tr. at 22–23) Post-confirmation, the argument goes, the Debtor will remain the operating entity but controlled by new owners. *Id.* According to Debtor's counsel, "[t]his is not an asset sale. This, at most, is a replacement of membership interest or perhaps a stock transfer." *Id.* Debtor cites no authority in its briefs to support its position that the proposed transaction is not, in fact, a sale but rather a recapitalization. CenterPoint argues that the Plan calls for a transfer of control over Debtor's property in exchange for value and is therefore a sale. (Reply at 4, 6.) Pursuant to the Plan, all of the Debtor's assets will become assets of the reorganized Debtor. Nonetheless, the effect of the proposed Plan on CenterPoint would be the same as if Debtor were to sell the Lakeside parcel for $35 million without allowing that secured creditor to credit bid on the sale.

### 2. The transaction in this case is a sale.

Neither the term "sale" nor "recapitalization" are defined in the Code. Black's Law Dictionary defines recapitalization as follows: "An adjustment or recasting of a corporation's capital structure – that is, its stocks, bonds, or other securities – through amendment of the articles of incorporation or merger with a parent or subsidiary." Black's Law Dictionary 1295 (8th ed. 2004). A sale is defined as "[t]he transfer of property or title for a price. *Id.* at 1364. There is little in the way of caselaw or precedent discussing or defining recapitalization in the context of bankruptcy and nothing could be found in the court's research distinguishing a

9

recapitalization from a sale. Briefs of the parties did not submit helpful research on those questions under the Bankrupty Code.

However, there is substantial precedent in cases involving the tax code. The term "recapitalization" appeared in at least two Supreme Court decisions analyzing the predecessor to 26 U.S.C. § 368 that lists certain corporate transactions exempt from taxation. In *Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 202 (1942), the Supreme Court defined a recapitalization as a "reshuffling of a capital structure, within the framework of an existing corporation." In this case, the cash and non-cash equity investors have no prior interest in the Debtor although the non-cash equity investor is married to the Debtor's manager. (Updated Third Amended Plan of Reorganization at 17 n.2) The Supreme Court further added in a later case that a recapitalization is "a new form of the previous participation in the enterprise, involving no change of substance of rights and relations of the interested parties one to another or to the corporate assets. *Bazley v. Comm'r*, 331 U.S. 737, 740 (1947). Under this standard, the transaction proposed under Debtor's Plan cannot be characterized as a "recapitalization."

Importantly for the Debtor here, in *Bazley* the Supreme Court declined to give a firm definition of the term "recapitalization" and instead considered the meaning of that term within the context of the tax code provision there in issue. *Id.* at 741. In the absence of contrary statutory authority or precedent, it is also logical to consider the proposed transaction at issue here in light of the bankruptcy code provision at issue. In *River Road*, the Seventh Circuit Panel noted that permitting a debtor to avoid strictures imposed by subsections (i) and (ii) of § 1129(b)(2)(A) conflicts with the ways that the interests of secured creditors are treated in other parts of the Code. *In re River Road Partners, LLC*, 651 F.3d 642, 652–53 (7th Cir. 2011). The Panel Opinion, upon reviewing sections of the Code "related to plan sales of encumbered property free of its liens, as well as sections concerning the protection afforded to secured creditors" stressed the interest under Bankruptcy law in properly compensating secured creditors. *Id.* at 653 (citing *In re Philadelphia Newspapers*, 599 F.3d 298, 331 (3d Cir. 2010) (Ambro, J., dissenting). That interest is protected in part by sections 363(k) and 1129(b)(2)(A)(ii) of the Code, which "provide a secured creditor with a right to credit bid whenever a debtor attempts to sell the asset that secures its debt free and clear of its lien." *River Road*, 651 F.3d at 653. Allowing the Debtor here to circumvent requirements of § 1129(b)(2)(A)(ii) by labeling the transaction a "recapitalization" that has precisely the same effect and consequence on the

10

creditor as a sale of property free and clear of the lien would eviscerate CenterPoint's rights through a procedural device with a different name.

One Opinion was discovered that, at first glance, would seem to support Debtor's position that the Plan does not implicate § 363(k)'s credit-bidding rights. In *In re PWS Holding Corp. Bruno's, Inc.*, 228 F.3d 224 (3d Cir. 2000), the Panel of the Third Circuit considered briefly whether recapitalizations are sales for purposes of the Bankruptcy Code. Under consideration in that case was a transaction labeled a "leveraged recapitalization." *Id.* at 230. In that transaction, existing shareholders of the debtor were bought out with financing from a revolving line of credit and term loan facility provided by a bank, a cash equity contribution, and issuance of notes subject to an indenture. *Id.* The debtor's plan called for old equity owners to be wiped out and for issuance of stock to the debtor's creditors. *Id.* at 247. The Opinion recognized that the transaction, for tax purposes, "was accomplished by transferring substantially all of the assets of the Debtors to a creditor's representative and immediately thereafter to a newly created Bruno's Supermarkets [the same name as the debtor in the case], a corporation whose equity is owned by the senior lenders." Nonetheless, it rejected a dissatisfied creditor's contention that the recapitalization was a "sale" of the debtor's assets subject to the requirements of § 363. *Id.*

In ruling that § 363 was inapplicable in the case, the Opinion stated, "just because a transaction is a sale or exchange for tax purposes does not mean it is a sale within the meaning of the [Bankruptcy] Code." *Id.* That Opinion cited precedent that looked to the economic substance of the transaction to determine whether a sale took place. *Id.* at 248 (citing *In re PCH Assocs.*, 804 F.2d 193, 201 (2d Cir. 1986); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 546 (3d Cir. 1979). In the *Major's Furniture Mart* case, a Panel of the Third Circuit considered whether an agreement for sale of accounts receivable merely created instead a security interest in those receivables. In finding that no sale occurred, the Opinion ignored the labels attached by the parties to the transaction. *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543 (3d Cir. 1979). Instead, it analyzed principally the nature of recourse available against the purported seller. *Id.* at 545. If the purported seller retained the risk of uncollected accounts, then no sale could be found to have taken place. *Id.*

Applying the *Major's* analysis to this case, the Plan Investor Offer ("the Offer"), a letter from Winners Development LLC 3 (the cash equity investor) to the Debtor and Landmark America LLC (the non-cash equity investor), lays out terms of the proposed transaction.

11

(Updated Third Amended Plan Ex. 1) The offer clearly states that it "does not constitute an offer to sell or purchase any securities of the Debtor. *Id.* Yet, paragraph 5 of that document also provides that "[a]s consideration for the Cash Equity Contribution ($35 million of which would be used to pay CenterPoint) and the Non-Cash Equity Contribution, the Plan will provide that the only equity interests in the reorganized Debtor will be owned by the Plan Investor (Winners Development) and Landmark." *Id.* at ¶ 5. The upshot of the Plan would be that ownership of the reorganized Debtor would be vested in two entities currently unrelated to the Debtor. Consequently, the Plan Investors, as new owners of the Debtor would hold all of the risk associated with developing the property. In *Major's*, the purported seller of accounts was required to warrant the collectability of those accounts, to conduct credit checks to verify collectability, and was obligated to indemnify the purported buyer for losses caused by non-collection of the accounts. Here, neither the Plan nor the Offer contain similar terms or requirements. Applying the *Major's* analysis here confirms that the Plan Investors would buy Debtor's assets in an outright sale because no indemnification is available to the Plan Investors against them should the enterprise fail.

In sum, the Plan here provides that all Debtor's assets be transferred to control of new principals in exchange for assumption of the Debtor's liabilities to all creditors. As set forth in the Disclosure Statement, Landmark America, LLC and Winners Development LLC 3 will each be 50% owners of a new joint venture, in exchange for equity contributions made to the Joint Venture including Cash and Non-Cash Equity Contributions. Neither entity is related to the Debtor at this time. This would thus be a transfer of ownership of rights in the Debtor and its assets to new owners of those rights in exchange for cash and property, a transaction normally defined as a sale. Title to the real estate held by the LLC would not change but control of the Debtor itself would be transferred to entirely new entities and CenterPoint would lose lien rights in one parcel. Since this would effectively constitute a sale, Debtor's Plan must provide CenterPoint with a right to credit bid its claim.

### 3. Debtor has not shown that CenterPoint should be restricted from credit-bidding.

Under language of 11 U.S.C. § 363(k), a creditor's right to credit bid may be abrogated "for cause." Debtor suggests that CenterPoint should be denied its right to credit bid because it has behaved in a way designed "geared solely to disrupt Debtor's confirmation." (Resp. at 5 n.5) It complains of the earlier battles by CenterPoint opposing efforts to reorganize, and to present

12

objections that it considers spurious. *Id.* Debtor contends that this provides a basis upon which to deny CenterPoint its right to credit bid under § 363(k). *Id.*

A secured creditor's ability to credit bid is within the discretion of the court and is not absolute. *see also In re N.J. Affordable Homes Corp.,* No. 05-60442 (DHS), 2006 WL2128624, at *16 (Bankr. D.N.J. June 29, 2006) (noting that a bankruptcy court retains the authority to deny a secured creditor the ability to credit bid for "cause"); *In re Theroux,* 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) (holding that "there is no absolute entitlement to credit bid"). The term "cause" is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis. *In re N.J. Affordable Homes Corp.,* 2006 WL 2128624, at * 16 (finding that cause is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis"); *In re River Road Hotel Partners, LLC,* No. 09-30029 (BWB), 2010 WL 6634603, at *1 (Bankr. N.D. Ill. Oct. 5, 2010) (holding that "[s]ection 363 gives courts the discretion to decide what constitutes 'cause' and the flexibility to fashion an appropriate remedy by conditioning [*37] credit bidding on a case-by-case basis."), *aff'd River Road Hotel Partners, LLC v. Amalgamated Bank,* 651 F.3d 642 (7th Cir. 2011).

Courts have found "cause" under § 363(k) to bar a secured creditor from credit bidding when the creditor's lien is questioned or otherwise in dispute. *See, e.g.. In re Daufuskie Island Props., LLC,* 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (holding that a creditor was not entitled to credit bid when its mortgage was in dispute); *Nat'l Bank of Commerce v. McMullan (In re McMullan),* 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "at any such sale, [the secured creditor] shall not be entitled to offset any of its claimed liens or security interests under 11 U.S.C. § 363(k) because the validity of its liens and security interests are unresolved.") *aff'd,* 162 F.3d 1164 (8th Cir. 1998). In this case, challenges to the CenterPoint claim have been soundly defeated following litigation, subject to appeal. No facts have been pleaded to show that cause now exists to deny CenterPoint its right to credit bid.

## CONCLUSION

For reasons stated above, the Motion to Dismiss will be granted unless Debtor promptly makes changes to its Plan so that it would no longer present the foregoing problems.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this ___ day of December, 2011.

13