UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                              )
                                    )      No. 10 B 22668
OLDE PRAIRIE BLOCK OWNER, LLC       )
                                    )      Chapter 11
                  Debtor.           )

## MEMORANDUM OPINION ON CENTERPOINT PROPERTIES MOTION TO MODIFY THE STAY OR IN THE ALTERNATIVE TO DISMISS

Nineteen months after filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, Olde Prairie Block Owner, LLC ("Debtor") has submitted its Fourth Amended Plan of Reorganization (Dkt. 1161) to seek confirmation. Its secured creditor, CenterPoint Properties Trust ("CenterPoint"), moved early in the case to Modify the Stay or in the Alternative to Dismiss. Following hearing at that time the stay motion was conditionally denied and ruling on dismissal delayed to give Debtor time to develop what then appeared to be a promising reorganization. As Debtor's prospects diminished CenterPoint renewed its request to modify stay and dismiss. Debtor's prospects have not attracted sufficient investor capital to demonstrate feasibility of its latest Plan so the current CenterPoint Motion will be allowed.

### Background

This matter relates to a long-running dispute between Debtor and CenterPoint over real estate securing a loan from CenterPoint. The real estate consists of two parcels of choice real estate located near McCormick Place in Chicago, Illinois and owned by the Debtor. The first parcel, known as the "Olde Prairie Property," is located at 230 E. Cermak Road in Chicago. The second parcel, known as the "Lakeside Property," is located at 330 E. Cermak Road in Chicago. Debtor has planned that these properties would be developed into a hotel complex. Debtor also holds a long-term lease ("the Parking Lease") with the Metropolitan Pier and Exposition Authority ("MPEA") that bestows on the Debtor rent-free use of 450 parking spaces at the McCormick Place parking garage until 2203.

On February 22, 2008, Debtor executed a promissory note for a loan from CenterPoint in the amount of $37,127,667.03 secured by Debtor's real estate so as to pay off a prior loan. That note matured and was due and payable on February 21, 2009 but Debtor defaulted. CenterPoint

filed a foreclosure action on February 24, 2009, and on May 28, 2009, the Circuit Court of Cook County appointed a receiver to manage Debtor's properties. When Debtor filed for bankruptcy, it owed CenterPoint $48,438,758.49 on the note. As of this writing, CenterPoint is owed at least $50,458,075.05.

Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 18, 2010. It was found early in this case that this is a single asset real estate case subject to special treatment under the Bankruptcy Code. Less than a month after Debtor's petition, CenterPoint moved to dismiss Debtor's bankruptcy case or in the alternative to lift the automatic stay so as to permit its foreclosure action to proceed. The request to modify the stay was heard first and separately from the motion to dismiss. That request was denied. *In re Olde Prairie Block Owner, LLC.*, 2010 Bankr. LEXIS 3929 (Bankr. N.D. Ill. Oct. 29, 2010). That ruling was premised on Debtor's ability to file a confirmable plan within the shortened time frame that applies to single asset real estate cases. *Id.* at *10. It was held based on evidence at the lift stay hearing that the value of the site gave Debtor some equity and prospects for a successful plan were likely *Id.*

Following months of further activity including failed litigation in which Debtor sought to reduce CenterPoint's claim through several counterclaims (*see e.g., In re Olde Prairie Block Owner, LLC.*, 441 B.R. 298 (Bankr. N.D. Ill. 2010); *In re Olde Prairie Block Owner, LLC.*, 442 B.R. 675 (Bankr. N.D. Ill. 2011)), the Motion to Dismiss was again considered following Debtor's submission of its "Updated Third Amended Plan." CenterPoint objected to that Plan as containing several violations of confirmation requirements under 11 U.S.C. § 1129. Following briefing, it was determined that Debtor's Plan would impermissibly strip CenterPoint of the lien securing its claim in violation of 11 U.S.C. § 1129(b)(2)(A)(i) and would unlawfully deprive CenterPoint of its statutory right to credit-bid its claims as provided under 11 U.S.C. § 1129(b)(2)(A)(ii). *In re Olde Prairie Block Owner, LLC.*, 2011 Bankr. LEXIS 5133, *27 (Bankr. N.D. Ill. Dec. 23, 2011). The Opinion on that ruling warned that the still pending Motion to Dismiss ". . . will be granted unless Debtor promptly makes changes to its Plan" so that it would no longer present the problems found. *Id.* at *29. Debtor has since submitted the most recent and pending version of its Plan, and CenterPoint renewed its request to lift the automatic stay and dismiss Debtor's bankruptcy case.

CenterPoint argues *inter alia* that the latest plan is not financially feasible and that it is also has legal defects for a number of reasons. It seeks dismissal on the basis that Debtor has had ample opportunity to present a confirmable plan but has been unable to do so.

The only issue addressed here is whether the Debtor's Plan is economically feasible. If not, then the Plan is not confirmable and the automatic stay should now be lifted and the case dismissed.

### Jurisdiction

Jurisdiction lies under 28 U.S.C. § 1334 and Internal Operation Procedure 15(a) of the District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## DISCUSSION

### Circumstances Warranting Modification of the Stay

CenterPoint contends that circumstances warrant lifting the automatic stay under 11 U.S.C. § 362(d)(3). That provision was added to the Bankruptcy Code as part of 1994 amendments to the Code to impose an expedited time frame for filing a plan in a single asset real estate case. It reflected a concern by Congress about delays in the bankruptcy process and the resulting unfairness to secured lenders when single asset real estate projects are involved. In re LDN Corp., 191 Bankr. 320 (Bankr. E.D. Va. 1996). *Collier on Bankruptcy* suggests that the purpose of section 362(d)(3) is to "address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully. ¶ 362.07(5)(b).

Under § 362(d)(3), a single asset real estate debtor may not take an unlimited time in which to file a plan that "has a reasonable possibility of being confirmed within a reasonable time." Rather, it requires that a debtor file a potentially confirmable plan within 90 days of the petition date. Debtor did timely file a Plan that seemed originally to meet that test and have that promise. However, Debtor has since filed several plans that were either withdrawn after objection or denied confirmation. It has had ample time to show whether it can file a confirmable plan.

3

**The Feasibility Standard**

Section 1129(a)(11) of the Bankruptcy Code codifies a feasibility standard for confirmation of a Chapter 11 Plan. Section 1129(a)(11) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

11) Confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the plan.

It has been suggested that the purpose of this section is to "prevent an abuse of visionary schemes which promise creditors and equity security holders more under a proposed plan [than] the debtor can possibly attain after confirmation . . . to prevent an abuse of the reorganization process . . . [and] promote the willingness [of future creditors] to extend the credit that such companies frequently need." *In re Agawam Creative Marketing Assoc. Inc.*, 63 B.R. 612, 619 (Bankr. D. Mass. 1986) (internal quotations and citations omitted).

Confirmation in Chapter 11 cannot be approved unless the bankruptcy judge make a specific finding that the proposed plan is feasible. *Financial Sec. Assur. v. T-H New Orleans Ltd. Pshp. (In re T-H New Orleans Ltd. Pshp.)*, 116 F.3d 790, 801 (5th Cir. 1997). If the plan is not feasible, a bankruptcy judge need not consider other objections to confirmation. *In re Chadda*, 2007 Bankr. LEXIS 4213, at *12 (Bankr. E.D. Pa. 2007). Plan proponents bear the burden of demonstrating feasibility by a preponderance of the evidence. *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

In determining whether a plan is feasible, the bankruptcy court need not find that it is guaranteed to succeed; "[o]nly a reasonable assurance of commercial viability is required." *Matter of 203 N. LaSalle St. P'ship*, 126 F.3d 955, 961-62 (7th Cir. 1997), *rev'd on other grounds*. On the other hand, a plan meets the feasibility standard only if it "offers a reasonable prospect of success and is workable." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 674 (D. Ariz. 1994). The central inquiry is "whether there is a reasonable probability the provisions of the plan can be performed." *In re G-1 Holdings, Inc.*, 420 B.R. 216, 267 (D.N.J. 2009). Furthermore, "[s]incerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises." *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985). Rather, the feasibility test "is firmly rooted in predictions based on objective facts." *In re Hoff*, 54 B.R. 746, 752 (Bankr. D.N.D. 1985) (citing *In re Clarkson*, 767 F.2d 417, 429 (8th Cir.

4

1985)). A Fifth Circuit Opinion stated that "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. Debtors are not required to view business and economic prospects in the worst possible light. " *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997). Furthermore, under the feasibility test, the judge "views the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." 9 *Collier on Bankruptcy*, at 1139. *Matter of Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978).

For reasons described more fully below, Debtor's current Plan on its face fails to satisfy any formulation of the feasibility standard.

**Plan Language and Treatment of CenterPoint's Claim**

Debtor's Plan contemplates seven classes of creditors. Three of those classes are impaired, most notably Class 4 (consisting of CenterPoint's Claim with respect to its pre-petition loan to Debtor). (Plan ¶ 3.3) Only CenterPoint has thus far objected to plan confirmation.

At a recent hearing on status of the Debtor's Plan and Disclosure Statement, Debtor's counsel was questioned on and defended the Plan's feasibility and relied repeatedly on the information found in Section 5.1 of the Plan. That section describes the proposed treatment of CenterPoint's claim. It reads in pertinent part:

> For purposes of this Plan, based on an estimated claim of $65,000,000, CenterPoint would receive the executed Plan Note on account of [its] Claim. The Plan Note, and related documentation, would containing [*sic*] the following terms and conditions: (i) interest will accrue at seven percent (7%) per annum . . . . and, commencing in the first (1st) month after the Effective Date, be paid on a monthly basis, at the Reorganized Debtor's option, either in cash or in kind and automatically added to the outstanding principal balance, (ii) a term of three years, (iii) monthly principal payments, commencing in the thirteenth (13th) month after the Effective Date, of an amount determined by reference to a twenty (20) year amortization schedule, (iv) prepayable in whole or in part without premium or penalty, (v) secured by a first priority mortgage on the Olde Prairie Property and the Lakeside Property and a first priority assignment of the Parking Lease (collectively, the "Plan Security Documents") . . . .

Therefore, execution of the Plan requires that Debtor pay off a Plan Note made to CenterPoint three years after the effective date of the Plan. Debtor forecasts that CenterPoint will be owed $65 million on its claim at the conclusion of the Plan (an amount described as "generously conservative" by CenterPoint's counsel). Therefore, the Plan Note would require payment from the reorganized Debtor of at least $65 million and possibly up to $79 million (if CenterPoint's figures are accepted) within three years of the Plan's effective date. Debtor argues that its Plan is feasible and that it has provided an adequate means for implementation. The Debtor proposes to pay back the note in several ways. Each element is reviewed here to determine whether Debtor will likely be able to follow through on those elements. Even if Debtor's projection of $65 million to be paid is accurate, whether it can make that payment is highly speculative.

a. The Plan Investor Offer

Debtor proposes that the Plan be funded in part by Winners Development, LLC ("the Plan Investor"). Amended Exhibit 1 to Debtor's Fourth Amended Plan is an offer letter from the Plan Investor. In that letter, the Plan Investor outlines the basic terms and conditions for a loan in the amount of $6 million to be made to Debtor to fund the Plan. This initial cash payment, called the "Mezzanine Loan" by Debtor, will evidently be used to pay in full debtor-in-possession claims, pay in full or any agreed amount to holders of administrative expenses, and pay allowed unsecured claims cash distributions outlined in the Plan. (Plan, at 17 ¶ 8.2) The letter also specifies that the Mezzanine Loan be increased if necessary "to an amount equal to the difference between the amount of [CenterPoint's] Claim and eighty percent (80%) of the fair market value of the Plan Collateral." (*Id.*) Debtor argues that any increase in the Plan Conversion Loan, in combination with other provisions of the Plan, will be sufficient to pay in full the outstanding principal amount of CenterPoint's loans. (*Id.*) But the commitment letter does not legally obligate the Plan Investor to any amount beyond the $6 million, and reliance on its vague statement as to a possible funding increase cannot show feasibility.

b. Economic Projections

Debtor also relies on assertions that it is eligible for Tax Increment Financing ("TIF") and tax credit benefits. It acknowledged at a recent hearing on an earlier Plan that some of these benefits may be delayed for up to a year but insisted that they will be available within the term of the plan or when principal payments come due to CenterPoint (Tr. 18: 11–17) At a hearing on

6

debtor-in-possession financing in January of 2011, witness testimony established that obtaining TIF funds and tax credits requires an application process that "typically" takes a year and a half. (Tr. 1/21/11 (McKenna) 148:24–149:5) Debtor's principal Pamela Gleichman testified early last year that construction of Phase 1 (the hotel development) would take at least two years. (Tr. 1/21/11 (Gleichman) 126:24–127:4)

However, in addition to whatever actual economic benefits that may be received pursuant to TIF and tax credits that could raise value of the Debtor's property Debtor relies on investor financing to become available as the investor market sees value rise attendant to those benefits. (Tr. 19:15–21) Debtor's counsel said that he expects that financing will become available within the coming year. (Tr. 20:1–2) When asked where the financing was expected to come from, he replied that Debtor expected the Plan Investor to make a further investment. (Tr. 20:7–15) Debtor's counsel insisted that the Plan Investor is committed in some way to invest the funds necessary to support of the plan upon confirmation. (Tr. 9:14–22) However, it is clear that there exists no present firm commitment from the Plan Investor to make additional contributions to the Debtor's Plan over the initial $6 million. The Plan Investor offer makes no commitment to continued investment beyond the initial cash infusion. (Amended Exhibit to Fourth Amended Plan of Reorganization 1)

Debtor also relies on projections by HVS, a hospitality consultant in Chicago. Paragraph V.C. in the Disclosure Statement. (Dkt. 1160) That Paragraph reads:

> The Fourth Amended Plan has been developed based on the Debtor's experience and upon the advice of certain entities with expertise in the real estate and hospitality professions. Based upon this background and expertise, the operation and development of the Lakeside Property has a high degree of success. As the economy and real estate markets continue to improve, Debtor anticipates that it will be able to execute its Fourth Amended Plan. Morgans Hotel Group has provided Debtor with a conservative estimate of financial projections over the next several years. For the first phase, 1167 room convention hotel, HVS performed a feasibility study with conservative estimates of both revenues and EBITDA for the first 10 years of operations. HVS projects the project will generate over $89 million in revenue and over $29 million in EBITDA in the first year of operation. Combined hotel and retail EBITDA will grow to over $50 million by year 7.

That very optimistic projection must be tested against lack of current investor interest in contributing adequate capital to support Debtor's Plan.

The projections themselves are predictions and provide no means of implementation as required under 11 U.S.C. § 1123(a)(5). *See In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994). Section 1123(a)(5) is located in the statutory provision that specifies required contents of a Chapter 11 plan. It contains a non-exclusive list of means of adequate implementation. § 1123(a)(5)(A)–(J). In this case, HVS does not specify any source of funds available to pay CenterPoint in full the funds required by the Plan to be paid at the end of three years following confirmation.

It appears, moreover, that Debtor does not expect any significant cash flow from operations before CenterPoint would be entitled to its payment. Even if Debtor secures TIF funding, and secures the various financing commitments necessary to proceed with construction, and completes the hotel project so it can earn revenue as projected by HVS, Debtor would most likely achieve those goals at some time after payment would be due to CenterPoint as provided in the Plan Note. Debtor's Plan therefore does not even on its face satisfy statutory requirements for confirmation of a Chapter 11 Plan.

There are too many uncertainties, financial and other, to rely on Debtor's ability to complete its hotel and obtain new financing in time to meet the Plan timetable.

**Debtor's Plan Does not Have a Reasonable Possibility of Being Confirmed Within a Reasonable Time**

A Panel of the Court of Appeals for the Seventh Circuit recently affirmed dismissal of a single asset real estate case in which the debtor was unable to file a confirmable plan within a time period much shorter than in this case. In *In River East Plaza, LLC.*, No. 11-3263, 2012 U.S. App. LEXIS 1048 (7th Cir. 2012), the Panel agreed with the bankruptcy judge's decision to dismiss the case after the debtor filed two plans that were legally deficient. Although the debtor filed a third plan that might have been confirmable, the bankruptcy judge dismissed the case anyway. Affirming the dismissal, the Panel Opinion held that:

> [t]he third proposal left the Chapter 11 proceeding still far from completion, because there was bound to be wrangle over the current value of the building and the proper interest rate. With [the debtor] having compromised its credibility by submitting two plans that sought to circumvent the statute, the 90-day deadline [for filing a confirmable plan] having expired long ago (the Chapter 11 plan was filed on February 10,

8

2011, and the third proposed plan on August 23 – 194 days later), the [secured creditor] having waited years to enforce its lien, the bankruptcy judge was not required to stretch out the Chapter 11 proceeding any longer.

*Id.* at *19. Debtor cannot fare any better in this case. The *River East* Opinion emphasized that "the Bankruptcy Code directs speedy resolution of single asset real estate bankruptcies . . . ." *Id.* at *2; *see also In re Scotia Pacific Co.*, 508 F.3d 214, 225 (5th Cir. 2007) ("SARE debtors are carved out and subjected to stringent requirements under § 362(d)(3).").

## CONCLUSION

This Debtor has had ample opportunity to present a confirmable plan for use of its property, but remains unable to demonstrate economic feasibility. Therefore, it is proper to lift the automatic stay and dismiss this case so that CenterPoint can proceed with its foreclosure action.

Though the land owned by Debtor is choice and it will likely prove someday to be the site of a prosperous hotel, this case pends during in a still depressed real estate market in which investors have not yet stepped forward with sufficient resources to enable Debtor's reorganization to have an opportunity for success. The investor market is not yet ready to back the Debtor adequately. Therefore, Debtor cannot now demonstrate that there is a reasonable prospect of feasible reorganization even though a generous time period has been afforded for it to do so.

Other legal issues have been asserted by CenterPoint under the Plan, some of which might be resolved by amendment or clarification, but since the economic wherewithal is not present those issues need not be addressed.

Therefore CenterPoint's Motion to Lift the Stay and its Motion to Dismiss will be granted by separate order. The status date heretofore set on April 4, 2012 will be used to consider such an order to be proposed by CenterPoint's counsel.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 14th day of March, 2012.

9